1                THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF HAWAII

3

4    UNITED STATES OF AMERICA,    )  CR. NO. 22-00099-JMS
                                  )
5              Plaintiff,         )  Honolulu, Hawaii
                                  )
6         vs.                     )  October 18, 2023
                                  )
7    MATTHEW MCBRAUN,             )  JURY TRIAL - DAY 2
                                  )
8              Defendant.         )
                                  )
9    _____)

10

11              TRANSCRIPT OF PROCEEDINGS (DAY 2)
              BEFORE THE HONORABLE J. MICHAEL SEABRIGHT
12                UNITED STATES DISTRICT JUDGE

13   APPEARANCES:

14   For the Government:        AISLINN K. AFFINITO, AUSA
                                MICHAEL DAVID NAMMAR, AUSA
15                              Office of the United States Attorney
                                PJKK Federal Building
16                              300 Ala Moana Boulevard, Room 6-100
                                Honolulu, Hawaii 96850
17
     For the Defendant:        CRYSTAL GAIL K. GLENDON, ESQ.
18                             Law Office of Crystal Glendon, LLLC
                                1130 N. Nimitz Highway, Suite B-299
19                             Honolulu, Hawaii 96817

20

21

22   Official Court            ANN B. MATSUMOTO, RPR
     Reporter:                 United States District Court
23                             300 Ala Moana Boulevard, Room C-338
                                Honolulu, Hawaii 96850
24

25   Proceedings recorded by machine shorthand, transcript produced
     with computer-aided transcription (CAT).

1                          I N D E X

2   WITNESSES                                  PAGE NO.

3   FOR THE GOVERNMENT:

4    TYLER GANZEL

5     DIRECT EXAMINATION                              5

6     CROSS-EXAMINATION                             60

7     REDIRECT EXAMINATION                          88

8     RECROSS-EXAMINATION                           89

9    JOSH KENT

10    DIRECT EXAMINATION                        90, 103

11    CROSS-EXAMINATION                            106

12   JOSEPH SOEKA

13    DIRECT EXAMINATION                       115, 157

14    CROSS-EXAMINATION                            166

15   YOSHIYUKI KIKUSHI, D.O.

16    DIRECT EXAMINATION                           167

17    CROSS-EXAMINATION                            182

18   DOLORES DeLIMA

19    DIRECT EXAMINATION                           186

20    CROSS-EXAMINATION                            215

21    REDIRECT EXAMINATION                         234

22

23

24

25

1                      E X H I B I T S

2                                                    PAGE  NO.

3    Government Exhibits 1 and 9 received            16
     in evidence
4
     Government Exhibits 2 and 10 received           19
5    in evidence

6    Government Exhibit 3 received in evidence        95

7    Government Exhibit 4 received in evidence        97

8    Government Exhibit 5 received in evidence        22

9    Government Exhibit 5A received in evidence      126

10   Government Exhibit 6 received in evidence       106

11   Government Exhibit 7 received in evidence        25

12   Government Exhibits 11 and 12 received           87
     in evidence
13
     Government Exhibit 13 received in evidence      175
14
     Government Exhibit 15 received in evidence       46
15
     Government Exhibit 16 received in evidence       33
16
     Government Exhibit 31 received in evidence       35
17
     Government Exhibits 32 and 33 received           54
18   in evidence

19   Government Exhibit 34 received in evidence       37

20   Government Exhibit 35 received in evidence       39

21   Government Exhibit 38 received in evidence       75

22   Government Exhibit 41 received in evidence      160

23   Government Exhibit 43 received in evidence      134

24   Government Exhibits 45 and 46 received          128
     in evidence
25

```
 1   WEDNESDAY, OCTOBER 18, 2023                8:37 O'CLOCK A.M.
 2             (Open court in the presence of the jury.)
 3             COURTROOM MANAGER:  Criminal Number 22-00099-JMS,
 4   United States of America versus Matthew McBraun.
 5             This case has been called for a jury trial, Day 2.
 6             Counsel, please make your appearances for the record.
 7             MS. AFFINITO:  Good morning, Your Honor.  Aislinn
 8   Affinito and Michael Nammar for the United States.  Also
 9   present with us is Frances Vess, our paralegal, and DEA Task
10   Force Officer Jared Lee.
11             THE COURT:  All right.  Yes.  Good morning to all of
12   you.
13             MS. GLENDON:  Good morning, Your Honor.  Crystal
14   Glendon on behalf of Mr. McBraun, who's standing right here to
15   my left.
16             THE COURT:  All right.  Thank you.  Good morning to
17   both of you.  You may be seated.
18             And most importantly, good morning, ladies and
19   gentlemen.  Hope you had a pleasant evening and fought the
20   traffic okay to get in this morning, and we are ready to start
21   with Day 2.
22             So your next witness.
23             MR. NAMMAR:  United States calls Special Agent Tyler
24   Ganzel.
25             THE COURT:  Okay.
```

```
 1              Yeah, you all can get your notepads and iPads.
 2              COURTROOM MANAGER:  Good morning, Mr. Ganzel.  Can
 3  you please take the stand?
 4              Please raise your right hand.
 5              TYLER GANZEL, GOVERNMENT'S WITNESS, SWORN.
 6              THE WITNESS:  I do.
 7              COURTROOM MANAGER:  Please be seated.  State your
 8  full name, spelling your first and last name for the record.
 9              THE WITNESS:  Yes, ma'am.  My name is Tyler,
10  T-Y-L-E-R.  Last name is Ganzel, G-A-N-Z-E-L.
11                      DIRECT EXAMINATION
12  BY MR. NAMMAR:
13  Q    Agent Ganzel, good morning.
14  A    Good morning.
15  Q    How are you employed?
16  A    I'm a special agent with the Drug Enforcement
17  Administration.
18  Q    And how long have you been with the DEA?
19  A    I've been an agent for five years.
20  Q    And what offices have you been assigned to?
21  A    Originally I was in Charlotte, but then my first office is
22  Honolulu.
23  Q    And what are your duties as a DEA agent?
24  A    I investigate federal controlled substance violations.
25  Q    And what are some of the types of substances you
```

1    investigate?

2    A     On this island's mainly meth and now fentanyl.

3    Q     And what is your area of responsibility?

4    A     My area of responsibility is the state of Hawaii.

5    Q     Okay.  So you cover the entire state?

6    A     That's correct.

7    Q     Okay.  Tell us about your professional experience before

8    joining the DEA.

9    A     I was four years as an attorney, two years as a prosecutor

10   in American Samoa, and then two years as representing victims

11   of domestic violence.

12   Q     How far did you go in school?

13   A     I have a law degree.

14   Q     From where?

15   A     From Charlotte School of Law.

16              THE COURT:  I'm sorry.  What?

17              THE WITNESS:  Charlotte law.

18              THE COURT:  School of law?

19              THE WITNESS:  Sorry.

20              THE COURT:  Like Charlotte, North Carolina?

21              THE WITNESS:  Yes, sir.

22              THE COURT:  Okay.

23   BY MR. NAMMAR:

24   Q     I want to turn your attention now to October 9th, 2022.

25   Were you working on that day?

1    A    I was.

2    Q    And did you respond to a residence in Hawaii Kai?

3    A    I did.

4    Q    Why?

5    A    It was reported of an overdose at the residence.

6    Q    Where did you go in Hawaii Kai?

7    A    It was -- the address was 711 Kalalea, which is near

8    Kaiser High School, out in Hawaii Kai.

9    Q    And what time, around what time did you respond?

10   A    I got there around 2:45 in the afternoon.

11   Q    Did you respond alone or did you go with anyone else?

12   A    I respond with one of our task force officers with HPD,

13   Jared Lee.

14   Q    And do you see Mr. Lee in the courtroom?

15   A    Yes, he's sitting behind the prosecutor's table.

16   Q    What is a task force officer?

17   A    They are with the local department, but they're deputized

18   with our agency.

19   Q    And what local department is Officer Lee with?

20   A    Honolulu Police Department.

21   Q    Okay.  What did you observe when you responded on

22   October 9th to the residence in Hawaii Kai?

23   A    I pulled into the driveway and I remember observing

24   several family members, probably 10, 15 that were in the -- the

25   garage grieving, clearly.  Walked into the residence and

1    observed what appeared to be the grandmother, who wasn't crying

2    at the time but clearly she had been crying because of the bags

3    under her eyes, and she was kind of like absently there but

4    there.

5        I walked into the bedroom in the back of the house and

6    observed the deceased laying face down and contorted in the

7    bedroom floor.

8    Q    Did you notice any items of significance on the floor in

9    the bedroom?

10   A    There were some small baggies that later I looked at were

11   empty, that were laying around his body.

12   Q    Did you see a desk in that room?

13   A    I did.

14   Q    Did you notice any items of significance on the desk?

15   A    Yeah, so the -- the victim was in the middle of the -- the

16   floor, and the desk was behind him.  On top of the desk there

17   was a metal straw that had some drug residue on it, some

18   aluminum foil, like tinfoil squares, that had drug residue on

19   it, lighters, and a pill -- an orange pill bottle that had a

20   baggie inside that had some crushed-up powder and some pills

21   on -- or inside of that bottle too.

22   Q    What, if anything, was the significance of the lighter

23   that you just mentioned?

24   A    Well, the lighter kind of corroborates that he's -- it's

25   an overdose because he potentially, I mean, used the lighters

1    to -- to use the drugs.

2    Q    Were there other individuals on scene when you arrived

3    with law enforcement?

4    A    Yes.  There was detectives there with the Honolulu Police

5    Department.

6    Q    Did you collect any evidence from the room where you saw

7    the male face down?

8    A    Yes.  The -- what I mentioned, the metal straw because it

9    had drug residue, the tinfoil because it had drug residue, the

10   orange pill bottle that had the -- the baggie with the crushed

11   powder and the pills inside.

12   Q    The orange pill bottle that you mentioned, did you observe

13   any markings on the pills?

14   A    The pills on -- were stamped with AN 415.

15             THE COURT:  Can you say that again?

16             THE WITNESS:  AN 415 is what they were stamped with.

17             THE COURT:  A-N?

18             THE WITNESS:  Yes.  Alpha, November.

19             THE COURT:  Slow down a little bit, okay?

20             THE WITNESS:  AN 415.

21             THE COURT:  Okay.

22             THE WITNESS:  Yes, sir.

23             THE COURT:  Thank you.

24   BY MR. NAMMAR:

25   Q    Did you know what AN 415 may refer to?

1   A    I looked it up, but it is -- referred to Suboxone.

2   Q    And what is Suboxone?

3   A    Suboxone's used at opioid treatment clinics, mainly.  It's

4   a mixture of naloxone, which is Narcan, and buprenorphine,

5   which is an opioid.

6   Q    Is it prescribed by physicians?

7   A    It is, yes.

8   Q    Okay.

9        MR. NAMMAR:  Your Honor, may we publish Exhibit 18 at

10  this time?

11       THE COURT:  Yes.

12       Ladies and gentlemen, is this monitor working now in

13  front of you?

14       JUROR:  Yes.

15       THE COURT:  It is?  Okay.

16       So that might be easier than moving the iPad and the

17  notepad around and so forth.  We didn't have access to that

18  yesterday, but we have that up for you today.  So there's two

19  monitors now for your iPads.  You can choose, okay?  Thank you.

20  BY MR. NAMMAR:

21  Q    Agent Ganzel, 18 is up on the screen.  The jury can see

22  it.  Do you recognize what we're looking at in 18?

23  A    I do.  My monitor's not working, but I can.

24       THE COURT:  Oh, your monitor's not working?

25       THE WITNESS:  No.

1           THE COURT:  Renee, we can just use the copies.

2           You can just use the binder.

3           THE WITNESS:  Okay.

4           THE COURT:  Old-fashioned way.

5           THE WITNESS:  I like it.

6           THE COURT:  Okay, we'll get that fixed during the

7    break.

8           MR. NAMMAR:  18.

9           THE WITNESS:  18.

10   A    Yes, I recognize it.

11   BY MR. NAMMAR:

12   Q    And what's shown in 18?

13   A    That is the scene of the overdose that I observed when I

14   walked in that day.

15   Q    Is this how the male appeared to you?

16   A    Yes.

17   Q    Okay.  Did it -- did he appear to you in a contorted

18   position?

19   A    He did, yes.

20   Q    Were you able to identify this male on the floor?

21   A    At this time, no, not until we were able to remove her.

22   Q    Later were you able to identify the male?

23   A    Yes, after his driver's license and speaking with the

24   grandmother.

25   Q    And who was the male?

1    A    Tyler Orso-DeLima.

2    Q    In 18, do you see -- you mentioned some baggies earlier in

3    your testimony.  Do you see any of those baggies in 18?

4    A    Yes.  They're on the floor.

5    Q    And did you check whether there was anything in those

6    baggies?

7    A    Yes, I did.

8    Q    And what did you find out?

9    A    Nothing of -- there's nothing in those bags.

10   Q    And you mentioned some -- well, did you find any baggies

11   on the desk that you talked about?

12   A    The baggies were -- that we -- I saw were in the orange

13   prescription bottle.

14   Q    Okay.

15              MR. NAMMAR:  Can we publish Exhibit 22 at this time?

16              THE COURT:  All right.

17   BY MR. NAMMAR:

18   Q    The jury can see 22.  Do you recognize this photo?

19   A    I do.

20   Q    And what's this a photo of?

21   A    This is a photo of the desk that was in the back side of

22   the bedroom.

23   Q    Okay.  You previously talked about some items.  You talked

24   about lighters.  Do you see those anywhere depicted in this

25   photo?

1   A    Yes.  They're in the center.

2   Q    Okay.  You talked about a metal straw?

3   A    Yes.

4   Q    Do you see that?

5   A    Yes.  They're left of the lighters and left of the

6   scissors.

7   Q    And for the record, what color straw are they to the left

8   of?

9   A    The -- what color the straw is, it's a --

10  Q    What --

11  A    It's a metal straw.

12  Q    Excuse me.

13          (Simultaneous speaking.)

14          THE COURT:  Wait, wait.  Both of you stop.

15          Ask another question.

16          MR. NAMMAR:  Yes.  That was a bad question.

17  BY MR. NAMMAR:

18  Q    What color lighter or -- is the straw to the left?

19  A    Of the red lighter, yes.

20  Q    Okay.  You mentioned tinfoil.  Do you see tinfoil on this

21  picture?

22  A    I do.

23  Q    Okay.  Where is that?

24  A    It -- there's a couple spots, but the -- the main part is

25  the top of the picture, inside the tape, you can see the -- the

 1   tinfoil.

 2   Q    And is this the same tinfoil you recovered?

 3   A    Yes.

 4   Q    Okay.  Do you see any baggies in Exhibit 22?

 5   A    Baggies?  There -- there is a couple baggies that do --

 6   that are around, inside the lighters.  But the baggies that we

 7   seized were inside the prescription bottle at the bottom of the

 8   picture.

 9   Q    Okay.  The baggies that you didn't seize, did you inspect

10   those to see if there was any items in them?

11   A    Yes.

12   Q    And what did your inspection reveal?

13   A    No items in there.

14   Q    Okay.

15            MR. NAMMAR:  Your Honor, may I approach the witness?

16            THE COURT:  Yes.

17   BY MR. NAMMAR:

18   Q    I've just handed you Exhibit 1.  Do you recognize

19   Exhibit 1?

20   A    I do.

21   Q    What is it?

22   A    It is the straw and the tinfoil that we seized that day.

23   Q    From the desk?

24   A    From the desk, yes.

25   Q    And how are you able to recognize it as the same straw and

1    tinfoil that you seized that day?

2    A    I remember from that day.  But also, based on the bag, my

3    signature, multiple signatures, and the case number, and the

4    exhibit number.

5    Q    And what did you do with Exhibit 1 after you seized it

6    from Tyler's room?

7    A    We processed it as evidence.

8    Q    And what was done with it after it was processed?

9    A    It was sent via FedEx to our drug lab in California.

10    Q    And can you tell from looking at the label on Exhibit 1

11    whether it made it to the lab?

12    A    I can, yes.

13    Q    And how can you tell that?

14    A    The custodians and the chemists sign at the bottom and

15    they affix their own label, yellow label at the top of the

16    bags.

17    Q    Okay.  What does the lab do with Exhibit 1?

18    A    They test it for -- determine what type of controlled

19    substance.

20    Q    And who is the person that tests that at the lab?

21    A    That was -- it was opened by Melisa Glatte.  I cannot

22    pronounce that name.

23    Q    And what does Melisa do?  What's her job title?

24    A    She is a chemist.

25    Q    Okay.  Is Exhibit 1 in substantially the same condition

1  now as when you first saw it?

2  A    Yes.

3           MR. NAMMAR:  Your Honor, I move to admit Exhibit 1.

4           MS. GLENDON:  No objection.

5           THE COURT:  Exhibit 1 is admitted.

6           (Government Exhibit 1 received in evidence.)

7           MR. NAMMAR:  Your Honor, may we publish and -- well,

8  I move to admit Exhibit 9, which I believe is already in

9  evidence by the stipulation of the chemist, that we signed

10  yesterday.

11          MS. GLENDON:  That's correct.

12          THE COURT:  Okay.  At some point that stipulation

13  will be read?

14          MR. NAMMAR:  Yes.

15          THE COURT:  Is that right?  Okay.

16          So without objection, Exhibit 9 is admitted.

17          (Government Exhibit 9 received in evidence.)

18          MR. NAMMAR:  And can we publish Exhibit 9?

19          THE COURT:  Yes.

20          MR. NAMMAR:  Which is the lab report.

21  BY MR. NAMMAR:

22  Q    Okay.  The jury can see Exhibit 9.

23          THE COURT:  Well, I don't know if they -- they can

24  view it.  I'm not sure they can read it.

25          MR. NAMMAR:  Okay.

1           THE COURT:  Yeah.

2           MR. NAMMAR:  Zoom in a little bit.

3    BY MR. NAMMAR:

4    Q    Agent, do you recognize Exhibit 9?

5    A    I do.

6    Q    And what is it?

7    A    Exhibit 9 is the lab report that Melisa, the chemist,

8    created for Exhibit -- or our exhibit.

9    Q    Okay.

10          MR. NAMMAR:  Can you zoom in on the -- where the

11   exhibit number -- observations, results, and conclusions

12   section.  It's at the top.  Perfect.

13   BY MR. NAMMAR:

14   Q    What's shown in the observation, results, and conclusions

15   section, Agent?

16   A    It is identifying the substance in the -- the second

17   column.  Well, exhibit number for -- for our exhibit.

18   Q    Okay.

19   A    The substance that's identified, the net weight is in the

20   third column.

21   Q    And so what substances were identified on Exhibit 1, which

22   is the metal straw and the tinfoil?

23   A    A mixture of fentanyl and heroin.

24   Q    And when it says "net weight," what is shown there?

25   A    Residue.

1   Q    Do you know what that means, residue?

2   A    It's too small of amount to -- to weigh.

3   Q    Okay.

4            MR. NAMMAR:  You can take that one down now.  Thank

5   you.

6            Your Honor, May I approach with Exhibit 2?

7            THE COURT:  You may.

8   BY MR. NAMMAR:

9   Q    I just handed you Exhibit 2.

10           Agent, do you recognize what Exhibit 2 is?

11  A    I do.

12  Q    What is it?

13  A    It is the pill bottle, the crushed tabs, and the taglets

14  that were in the pill bottle, along with the baggie that was

15  located on the decedent's desk.

16  Q    Is this the same bottle that you found, the markings came

17  back to Suboxone?

18  A    Yes.

19  Q    Okay.  How are you able to recognize Exhibit 2 as that

20  same bottle?

21  A    Again, I remember it from that day.  But also, my

22  signatures, the exhibit number, and the case number for us.

23  Q    What was done with Exhibit 2 after it was seized?

24  A    It was processed as evidence.

25  Q    And then what was -- what was done with it after it was

1   processed?

2   A    Sent off via FedEx to our lab in California.

3   Q    Is Exhibit 2 in substantially the same condition now as

4   when you first saw it?

5   A    Yes, it is.

6              MR. NAMMAR:  We would move for the admission of

7   Exhibit 2, Your Honor.

8              MS. GLENDON:  No objection.

9              THE COURT:  2 is admitted.

10             (Government Exhibit 2 received in evidence.)

11             MR. NAMMAR:  We would also move for the exhibit --

12  admission of 10, which is covered by the same drug stipulation.

13  It's the lab report for Exhibit 2.

14             MS. GLENDON:  That's correct, Your Honor.

15             THE COURT:  All right.  Without objection, Number 10

16  is admitted.

17             MR. NAMMAR:  Can we publish Exhibit 10, Your Honor?

18             THE COURT:  Yes.

19             (Government Exhibit 10 received in evidence.)

20             MR. NAMMAR:  Maybe zoom in on "observations" right

21  now.

22  BY MR. NAMMAR:

23  Q    Agent, Exhibit 10 is up on the monitor.

24       Do you recognize what Exhibit 10 is?

25  A    Yes.  That is the lab report that the chemist created for

1    our exhibit.

2    Q    Okay.  For the pill bottle, correct?

3    A    That's correct.

4    Q    Okay.  And what substances were identified on this lab

5    report?

6    A    Buprenorphine and naloxone.

7    Q    Okay.  And do you know the trade name for -- for these two

8    substances?

9    A    Suboxone.

10   Q    And that's the drug you talked about earlier that's

11   prescribed by doctors?

12   A    That's correct.

13   Q    Okay.

14        MR. NAMMAR:  You can take that down.  Thank you.

15   BY MR. NAMMAR:

16   Q    Okay.  So you seized these items from the decedent's room,

17   the Exhibit 1 and 2.  What did you do in your investigation

18   after seizing those items?

19   A    After seizing those items, I decided to talk to the

20   grandmother.

21   Q    Okay.  And without telling us what the grandmother told

22   you, why did you want to speak with the grandmother?

23   A    The grandmother -- I knew it was her house and she was

24   allowing her grandson to stay there.  So I figured that she had

25   some idea as to the events that led up to deceased dying.

1    Q    Did you obtain any items of evidence from the grandmother?

2    A    I did.

3    Q    What did you obtain?

4    A    The deceased's cell phone.

5    Q    And were you able to access that cell phone?

6    A    I was.

7    Q    How?

8    A    The grandmother had the code for it.

9    Q    Okay.

10            MR. NAMMAR:  Your Honor, I approach with Exhibit 5.

11            THE COURT:  All right.

12   BY MR. NAMMAR:

13   Q    Agent, I've just handed you Exhibit 5.

14        Do you recognize what Exhibit 5 is?

15   A    I do.

16   Q    What is it?

17   A    That is the deceased's cell phone.

18   Q    And how are you able to recognize it as the deceased's

19   cell phone?

20   A    I spent a lot of time with it that day, but also based on

21   the markings on the -- on the -- the evidence bag.

22   Q    And does your signature appear on the evidence bag

23   anywhere?

24   A    My signature does not, no.

25   Q    Okay.  Was it bagged in your presence, though?

1   A    It was, yes.

2   Q    Okay.

3        All right.  Does it also contain a unique DEA number

4   that's associated with this case?

5   A    It does.

6   Q    Is Exhibit 5 in substantially the same condition now as

7   when you first saw it?

8   A    Yes.

9             MR. NAMMAR:  Your Honor, we move Exhibit 5 in at this

10  time.

11            MS. GLENDON:  Objection, foundation.

12            THE COURT:  Well, foundation?

13            MS. GLENDON:  And relevance at this point in time.

14            THE COURT:  Overruled.  Exhibit 5 is admitted.

15            (Government Exhibit 5 received in evidence.)

16  BY MR. NAMMAR:

17  Q    On October 9th, the day you responded and received

18  Exhibit 5, what did you do with it?

19  A    I accessed the contents of the phone.

20  Q    And where did you first access it?

21  A    At the residence.

22  Q    And why did you want to access it right away?

23  A    I wanted to determine immediately who provided the -- the

24  substance that led to the overdose.

25  Q    Okay.  Did you see anything of significance in that regard

1   in your review of the cell phone?

2   A    I did.

3   Q    And what did you see?

4   A    I saw several text messages between the deceased and an

5   individual named Cory Gz in the phone.

6   Q    And what was the subject of those text messages?

7   A    The subject of the messages was Cory brokering a deal for

8   fentanyl for the deceased.

9   Q    And do those subjects mention who Cory's source was going

10  to be for that deal?

11  A    An individual named Debo.

12  Q    Okay.  Can you turn now in the binder to Exhibit 7?

13  Specifically, page 3.

14       Do you recognize what's here on page 3?

15  A    I do.

16  Q    What is shown on page 3?

17  A    This is a timeline between the defendant's phone, the

18  deceased's phone, and Cory's phone.

19  Q    And when you were talking about the messages that you

20  observed between Cory and the decedent's phone, do you see

21  those on page 3?

22  A    Yes.

23  Q    Are those the same messages that you were reviewing in the

24  time when you were at the decedent's home on October 9th, 2022?

25  A    Yes.

 1  Q     Now, did you prepare Exhibit 7, the timeline?

 2  A     I did not, no.

 3  Q     Even though you didn't prepare it, based on your review of

 4  Tyler's cell phone and the defendant's cell phone, does

 5  Exhibit 7 appear to be accurate?

 6  A     Yes.

 7            THE COURT:  Are you asking him the whole thing or

 8  just page 3?

 9            MR. NAMMAR:  Well, I think we have a stipulation.

10  I'm -- is that right?

11            MS. GLENDON:  We won't object to 7.

12            MR. NAMMAR:  Okay.  So --

13            THE COURT:  You have no objection to 7?

14            MS. GLENDON:  Yes.

15            MR. NAMMAR:  It'll be covered more in depth with the

16  next witness.

17            THE COURT:  Okay.

18            MR. NAMMAR:  But I think it would be helpful to

19  publish this and show it with this witness.

20            THE COURT:  Well, you're going to have to admit it

21  then.

22            MR. NAMMAR:  Yes, I would move for the admission of

23  7.

24            MS. GLENDON:  No objection.

25            THE COURT:  All right.  7 is admitted.

1              (Government Exhibit 7 received in evidence.)

2              MR. NAMMAR:  Okay.  Can we publish page 3?

3              THE COURT:  Yes.

4              MR. NAMMAR:  Can you go to page 3?  Can you zoom in

5    on the message at 22:22 and 17 seconds.

6    BY MR. NAMMAR:

7    Q    Can you see that message, Agent?

8    A    I can.

9    Q    And who is that between?

10   A    The message is from DeLima, the deceased, to Cory Gz.

11   Q    And what's shown in the content section?

12   A    The victim is messaging Cory and said:  Can you middleman

13   from -- someone -- for me.  I'll throw you, dollar sign.

14   Q    Okay.

15   A    Which is cash.

16   Q    Did you do any further examination of the phone on

17   October 9th to figure out who this Cory Gz contact person --

18   A    I did.

19   Q    -- was?

20   A    Yes.

21   Q    What did you do?

22   A    I looked at his contact information.  This is an iPhone.

23   So if you go into contacts, just like you do on your phone, you

24   can either see a phone number associated with the contact or in

25   this case it was an iCloud account.

1   Q    Okay.  Was there a response to this message from DeLima

2   from Cory?

3   A    Yes, there was.

4   Q    Sorry.  And before I go to that, you said you looked in

5   the iCloud for Cory Gz, and what did it come back to?

6   A    Cory Germain at gmail -- it was, like, Cory.Germain1@

7   gmail.com.

8   Q    So at that point was Cory Germain, based on your reviews

9   of these messages, was he a person of interest?

10  A    He was, yes.

11  Q    Okay.

12            MR. NAMMAR:  Can you now blow up the message at 22:23

13  and one second?

14  BY MR. NAMMAR:

15  Q    Agent, what is shown here?

16  A    That is a message, return message from Cory to the

17  deceased.

18  Q    Okay.  And the content is:  Yeah, one sec.  How much you

19  want?

20  A    Correct.

21            MR. NAMMAR:  Can you blow up the message at 22:23 and

22  38 seconds?

23  BY MR. NAMMAR:

24  Q    What's shown here?

25  A    That is a message back from the victim to Cory.  And he

1  says:  Or how much for .2?

2      In the previous message it says:  However much that is in

3  points.

4  Q    Okay.  Do you know what that term "points" means?

5  A    Yes.  Points is a tenth of a gram.

6  Q    Okay.  And are you familiar with that term from a number

7  of different cases you've worked on?

8  A    Yes.

9  Q    Okay.

10          MR. NAMMAR:  Your Honor, can we publish page 4 of

11  this?

12          THE COURT:  All right.  Yeah.

13          MR. NAMMAR:  And can you zoom in on the top message,

14  including the image.

15  BY MR. NAMMAR:

16  Q    What's shown in this top message, Agent?

17  A    That is a screen shot from Cory to the victim of a message

18  that he had with Debo.  It's not a screen shot.  It's actually

19  a photo from Cory, of his other phone, that he had a message

20  from Debo earlier tonight and he had forgotten about it.  So he

21  was messaging the victim saying -- and the messages says:  Oh,

22  I -- I got fetty and xans yo.

23  Q    Okay.  So this is a message from Cory to DeLima, correct?

24  A    Correct, of a message between Cory and Debo.

25  Q    And he -- Cory is attaching an image to that message; is

1   that right?

2   A    Correct.

3   Q    Okay.  And is the image what appears in the comment

4   section?

5   A    Yes.

6   Q    Okay.

7              MR. NAMMAR:  Can you go to the last page of the

8   timeline?

9   BY MR. NAMMAR:

10  Q    Is this the same image that we were just looking at?

11  A    Correct.  That's a photograph of the message between Debo

12  and Cory.

13  Q    Okay.  And at this point was Debo, based on the -- on

14  the -- on this particular message, was Debo a person of

15  interest in this investigation?

16  A    Yes, he was.

17  Q    Okay.  And why was he a person of interest?

18  A    It seemed clear from the messages that Cory received the

19  fentanyl that night on Friday, October -- that night on the

20  Friday from -- October the 7th, from Debo.

21  Q    So we've looked at some of the messages between Cory and

22  DeLima.  Did you also see some messages that took place in time

23  before that, before those messages between Cory and DeLima,

24  with a person named New Dog?

25  A    Yes, I did.

1   Q    And did you review those messages on October 9th, when you

2   were at Tyler's house?

3   A    I did, yes.

4   Q    Okay.

5           MR. NAMMAR:  If we can now bring up page 2 of the

6   timeline.

7           THE COURT:  All right.

8           MR. NAMMAR:  And if we could zoom in on the message

9   at 21:57 and 9 seconds.

10  BY MR. NAMMAR:

11  Q    Agent, what's shown here?

12  A    This is a message from the deceased to the contact, New

13  Dog.

14  Q    Okay.  And as far as timing, were these sent before the

15  messages that we just looked at, looked at with Cory Germain

16  and the decedent?

17  A    It was -- yes, it was.

18  Q    Okay.  And the message:  Just trying to grab a Q, if I can

19  throw you ten extra.  Do you see that?

20  A    I do.

21  Q    Is that something that you reviewed on that day?

22  A    I did.

23  Q    And did you find that message of significance?

24  A    I did, yes.

25  Q    Okay.  And why was that?

1    A    Q is referencing a quarter.  So in this case it's going to

2    be a quarter of a gram, likely, since he's looking for

3    fentanyl.

4    Q    Okay.

5              MR. NAMMAR:  Can you now zoom in on the message at

6    22:17 and 14 seconds?

7    BY MR. NAMMAR:

8    Q    Who's sending this message?

9    A    This is a message from the victim to New Dog, again.

10   Q    Okay.  Can you read it to the jury?

11   A    It says:  Please, my G, I got you FR -- which is "for

12   real."  Just this one time.  I never really grab this late.  I

13   just didn't have a ride.  That's why I was trying grab earlier.

14   My bad.

15   Q    Were there any messages or any responses from New Dog that

16   were shown on Tyler DeLima's phone after this particular

17   message?

18   A    After this message, no.

19   Q    Did it appear to you that -- from based on a review of

20   Tyler DeLima's cell phone that Tyler DeLima made contact with

21   New Dog after this?

22   A    No, he did not.

23   Q    Okay.  What was the significance of that in your

24   investigation?

25   A    It seemed to me that he was initially trying to get from

1   New Dog.  New Dog said:  Hey, here's the message.  It says:  I
2   see you tomorrow morning.
3        So then he hit up his next candidate, which was Cory Gz.
4   Cory responded, and New Dog never said anything back.  And that
5   was the last messages of him clearly wanting really bad, but
6   Cory was responding.
7   Q    And you mentioned the "I see you tomorrow morning."
8            MR. NAMMAR:  Can you zoom in on that and the message
9   right below it?  It's at 22:01 and -- 22:01 and 16 seconds.
10  And the one right below it.  Can you capture the one right
11  below it too?  Sorry about that.
12  BY MR. NAMMAR:
13  Q    Is this the message you were mentioning from New Dog -- to
14  New Dog:  I see you tomorrow morning?
15  A    Yes, that's correct.
16  Q    Okay.  And so New Dog at 22:01 and 16 seconds tells
17  DeLima:  I see you tomorrow morning.  Is that right?
18  A    Correct.
19  Q    Okay.  What is the response to that message from DeLima?
20  A    The victim says:  I could be out there in less than 20
21  minutes, bro.  It's just I'm not gonna be out there tomorrow.
22  My gram's going to be busy all day -- referencing tomorrow's
23  Saturday.
24       Can grab a half G -- which is a gram.  I'll throw you an
25  extra ten dollars for staying around.

1   Q    Okay.  And then as far as on the timeline, what comes next
2   is the praying hands message that we just went over, right?
3   A    Correct.
4   Q    Okay.  And then there's no response at all from New Dog;
5   is that right?
6   A    Correct.
7        MR. NAMMAR:  We can take down that exhibit.
8   BY MR. NAMMAR:
9   Q    So you told us that at this point based on your review of
10  the message that Cory Germain was a person of interest; is that
11  right?
12  A    Yes, he was.
13  Q    Okay.  Did you attempt to locate him?
14  A    We did, yes.
15  Q    And what date did you attempt to locate Cory Germain?
16  A    The -- two days later, on the 11th.
17  Q    And where did you go?
18  A    We went to his -- his address on Kalihi Street, 27, 118 --
19  or 2718.
20  Q    Can you flip now in the binder to Exhibit 16?
21       Do you recognize what's in Exhibit 16?
22  A    I do recognize it.
23  Q    And what is it?
24  A    It is a Google Maps print-off of the area above Cory
25  Germain's residence.

1  Q    Does the map appear to you to be drawn to scale?

2  A    Yes, it does.

3  Q    Does it fairly and accurately depict the streets in the

4  areas of Liliha Street?

5  A    Yes, it does.

6            MR. NAMMAR:  Your Honor, we move admission of 16.

7            THE COURT:  All right.

8            MS. GLENDON:  No objection.

9            THE COURT:  16 is admitted.

10           MR. NAMMAR:  Can we publish it for the jury?

11           THE COURT:  Yes.

12           (Government Exhibit 16 received in evidence.)

13  BY MR. NAMMAR:

14  Q    16's on the screen.  Where did you go --

15       Do you recall where you went to try to track down Cory

16  Germain?

17  A    Yes.  It is up towards the top, in the valley, of Liliha

18  Street near the intersection of Hawaii Street.

19  Q    Okay.  There should be a pen in front of you.

20           THE COURT:  Well, his monitor's not working.

21           MR. NAMMAR:  Okay.  All right.

22  BY MR. NAMMAR:

23  Q    So the cross streets were --

24           COURTROOM MANAGER:  Mr. Nammar, you can use it as

25  well.

1              MR. NAMMAR:  Okay, great.

2    BY MR. NAMMAR:

3    Q    What were the cross streets you mentioned?

4    A    It was near the cross street of Liliha.  So top right of

5    Liliha and Hawaii Street.

6    Q    Is it in the area where this -- the circling is on -- with

7    the yellow?

8    A    Correct.

9    Q    Okay.  And when you went to that area, what did you find?

10   A    Cory was not there, but his roommate was and was able to

11   get us in contact with Cory.

12   Q    Did you later meet up with Cory in a different part of

13   town?

14   A    I did, yes.

15   Q    Okay.  That same day?

16   A    Yeah, an hour later, at 3:00 p.m.

17   Q    Where did you meet up with him?

18   A    Down -- further down the valley at the Hawaii Dance

19   Academy in Kalihi.

20   Q    And without telling us what Mr. Germain may have said to

21   you, what happened when you made contact with him?

22   A    He agreed to actively cooperate with us.

23   Q    And before he made that agreement, did you interview him?

24   A    I did, yes.

25   Q    For how long?

1    A    Approximately an hour.

2    Q    Okay.  And when you interviewed for -- him for an hour,

3    were you able to become familiar with his voice?

4    A    Yes.

5    Q    Okay.  Can you flip now to Exhibit 31.

6         Do you recognize what's shown in 31?

7    A    Yes, I do.

8    Q    And what is it?

9    A    This is a photograph of Cory Germain.

10   Q    And how are you able to recognize it as a photo of Cory

11   Germain?

12   A    I spent significant time with him that day.

13   Q    Was this photo -- sorry.

14   A    No, you're fine.  On that day I spent time with him.

15   Q    Does to this photo accurately depict how Mr. Germain

16   looked to you in October of 2022?

17   A    Yes.

18            MR. NAMMAR:  Move to admit Exhibit 31, Your Honor.

19            MS. GLENDON:  No objection.

20            THE COURT:  31 is admitted.

21            (Government Exhibit 31 received in evidence.)

22            MR. NAMMAR:  Can we publish it?

23            THE COURT:  Yes.

24            MR. NAMMAR:  Can you zoom in on just the whole

25   picture.

1   BY MR. NAMMAR:

2   Q    Okay.  The jury can see 31.  Who's the person in this

3   photo?

4   A    That is Cory Germain.

5   Q    And can you describe for the jury Mr. Germain's build?

6   A    A white male, very skinny, tall.

7   Q    Okay.  So you interviewed him, you said, for about an

8   hour?

9   A    Yes.

10  Q    Okay.  And you also said that he agreed to proactively

11  cooperate?

12  A    Yes, he did.

13  Q    What does that mean?

14  A    In this situation it meant that he agreed to communicate

15  with Debo to set up a drug transaction.

16  Q    And what was the plan?

17  A    The plan was to communicate with Debo and for him, Debo,

18  to show up to meet with Cory.

19  Q    Okay.  Can you look in the binder in front of you to

20  Exhibit 34?  And there's three pages.

21       Do you recognize those three pages?

22  A    I do, yes.

23  Q    And what are they?

24  A    These are text messages from Cory's phone -- or it's a

25  picture of Cory's phone that had text messages with Debo.

1    Q    And how are you able to recognize these photos?

2    A    I was there that day, and that's my car seat that I took

3    the photo on.

4    Q    Okay.  So the background shows your car seat?

5    A    Correct.

6    Q    And it's actually but a -- it's a photo of Cory's phone?

7    A    Correct.

8    Q    Have these photos been altered in any way?

9    A    No.

10            MR. NAMMAR:  Your Honor, we move for the admission of

11   34.

12            MS. GLENDON:  No objection.

13            THE COURT:  This is from October 11th; is that right?

14            THE WITNESS:  Yes, sir, at 3:23.  You can see in the

15   top left we took those photographs.

16            THE COURT:  Okay.  All right.  34 is admitted.

17            (Government Exhibit 34 received in evidence.)

18            MR. NAMMAR:  May I approach with Exhibit 35, Your

19   Honor?

20            THE COURT:  You may.

21   BY MR. NAMMAR:

22   Q    Agent, I've handed you Exhibit 35.  Do you recognize 35?

23   A    I do.

24   Q    And what is it?

25   A    It is a CD that contains an audio recording of a call

1    between Cory and the defendant.

2    Q    And how were you able to recognize it as such?

3    A    It's -- my signature is on there from when I listened to

4    it.

5    Q    And did you date it?

6    A    I did.

7    Q    Okay.  Were these calls -- was this call the one call --

8    is it one call?

9    A    Yes.

10   Q    Was that call made in your presence?

11   A    It was.

12   Q    And was your voice originally at the end of that

13   recording?

14   A    Yes, it was.

15   Q    The version in front of you, has your voice been removed?

16   A    Yes, it has.

17   Q    Besides removing your voice, has the recording been

18   altered in any way?

19   A    No, it has not.

20   Q    Is it a true and accurate copy of the conversation that

21   day between the defendant and Cory Germain?

22   A    Yes.

23            MR. NAMMAR:  Your Honor, we move for the admission of

24   35.

25            MS. GLENDON:  No objection.

1           THE COURT:  35 is admitted.

2           (Government Exhibit 35 received in evidence.)

3           MR. NAMMAR:  Can we now publish 34, just the

4    photographs?

5           THE COURT:  All right.

6    BY MR. NAMMAR:

7    Q    Okay.  34 is up on the screen.  What are we looking at

8    here?

9    A    This is a photograph of Cory's phone.

10   Q    Okay.  Where was this taken?

11   A    In my vehicle.

12   Q    Okay.  And what is the date -- for the first messages at

13   the top, what is the date associated with the -- well, first of

14   all, who's the blue and who is the -- who's the blue on the

15   right?  And who's the off-white on the left?

16   A    The messages on the right are the -- it's Cory's.  And on

17   the left it is Debo.

18   Q    Okay.  The mess -- the first message on the top "My bad,

19   I'm headed your way I'll LYK when I'm in Kalama," do you know

20   the date associated with that message?

21   A    Yeah, that was the Friday prior.

22   Q    Okay.

23   A    This was Tuesday.

24   Q    So was that October 7th, 20 --

25   A    October 7th.

1   Q    Okay.  And response is -- from Debo is what?

2   A    That night is "KK."

3   Q    And then what's the next message from Cory?

4   A    "Pulling up" and then "I'm up towards my mom's a little."

5   Q    Okay.

6   A    Which Cory's mom lives actually a couple houses down from

7   the defendant.

8   Q    And then there's a time that shows up, 3:22 p.m., and

9   there's a message in blue that says:  Yo.

10  A    Yes.

11  Q    Who's the blue?

12  A    That is Cory at our direction messaging Debo.

13  Q    And what date and time is associated with the "Yo"

14  message?

15  A    That is that Tuesday.

16  Q    Okay.  Tuesday, the 11th?

17  A    The 11th.  Sorry, yes.

18  Q    Okay.  Can you go to the second page?

19       And what are we looking at here?

20  A    That is a continuation of the messages from the first

21  page, is messages between Cory and Debo.

22  Q    And the message on the right in blue, what does it say?

23  A    Debo responded:  What upper.  And Cory said:  Do you have

24  any fent right now -- "RN," right now.

25  Q    And what's the response from Debo?

 1   A    "Yup."

 2   Q    Did you direct Cory to send the "Do you have any fent

 3   right now" message?

 4   A    Yes.

 5   Q    Did you know what "fent" meant?

 6   A    Yes.

 7   Q    What?

 8   A    Fentanyl.

 9   Q    Can you go to page 3?

10        What's shown at the top in blue?

11   A    That is a continuation of these messages.  This is at

12   4:44 p.m. on a Tuesday.  Cory messages:  My homie wants

13   whatever $200 worth.

14   Q    And again, was that sent at your direction?

15   A    It was, yes.

16   Q    And what were you trying to obtain for $200?

17   A    Fentanyl, ultimately.  Yes.

18   Q    Okay.  And what's the response from Debo to that message?

19   A    He just responded:  Kalama Valley.

20   Q    What's the significance, if any, of Kalama Valley?

21   A    We had a feeling that Matthew McBraun, the defendant,

22   lived in Kalama Valley, and it lined up with Cory saying that

23   his mom lived in Kalama Valley.  Yeah.

24   Q    And the response to Kalama Valley from Cory is what?

25   A    Okay.  I'll HYU -- "hit you up" -- when my friend grabs

1    me.

2    Q    And then what appears after that?

3    A    8:13 p.m. Cory messages:  My friend just got me.  My bad,

4    OMW -- which is "on my way."

5    Q    Okay.  And what's the response from Debo?

6    A    LMK.  Which means "let me know."

7    Q    Okay.  Is there a phone call that takes place shortly

8    after this last message?

9    A    Yes.

10   Q    Okay.  What time did that phone call take place?

11   A    It was at 8:56 p.m.

12   Q    Okay.  So about 30 message -- 30 minutes or so after this

13   last message?

14   A    Yeah, that's correct.  We were on our way out to Kalama

15   Valley.

16         MR. NAMMAR:  Your Honor, I ask now to play 35, which

17   is a recording of that phone call.  We have transcripts that we

18   provided to defense counsel that has no objection.

19         THE COURT:  All right.  Is that right?

20         MS. GLENDON:  Yes.

21         THE COURT:  Okay.  So let me instruct you, ladies and

22   gentlemen.  You'll be provided with transcripts, and you can

23   follow along as you hear the audio recording that's been

24   admitted into evidence.  But the transcript is not evidence.

25   It's only an aid to help you follow along.  If you believe

```
 1    there is something different between what you see in the
 2    transcript and what you hear, what you hear controls because
 3    that is the evidence in the case.  All right?
 4              COURTROOM MANAGER:  (Distributed transcripts.)
 5              (Audio recording played.)
 6              THE COURT:  Wait, wait, wait.  Hold on.  Wait.
 7              MR. NAMMAR:  Sorry.
 8              THE COURT:  No, no, stop.  Stop.
 9              MR. NAMMAR:  Sorry, Judge.
10              (Audio recording stopped.)
11              MS. VESS:  Sorry.
12              THE COURT:  Okay.  Everyone has a copy now?
13              (Jurors respond.)
14              THE COURT:  All right.  Now we can play Exhibit 35.
15              (Audio recording played.)
16    BY MR. NAMMAR:
17    Q    Was that call made in your presence?
18    A    It was, yes.
19    Q    And you able to recognize the voices on this particular
20    call?
21    A    Yes, I am.
22    Q    And how are you able to recognize both voices in the call?
23    A    I spent significant time with both individuals that night.
24    Q    Okay.  The "I am almost to Kalama Valley" in this call, do
25    you know who says that?
```

1  A    Cory does.

2  Q    Okay.  And then the "You still want that" in response, who

3  says that?

4  A    Debo, the defendant.

5  Q    Okay.  And then what's the response, if you recall?

6  A    He said:  Do you still want?  And he said:  Yes.

7  Q    And then is there a "Let me know when you're closer"?  Did

8  you hear that?

9  A    Yes.

10 Q    Who said that?

11 A    The defendant did.

12 Q    Okay.  What was the purpose of this particular phone call?

13 A    This was a phone call to confirm with the defendant that

14 we're going to be showing up, or Cory's going to be showing up

15 to meet for the fentanyl transaction.

16          MR. NAMMAR:  I think we can collect these now, Your

17 Honor.

18          THE COURT:  All right.  Yes, just pass those back

19 towards the -- my side.

20 BY MR. NAMMAR:

21 Q    Okay.  You testified that this call took place at around

22 8:56 p.m.; is that correct?

23 A    That is correct.

24 Q    What happens after this call?

25 A    We arrived to the residence of the defendant.

1    Q    And where do you -- where do you arrive?

2    A    Where did I arrive?

3    Q    Yes.

4    A    Is 1392 Honokahua, which is Kalama Valley.

5    Q    And when you arrive, was Mr. Germain with you?

6    A    He was, yes.

7    Q    Okay.  What happened when you all arrived at the

8    residence?

9    A    We -- I directed the -- Cory to send a message to the

10   defendant to come outside.

11   Q    And then what happened?

12   A    The defendant came outside, walked mauka, north, up Kalama

13   Valley, maybe like 20 yards, and he was arrested.

14   Q    Who was he arrested by?

15   A    DEA personnel.

16   Q    Okay.  Approximately what time did the arrest take place?

17   A    It was after 9:00 p.m.

18   Q    Was a search conducted of McBraun's person?

19   A    Yes, there was.

20   Q    Did you see the results of the search?

21   A    I did, yes.

22   Q    And what did you see?

23   A    He had a small baggie of fentanyl.  He had two small

24   baggies, later determined as fentanyl and methamphetamine.

25   Q    Okay.  Can you flip to Exhibit 15 in the binder in front

1    of you?

2         Do you recognize 15?

3    A    I do, yes.

4    Q    What is it?

5    A    This is another Google Maps printout map of defendant's

6    residence.

7    Q    Is it drawn to scale?

8    A    It is, yes.

9    Q    Does it fairly and accurately depict the areas -- the

10   streets in the area of where you made the arrest of

11   Mr. McBraun?

12   A    Yes.

13             MR. NAMMAR:  Your Honor, we move to admit Exhibit 15.

14             MS. GLENDON:  No objection.

15             THE COURT:  All right.  15 is admitted.

16             (Government Exhibit 15 received in evidence.)

17             MR. NAMMAR:  May we publish it?

18             THE COURT:  Yes.

19   BY MR. NAMMAR:

20   Q    Okay.  15 is on the screen.  The jury can see it.

21        Looking at 15, can you describe the general area where the

22   arrest of McBraun was -- took place?

23   A    Yes.  Again, it was the -- the mauka side of Honokahua,

24   towards the intersection of -- I don't remember what that is.

25   Kaeluku -- leku Street.  Towards --

1  Q    Okay.

2  A    -- the bend in the road.

3  Q    You see the Gold Pacific Roofing --

4  A    Yes.

5  Q    -- dot?  Is it near there?

6  A    Yeah.  It's directly right of that.

7  Q    Okay.

8  A    On Honokahua.

9  Q    And you said it was in Kalama Valley.  But where in Kalama

10 Valley, back or front of the valley?

11 A    It's the back.  Up the mountain.

12 Q    Okay.  For the jury's sake, can you point out some

13 businesses that they may recognize --

14 A    Sure.

15 Q    -- in the area?

16 A    The -- you get the Hawaii Kai golf course, which I know.

17 And then Ono Seafood, the marketplace that's there.

18 Q    Okay.  When the arrest took place, where were you

19 situated?

20 A    So I was at the intersection, a little bit, like, Makapuu

21 side, or east of -- of the residence, to be able to view and

22 get an ID from Cory of the defendant walking out without him

23 being able to see our vehicle.

24 Q    Okay.  You said that a search was conducted of the

25 defendant's person, he was taken into custody.  What happened

1  after that?

2  A    He was placed in my vehicle and he was -- I read his

3  Miranda warnings to him.

4  Q    And what did Mr. McBraun elect to do when you read him the

5  Miranda warnings?

6  A    He elected to waive those rights.

7  Q    And then did you take his statement there in your car?

8  A    I did, yes.

9  Q    Okay.  What did he tell you?

10  A    He confirmed that he was coming outside to sell meth and

11  fentanyl to Cory, that he had gotten both from a man named Omar

12  that lived down in Waikiki.

13  Q    And did he say anything about the frequency of which he

14  contacted Omar and met up with Omar?

15  A    Yeah, he said he met with him daily, but the most recent

16  time he met was three days prior.  So this was Tuesday, and he

17  confirmed that it was Saturday that he met with him most

18  recently.

19  Q    And did he say anything about quantity of drugs that he

20  currently was in possession of?

21  A    He said it is a small amount.  He -- he said he was going

22  to short Cory on the amount of fentanyl and give more meth and

23  that Cory wouldn't have known, but it was a very small amount.

24  Q    Okay.  And did you say anything about any plans he had, if

25  any, later that evening?

1   A    He said that he was actually in contact -- fortunate for

2   us he was in contact prior to getting contact with -- by Cory

3   with his source Omar to resupply drugs.

4   Q    Okay.  Did he provide consent to search anything?

5   A    Yes.  He provided consent to search his phone and to

6   search his residence.

7   Q    Did you search his residence?

8   A    I did, yes.

9   Q    And what, if anything, was recovered?

10  A    We took his cell phone.

11  Q    And where was that found?

12  A    It was in his bedroom.

13  Q    Okay.  The person that you were interviewing in your car,

14  who you described as Matthew McBraun, do you see him in the

15  courtroom?

16  A    Yes, I do.

17  Q    Can you pick him out and describe an article of clothing

18  he's wearing?

19  A    Yes.  He's sitting to the right of defense counsel with

20  glasses on.

21           MR. NAMMAR:  May the record reflect that the witness

22  has identified the defendant?

23           THE COURT:  Yes.

24  BY MR. NAMMAR:

25  Q    So you take his initial statement in the car.  You search

 1    his bedroom.  What happens after that?

 2    A    We transport him down to our office in Honolulu.

 3    Q    And where is that?

 4    A    This office right here, connected to the federal

 5    courthouse.

 6    Q    Okay.  What happens at the office?

 7    A    We wanted to talk to him more, not only about his source

 8    but also about the deceased.

 9    Q    Okay.  Did you talk to him -- did he agree to talk to you,

10    make additional statements to you?

11    A    Yes, he did.

12    Q    Okay.  Tell us what he said.

13    A    He stated that -- well, he identified Omar from a booking

14    photo as Sajib Anas.  And, yeah, he said he -- we were able to

15    pin down where Sajib Anas lived in Waikiki.  He said that --

16    again, he reiterated that he picked up on Saturday, but he also

17    had picked up the day before, on Friday, which was the date

18    that the deceased and Cory met up with him; that he had met

19    with his source earlier in the day, in the afternoon, and then

20    met with Cory that night, on Friday.

21    Q    And that would be October 7?

22    A    Correct, yes.

23    Q    Okay.  Did he mention about anything about quantity and

24    Anas?

25    A    Yeah, he said, again, he would, normally every day he

1   would meet up with his source.  And then he would get up to

2   2 grams of fentanyl.

3   Q    And did he mention whether -- what kind of fentanyl he

4   would get?

5   A    What kind of fentanyl, he -- I mean pure fentanyl.

6   Q    Okay.  And tell the jury what pure fentanyl is.

7   A    Unadulterated, so not cut or mixed with anything.

8   Q    Okay.  Did he say anything about whether he had other

9   sources besides Anas for drugs?

10  A    Not for fentanyl, no.

11  Q    Okay.  Did he say anything about Cory Germain?

12  A    He did.  He actually said that he has sold Cory fentanyl

13  on multiple occasions and that he's actually witnessed Cory

14  overdose on fentanyl that he had given him before.

15  Q    Okay.  You said you were -- you spoke with him about

16  October 7th and you -- you just told us that he had said that

17  he had gone to see Anas that day.

18       Did you ask him about anything that may occurred on the

19  evening of October 7th?

20  A    On the evening of October 7th.  Yeah, he said he met up

21  with Cory, that he gave him drugs.  Could not remember what

22  type of drugs because, I'm quoting him, he was xaneed out of

23  his mind -- "xaneed" meaning Xanaxed.

24       So he meant that on that Friday he was on Xanax and

25  couldn't remember exactly what he gave Cory, whether he was

1    actually -- couldn't remember or if he was being kind of coy

2    with us, I don't know.  But he remembered meeting with Cory

3    that night.

4    Q    Okay.  Did he -- did he confirm, though, that he had

5    provided certain substances to Cory in the past?

6    A    Yeah, he said he provided fentanyl before.

7    Q    In the interview, did the term "Debo" come up?

8    A    It did, yes.

9    Q    And what, if anything, was said about that?

10   A    He confirmed that he is Debo.

11   Q    Okay.  Did the -- did a person named "Auntie" come up?

12   A    Yeah.  The auntie that he's referencing to is a lady that

13   lives with his source, Mr. Anas, and that sometimes he would

14   contact Auntie or Auntie would contact him about the day of

15   resupply because Anas's phone would be off or he didn't pay his

16   phone bill, so he would contact Auntie instead.

17   Q    So in the calls and texts that we just played, the order

18   was for fentanyl, correct?

19   A    Correct.

20   Q    But when the defendant was arrested, he had both fentanyl

21   and methamphetamine; is that right?

22   A    Correct.

23   Q    Did you ask McBraun why he had those two substances on

24   him?

25   A    Yeah.  I think I mentioned briefly, but he was planning to

1    short Cory on the fentanyl and just give him some meth.

2    Q    What does "short" mean?

3    A    Short -- short means to kind of sell him less than what he

4    was supposed to on purpose, for his own benefit.

5    Q    You talked about the consent that Mr. McBraun gave for the

6    search.  Did he give a consent, that same consent for his cell

7    phone?

8    A    He did, yes.

9    Q    Okay.  And did you look at his cell phone that same night?

10   A    I did, yes.

11   Q    Okay.  Why?

12   A    Again, I wanted to see where he was -- and confirm and

13   corroborate what he was saying about his source.  And then also

14   confirm the text messages with Cory from that Friday.

15   Q    Can you flip in the binder to Exhibit 22 and 23.

16        Before we get to that, were you able to confirm some of

17   the things that Mr. McBraun was telling you in review of the

18   cell phone?

19   A    Yeah, I saw the messages with -- with Auntie from Friday.

20   I saw historically the messages, and then I saw the messages

21   with Cory from that Friday and I confirmed everything.

22   Q    Okay.  So 32, are you there?

23        THE COURT:  Wait.  32 or 22?

24        MR. NAMMAR:  I'm sorry.  I meant 32, Your Honor.

25        THE COURT:  32.  Okay.

1   A    Yes.

2   BY MR. NAMMAR:

3   Q    Okay.  Can you look at 33 as well?

4   A    Yes.

5   Q    Do you recognize these two exhibits?

6   A    Yeah, these are -- this is pictures that we took of the

7   defendant's cell phone of Uber receipts.

8   Q    And how were you able to recognize them as such?

9   A    I've been able to recognize them 'cause I was there for

10  the photograph, and I was there going through his cell phone.

11  Q    And do these photographs accurately depict the subject

12  matter therein?

13  A    They do.

14  Q    Have they been altered in any way?

15  A    No, they haven't.

16           MR. NAMMAR:  Your Honor, we move to admit 32 and 33.

17           MS. GLENDON:  No objection.

18           THE COURT:  All right.  32 and 33 are admitted.

19           (Government Exhibits 32 and 33 received in evidence.)

20           THE COURT:  You can publish if you wish.

21           MR. NAMMAR:  Can you put 32 up on the screen?

22  BY MR. NAMMAR:

23  Q    Okay.  32 is on the screen.  What is shown here?

24  A    This is a photograph of the defendant's phone, of a Uber

25  receipt that was on that Friday, October 7th, 2022.  It was

1    around 12:52 p.m. he took a Uber from 10th Avenue, which is

2    Waialae area, or Waialae Ave. area, to 203 Paoakalani Street --

3    Q    Okay.

4    A    -- or Avenue.

5    Q    And what, if anything, is the significance of the

6    addresses here?

7    A    It matches up with his text messages that he has with --

8    with Auntie, saying that he was in -- in Waialae Avenue, and

9    then going to the source, Sajib Anas's place.

10   Q    Those messages that you just mentioned, did it mention

11   anything about why the defendant was on Waialae Avenue?

12   A    He was going to a bank to get cash.

13   Q    Okay.  And the message, the address that shows up, the

14   other address that shows up there, is that familiar to you?

15   A    It is, yes.

16   Q    How so?

17   A    We arrested Sajib Anas outside that residence.

18   Q    Okay.  And which residence was that?

19   A    The 203 Paoakalani Street.

20   Q    Okay.

21   A    Avenue.

22        MR. NAMMAR:  Can we publish 33 -- can you put up 33

23   now?

24   BY MR. NAMMAR:

25   Q    What's shown here?

1    A    Another Uber -- or photograph of McBraun's phone of an

2    Uber receipt.

3    Q    And what's the date and time associated with this trip?

4    A    October 7th, 2022, at 6:00 p.m.

5    Q    And what, if anything, is the significance of this

6    particular Uber trip?

7    A    He has gone back to -- it's from Piikoi Street down to

8    Paoakalani.

9    Q    And is that, that Paoakalani, is that the same address

10   where you had encountered Sajib Anas?

11   A    Yes, it is.

12   Q    Okay.

13        Did you discuss these Uber trip photos with the defendant?

14   A    I did, yes.

15   Q    And what, if anything, did he say?

16   A    He -- he agreed that he had taken Ubers before.  I don't

17   remember if I showed him the photographs, but we talked about

18   his mean of transportation down there.  And he confirmed that

19   he -- he had taken Ubers.

20        MR. NAMMAR:  Can we go back, Your Honor, to the

21   timeline, which is Exhibit 7, pull up page 1?

22        THE COURT:  All right.

23        MR. NAMMAR:  Can you zoom in on -- starting at 11:43

24   and end at 20 minutes, the message that ends at 12:34?

25        Okay, perfect.

1    BY MR. NAMMAR:

2    Q    What is shown here?

3    A    The -- this is a timeline of messages between McBraun and

4    the Auntie that I mentioned, which --

5    Q    Okay.

6    A    -- lives -- sorry -- lives with his source, Sajib Anas.

7    Q    And this is the same Auntie that you asked the defendant

8    about?

9    A    Correct.

10   Q    Okay.  And the second message, is there a reference to

11   Uber?

12   A    Yes.

13   Q    And does that roughly line up with the receipt that we

14   just looked at, the timing of that?

15   A    Yes, it does.

16   Q    Okay.  And the message at 12:31 and 9 seconds, does

17   McBraun say:  I'm almost to Waialae, to the bank?

18   A    Yes.

19   Q    Is that the bank that you mentioned earlier?

20   A    Correct.

21   Q    Okay.  And then later on in that stream, at 12:34 and 22

22   seconds, does McBraun say:  And then to you 20 minutes?

23   A    Correct, yes.

24        MR. NAMMAR:  Can we go now to page 4 of the same

25   timeline?  And can you zoom in on the message at 22:25 and 53

1   seconds?

2   BY MR. NAMMAR:

3   Q    Who's this message between, Agent?

4   A    This message is between the -- the deceased and -- and

5   Cory.

6   Q    And does this message appear directly in time after that

7   screen shot that was sent from Cory to DeLima that we talked

8   about earlier that references fent and Debo?

9   A    Yeah.  It's in response to the deceased learning that the

10  person that Cory is middlemanning for is Debo.

11  Q    Okay.  And it mentions "heavy beefing"?

12  A    Yes.

13  Q    You see that?  Is beefing a term that you are familiar

14  with before this case?

15  A    Yes.

16  Q    And what does that mean?

17  A    They're feuding.  They're upset with each other.

18  Q    Okay.  What, if anything, was the significance of this

19  message in your investigation?

20  A    It confirmed what they were saying, that -- that the

21  victim -- Cory had said -- they're -- they're all graffiti

22  artists and they were feuding --

23          MS. GLENDON:  Objection.

24  BY MR. NAMMAR:

25  Q    Without going into that --

1    A    The defendant said --

2              THE COURT:  Hold on.  Wait.

3              Okay, I'll sustain the objection.  Strike the

4    previous answer.  Ask another question.

5              MR. NAMMAR:  Yeah.

6    BY MR. NAMMAR:

7    Q    Without going into that, did the beefing part, in your

8    mind, relate in any way to the middleman aspect of the messages

9    between Cory and the victim?

10             MS. GLENDON:  Objection, speculation.

11             THE COURT:  Overruled.

12   A    Correct.  It was the entire reason that Cory was involved.

13   BY MR. NAMMAR:

14   Q    Okay.  And could you explain that further?

15   A    Cory was insulating the deceased.

16             MS. GLENDON:  Objection, speculation.

17             THE COURT:  Overruled.  This is based on your review

18   of these texts?

19             THE WITNESS:  Correct.

20             THE COURT:  All right.  Go ahead.

21   A    Cory was insulation between the deceased and the defendant

22   because they were feuding.

23             MR. NAMMAR:  Pass the witness, Your Honor.

24             THE COURT:  All right.  Ms. Glendon, cross.

25             MS. GLENDON:  Just give me second to get settled.

1                    CROSS-EXAMINATION

2   BY MS. GLENDON:

3   Q    Okay.  Good morning, Agent Ganzel.

4   A    Good morning.

5   Q    How are you this morning?

6   A    Great.

7   Q    Okay.  So let's pick up with some of the questions that

8   you answered with Mr. Nammar.

9             THE COURT:  Ms. Glendon, just pull those mics down a

10   little bit.

11             MS. GLENDON:  Sorry.

12             THE COURT:  I just want to make sure everyone can

13   hear you.

14             MS. GLENDON:  Yes.

15   BY MS. GLENDON:

16   Q    Okay.  So you had said that you responded to the scene of

17   the home where Tyler -- Tyler Orso-DeLima's home, correct?

18   A    That's correct.

19   Q    And that would have been on October 9th?

20   A    That was on October 9th, yes.

21   Q    Okay.  You said that other DEA personnel were there with

22   you.  Who else was there?

23   A    Task Force Officer Jared Lee.

24   Q    Any others?

25   A    No, not at the scene.

1  Q    Okay.  I want to just draw your attention to Exhibit 1, in

2  evidence, the Government's Exhibit 1.  That's -- you don't have

3  to look at it yet.

4  A    Okay.

5  Q    That's the metal straw and the tinfoil squares, correct?

6  A    Yes, ma'am.

7  Q    Okay.  So you were the one that gathered that evidence?

8  A    I did not gather.  I witnessed it by -- TFO Lee was the

9  one who gathered it.

10 Q    Okay.  So HPD officer?

11 A    We were --

12 Q    How do I refer to him as?

13 A    You can call him TFO Lee.

14 Q    Okay.  What does TFO stand for?

15 A    Task force officer.

16 Q    Thank you.

17      Okay, so TFO Lee -- he gets the metal straw and the

18 tinfoil squares.

19      Was that at your direction?

20 A    Both of our directions.  We both observed the residue.

21 Q    Okay.  So when you say that you observed the residue, that

22 means you saw residue on both the straw and the tinfoil

23 squares?

24 A    Correct.

25 Q    So how many tinfoil squares were there?

1    A    I cannot recall.

2    Q    More than one?

3    A    Yes.

4    Q    More than ten?

5    A    I can't recall.

6    Q    Okay.  Okay, so you are aware that the metal straw and the

7    tinfoil squares were sent to the lab for testing, correct?

8    A    Yes.

9    Q    And that -- we actually admitted -- that test was actually

10   submitted into evidence as well, right?  Exhibit 9?

11   A    Correct.

12   Q    If you want to refer to it, you can.

13           MS. GLENDON:  May I please have Exhibit 9 published,

14   Your Honor?

15           THE COURT:  Yes.

16           MS. GLENDON:  Thank you.

17           THE COURT:  Do you want just part of that pulled up?

18   Because the jury won't be able to read it from there.

19           MS. GLENDON:  If I could have just the portion that

20   says exhibit, substance identified, net weight, that whole

21   thing.  Thank you.

22           THE COURT:  Okay.

23   BY MS. GLENDON:

24   Q    Does the lab report, as far as you understand, distinguish

25   where the samples came from?  If it came from just the straw or

1    just the tinfoil?

2    A    I think at the -- the remarks of it are what guide what

3    was tested.  It's a little bit lower than what's zoomed in on,

4    but the remarks say the inner packaging consisting of three

5    pieces of foil and one metal tube commingled.  And it just says

6    residue.

7    Q    So everything is commingled, though, right?

8    A    Correct.

9    Q    Okay.

10            THE COURT:  Can you explain what that means?

11            THE WITNESS:  Commingled means that they're together.

12            THE COURT:  No, I understand that.  But I mean what

13    was from the straw and the tinfoil were put together and

14    tested; is that your understanding?

15            THE WITNESS:  Yes, from -- that's my understanding.

16    I am not the chemist so --

17    BY MS. GLENDON:

18    Q    I understand that.

19    A    Correct.

20    Q    But as far as your understanding of it being commingled,

21    you can't exactly tell what item it came from, right?

22    A    I would not venture down that area of chemistry.

23    Q    Okay.  Now, in that one section where it says net weight

24    and residue, you pointed out with Mr. Nammar that for the

25    fentanyl there's residue, correct?

1   A    Yes.

2   Q    And that indicated to you that it was -- the sample was

3   too small to weigh?

4   A    Correct.

5   Q    What does it mean when it's blank, like the heroin?

6   A    I -- I believe that the residue is -- is meant for both of

7   those, not necessarily that -- again, this is my -- I'm not the

8   chemist.  I didn't create this report.

9   Q    Understood.

10  A    But my -- is that it's for both.  It's net weight of the

11  whole exhibit.

12  Q    Okay.  But it's clearly not there, right?

13  A    It doesn't seem that way, no.

14  Q    I'm sorry?

15  A    No, it doesn't.

16  Q    Okay.

17        MS. GLENDON:  I'm done with it.  Thank you.

18  BY MS. GLENDON:

19  Q    Okay.  You had talked a little bit about points and how

20  much a point of fent -- say, fentanyl is, correct?

21  A    Correct.

22  Q    So a point to you -- and this is through your training and

23  experience as a DEA agent --

24  A    Mm-hmm.

25  Q    -- is one-tenth of a gram?

1    A    In this instance, yes, one-tenth of a gram.

2    Q    Kind of want to figure out exactly how much that is.

3         Okay, so have you ever seen one-tenth of a gram?

4    A    Have I seen a tenth of a gram?

5    Q    Yes.

6    A    Yes, I have before.  Yeah.

7    Q    Okay.  So just to give us a little bit of a -- a range --

8    okay.  Are you familiar with, like, different measurements when

9    it comes to drugs?

10   A    Yes.

11   Q    Just in general.  So, say, like a teaspoon?

12   A    A -- do I know what a teaspoon is?  Yes.

13   Q    Yeah, okay.  Could you tell -- like a teaspoon of sugar,

14   could you tell me how much -- how many grams are in a teaspoon

15   of sugar?

16   A    I do not know off the top of my head, no, the

17   calculations.

18   Q    But essentially, a gram is a very small amount, correct?

19   A    Yeah.  And a tenth of a gram is point-1.  Lethal amount of

20   fentanyl is point-O.

21        MS. GLENDON:  Objection, non-responsive, Your Honor.

22        THE COURT:  Yeah, I'm going to strike that answer.

23   You're to disregard it, ladies and gentlemen.  All right?

24        You're not an expert witness.  You can't testify to

25   that.  Strike that from the record.

1          MS. GLENDON:  Thank you.

2          THE WITNESS:  Yes, Your Honor.

3    BY MS. GLENDON:

4    Q    Just asking about how much.

5          So a tenth of a gram, I guess, how would you describe it

6    in terms of like what it actually looks like, a tenth of a gram

7    of fentanyl?

8    A    It's a very small amount.

9    Q    Can you give me an example?

10   A    I cannot, no.

11   Q    Okay.  So say you have sugar in your hand.  Like how much

12   sugar would it look like in your hand?

13   A    A very small amount.  You'd have to weigh out a tenth of a

14   gram.

15   Q    With a scale?

16   A    Can, yes.

17   Q    So very small amount, like granules?

18   A    Yes.

19   Q    Okay.

20        Okay.  Okay, so as you testified, October 11th you helped

21   to set up the buy between Cory Germain and Matthew -- Matthew

22   McBraun, correct?

23   A    Yes, ma'am.

24   Q    Okay.  The buy was for fentanyl?

25   A    That is correct.

1    Q    And you were the one who directed Cory to spent -- send

2    the message, specifically fent?

3    A    Yes.

4    Q    Or fentanyl?

5    A    Yes.

6    Q    And "fent" means fentanyl, correct?

7    A    Yes.

8    Q    Okay.  If -- I've sometimes seen it referred to as

9    "fetty."  That's also fentanyl?

10   A    Correct.

11   Q    Okay.  At that point in time your investigation was

12   focused on the fentanyl, correct?

13   A    That is correct.

14   Q    Okay.  And -- okay.  So on October 11th you arrive at

15   Matt -- Matthew McBraun's house around -- I'm just going to

16   call him Matt.  You arrive at Matt's house sometime around

17   9:00 p.m., correct?

18   A    That is correct.

19   Q    Okay.  He's arrested?

20   A    He is, yes.

21   Q    Okay.  And he's placed into custody without incident.

22   A    No incident.

23   Q    Okay.  Meaning that he was cooperative.  He wasn't

24   fighting.  He wasn't doing anything weird?

25   A    No.

1    Q    Okay.

2              THE COURT:  No, meaning you agree with that?

3              THE WITNESS:  No, I agree he wasn't fighting.

4              THE COURT:  Okay.

5              MS. GLENDON:  Okay.

6    BY MS. GLENDON:

7    Q    And were you present for the arrest?

8    A    I observed it.  I wasn't present for it.

9    Q    From what distance did you observe it?

10   A    I -- more than ten yards.

11   Q    Okay.  Could you hear what was happening, though?

12   A    No.  I was inside a vehicle.

13   Q    Who was the one who placed him under arrest?

14   A    Special Agent Kent and a couple other individuals were

15   there.

16   Q    Who else was there, besides Special Agent Kent?

17   A    I do not recall, top of my head.

18   Q    How many people were there besides Special Agent Kent?

19   A    I would have to refer to the report.  I don't know off the

20   top of my head.

21   Q    Okay.  So you're not the one who actually recovered

22   anything from him, correct?

23   A    I did not search his pockets.

24   Q    Okay.  That was Special Agent Kent?

25   A    Yes.

1   Q    Okay.  But you're aware that Matt admitted to Special

2   Agent Kent that "I have drugs on me"?

3   A    Yes, he said that.

4   Q    And that was pretty much immediately, right?

5   A    I wasn't there for that, but yeah.

6   Q    Okay.

7        Okay, and then ultimately that's when the two plastic

8   baggies were found, Government's I think it's 11 and 12,

9   correct?

10  A    Correct.

11  Q    Okay.  And we've already stipulated that in, so it's fine.

12       Now, 11 -- let's see.  We've already talked about the lab

13  report.

14       Okay.  It wasn't until after he gave up that he had the

15  baggies on him, after that is when you actually read him his

16  Miranda rights, correct?

17  A    Yeah, we read his Miranda warnings once he got into the

18  vehicle.

19  Q    Okay.  I mean, basically he was cooperative from the

20  get-go is my point, correct?

21  A    Correct.

22  Q    Okay.  So you're the one who actually read him his rights,

23  correct?

24  A    That is correct.

25  Q    And he gave you a statement.  He said:  Okay, I'm going to

1  talk.  Right?

2  A    Yes.

3  Q    Now, when he gave the statement, at that point in time he

4  was just under arrest for trying to sell drugs to Cory,

5  correct?  Or for selling drugs to Cory --

6  A    Yes, he --

7  Q    -- that night?

8  A    Yes, he was.

9  Q    Okay.  Because, in fact, the medical examiner's report

10 that showed what Mr. Orso-DeLima's cause of death was,

11 regarding fentanyl, that didn't even come in yet, right?

12           MR. NAMMAR:  Objection.

13           THE COURT:  I'm going to sustain it because I don't

14 understand the question.

15           MS. GLENDON:  I can withdraw the question, Your

16 Honor.  Yeah.

17           THE COURT:  All right.

18 BY MS. GLENDON:

19 Q    Basically, you didn't tell Matt that he was under arrest

20 for Tyler Orso-DeLima, like, whatever happened to Tyler

21 Orso-DeLima at that point, correct?

22 A    No.

23 Q    You were just dealing with whatever was happening on

24 October 11th?

25 A    That's correct.

1    Q    Okay.  And that was the night that Matt told you that his

2    only source for fentanyl was Omar, or Sajib Anas?

3    A    Correct.

4    Q    Okay.  Now, he did consent to the search of his phone.  He

5    gave it up.  He let you go into his house to go and get the

6    phone, right?

7    A    Correct.

8    Q    He also said that you could search his room.

9    A    Yes.

10   Q    Did you?

11   A    Yes.

12   Q    You didn't find any other drugs there, correct?

13   A    Nothing that I can remember, no.

14   Q    You didn't recover any drugs there?

15   A    Nothing was seized.

16   Q    Thank you.

17        Okay.  Now, with the phone, you looked at it, obviously,

18   right?

19   A    Yes, ma'am.

20   Q    Okay.  You came across text messages with Cory?

21   A    Correct.

22   Q    Came across some of his text messages with -- with Sajib

23   Anas, or Omar, correct?

24   A    Correct.

25   Q    Now, Matt, as far as you understand, he's an admitted user

1   of drugs, correct?

2   A    Yes.

3   Q    And in all candor, he admitted to you that he had used

4   heroin before, but he switched to fentanyl a few months before

5   his arrest, in October -- on October 11, 2023, correct?

6   A    Correct.

7   Q    Okay.  He's also an admitted dealer, he's told you that,

8   right?

9   A    Yes.

10  Q    He gets his fentanyl only from Anas?

11  A    That's what he said, yes.

12  Q    Now, let's talk about the text messages with Anas.  Are

13  you familiar with those?

14  A    I am, yes.

15  Q    Okay.  And if you want to refer to I think it's

16  Government's 7, we can.

17        I want to focus on the text messages from Thursday,

18  October 6th, 2023, to Tuesday, October 11, 2023, when Matt was

19  arrested.

20            THE COURT:  This doesn't even cover October 6th.

21            (Counsel confer off the record.)

22            MS. GLENDON:  Your Honor, at this time I believe the

23  government and defense will be stipulating 38 -- Government's

24  Exhibit 38 in.

25            THE COURT:  38.  All right.  Well, let's go to

1    sidebar real quick on this.

2              (Sidebar on the record.)

3              THE COURT:  Okay.  So I just want to make sure for

4    the record we're clear as to where we stand on this, because

5    this is the subject of the matter we talked about --

6              MR. NAMMAR:  Yes.

7              THE COURT:  -- in the earlier dealings between Mr. --

8              MR. NAMMAR:  Yes.

9              THE COURT:  -- Anas and the defendant, right?

10             MS. GLENDON:  Correct.

11             THE COURT:  You objected to it when we had an earlier

12    discussion, but you then said you wanted to take a look and

13    consider it.

14             MS. GLENDON:  Yes.  So --

15             THE COURT:  So I just want to make sure.  I haven't

16    ruled on this.  I'm not hearing an objection, but I want to

17    make sure.  If you want it in, you can get it in.  But for

18    strategic reasons or whatever you think that's --

19             MS. GLENDON:  Yes, sir.  So ultimately, the current

20    version of 38 is -- is what we are stipulating to, so the

21    original one that I objected to was much more voluminous.  And

22    so this would be Mr. Nammar and Ms. Affinito sent me the

23    updated version of 38, and as it is in this current form we

24    have no objection to it coming in.

25             THE COURT:  Okay.  That's not my question, though.

1    You not only have no objection; you affirmatively want to get
2    it in --
3              MS. GLENDON:  Yes.
4              THE COURT:  -- is that right?
5              MS. GLENDON:  Yes.
6              THE COURT:  Because I think you made some objections
7    that may have a point.
8              MS. GLENDON:  Understood, Your Honor.  But based on
9    that, at this point in time we are okay with this coming in.
10             THE COURT:  No, no, no.  See, I'm not going to have a
11   plain error argument here over this document.
12             MS. GLENDON:  I understand.
13             THE COURT:  Okay?  What that means is you have to
14   tell me you affirmatively strategically are making a choice to
15   have this document come in, even though understanding you may
16   have a valid objection keeping it out.
17             MS. GLENDON:  Understood, Your Honor.  We do
18   affirmatively agree that this document should come in.
19             THE COURT:  Okay.  Are you satisfied with that?
20             MR. NAMMAR:  Yes, Your Honor.
21             THE COURT:  Okay.
22             (End of sidebar.)
23             THE COURT:  So, Mr. Nammar, I can't recall.  Did you
24   say no objection to this?
25             MR. NAMMAR:  No objection, Your Honor.

1             THE COURT:  All right.  38 is admitted.

2             (Government Exhibit 38 received in evidence.)

3    BY MS. GLENDON:

4    Q    I'm going to direct your attention to 38.  It should be in

5    the binder in front of you.

6    A    Yes, ma'am.

7    Q    And I'm going to have you flip to -- at the bottom

8    portion, it says --

9             THE COURT:  Well, what page are you on?

10            MS. GLENDON:  Yes, Your Honor.  165.

11            THE COURT:  So the bottom right-hand corner?

12            MS. GLENDON:  Correct.

13            THE COURT:  Okay.

14   BY MS. GLENDON:

15   Q    Are you familiar with these text messages?

16   A    I have not reviewed this in, like, some time.  I'm --

17   don't want to guess as to -- I see Anas is the to.  But who's

18   the owner of this?

19   Q    This would be the text messages between Mr. McBraun and

20   Anas.

21   A    Okay.

22   Q    So you've previously reviewed this, maybe perhaps not in

23   preparation for today?

24   A    Yes.  Yes, I have.  I've seen these.

25   Q    Okay.  Ultimately, the text messages, I want to focus on

1    the text messages on October 6, again, October 6 to October 11.

2        On October 6, as you can see from the text messages, there

3    is conversation between Matt and Anas about Matt paying Anas

4    money that he owes him.  You see that?

5    A    Are you on page 166 or 165?

6    Q    About 165.

7            THE COURT:  Well, don't say about.  I mean you have

8    to give him a page number to look at.

9            MS. GLENDON:  Yes, Your Honor.

10   A    I see the message, it says:  And he spelled my name

11   fucking wrong.  That was from the defendant.

12   BY MS. GLENDON:

13   Q    Okay.  We can start there.

14       So that would be on 165, correct?

15   A    Correct.

16   Q    Okay.  They continue to text back and forth, if you want

17   to -- we can flip to 166.

18           MS. GLENDON:  Your Honor, if I could have page 165 of

19   38 published.

20           THE COURT:  Do you have that?

21           MS. VESS:  (Nods.)

22           THE COURT:  Okay.

23       All right.  Do you want one of those in particular

24   blown up?  Because the jury won't be able to see it from --

25           MS. GLENDON:  I guess the one that Agent Ganzel was

1    referring to:  And he spelled my --

2            THE COURT:  All right.  The one in the middle?

3            MS. GLENDON:  In the middle.

4    BY MS. GLENDON:

5    Q    Okay.  So that's October 6, correct?

6    A    Yes, ma'am.

7    Q    Okay.  Now, if you flip to the next page, as far as you

8    can tell from these text messages, do they actually see each

9    other on this day?

10   A    (Reviews document.)  On these --

11           THE COURT:  Are you asking if there's anything on

12   these two pages, pages 165 and 166, to reflect that they met?

13           MS. GLENDON:  Yes.

14           THE COURT:  Is that what you're asking?  Okay.

15   A    No.

16   BY MS. GLENDON:

17   Q    Okay.  Now, on the same page, on 166, if you could --

18           MS. GLENDON:  166 in the blue section, if we could

19   have that highlighted.

20   BY MS. GLENDON:

21   Q    That would be the first conversation that they have

22   together, on October 7th, correct?

23   A    On October 7th, yes.

24   Q    Okay.  And that's the day that you referenced in terms of

25   the Uber trip and the times when Mr. -- when Matt went over to

1   see Anas, correct?

2   A    Yes.

3   Q    Okay.  October 7th.

4        Now, can we flip to page 168?

5        The date on those text messages is October 8th, correct?

6   A    That is correct.

7   Q    Okay.  That would be Saturday, correct?

8   A    Yes.

9   Q    7th was Friday.  8th was Saturday.  Correct?

10  A    Yes, ma'am.

11  Q    Okay.  Now, between page 168, all the way up until page

12  173, can you tell from the text messages whether or not they

13  met up?

14  A    From 168 to 173?

15  Q    168 to 173, yes.

16  A    One moment.  (Reviews document.)

17       Can you repeat your question now?

18  Q    Sure.  Between pages 168 to 173, those reflect text

19  messages between Matt and Anas on October 8th, Saturday,

20  correct?

21  A    Yes, ma'am.

22  Q    Okay.  And from those text messages, isn't it true that

23  they did not in fact meet up on Saturday?

24  A    I --

25            MR. NAMMAR:  Objection, Your Honor.

1              THE COURT:  Sustained.

2    A    I --

3              THE COURT:  Wait.  No, no, I sustained the objection.

4              THE WITNESS:  Yes, Your Honor.

5              MS. GLENDON:  I can rephrase the question.

6    BY MS. GLENDON:

7    Q    Isn't it true from those text messages that it does not

8    reflect that they met up?

9              MR. NAMMAR:  Objection, Your Honor.

10             THE COURT:  Well, I think it's okay to ask if the

11   text messages themselves reflect whether they met up.  So --

12             MR. NAMMAR:  Yeah.

13             THE COURT:  So I'll overrule that objection.

14             MR. NAMMAR:  Okay.

15             THE COURT:  Whether they met up or not isn't the

16   question anymore.  It's whether the text messages reflect that.

17             MR. NAMMAR:  Right.

18             THE WITNESS:  Yes, Your Honor.  It -- based on the

19   text messages, it would not seem that they met.

20             MS. GLENDON:  Thank you.

21             THE COURT:  Ms. Glendon, is this a good time to take

22   a break for the morning?

23             MS. GLENDON:  Okay.

24             THE COURT:  So we'll go ahead and take our morning

25   recess.  Ladies and gentlemen, I'll remind you not to discuss

1    the case with each other or others, or do any research

2    regarding it in any way.  And just leave your notepads and

3    iPads behind.  Okay?  We'll have about a 10-15 minute recess.

4              COURTROOM MANAGER:  All rise for the jury.

5              (The jury was excused at 10:10 a.m.)

6              (The court recessed at 10:11 a.m. until 10:33 a.m.)

7              (Open court in the presence of the jury.)

8              THE COURT:  All right.  Please be seated.

9              All right.  We're back with ladies and gentlemen of

10   the jury, counsel, the defendant.

11             Agent, I remind you, you're still under oath.

12             And, Ms. Glendon, you may continue with your

13   cross-examination.

14   BY MS. GLENDON:

15   Q    Okay.  Let's get our game face back on, right?

16   A    Yes, ma'am.

17   Q    Okay.  We've established that, at least from the text

18   messages, it doesn't like he and Anas hooked up on Saturday,

19   correct?

20             MR. NAMMAR:  Objection.

21             THE COURT:  Sustained.

22             MS. GLENDON:  Okay.

23   BY MS. GLENDON:

24   Q    Okay.  So moving on from there -- let's see.

25        Let's keep going, after Saturday.

1          So if you look at the text messages on Sunday,

2    October 9th -- and let me get the page number for you.

3    A     What exhibit?  Sorry.

4    Q     I'm so sorry?

5    A     What exhibit are we in?

6    Q     Sure.  It's the same Exhibit 38, Government's 38.  And you

7    would be starting at 38, page 173.

8               MS. GLENDON:  If we could please have page 173 pulled

9    up?  Thank you.

10   BY MS. GLENDON:

11   Q     Okay?

12   A     Yes, ma'am.

13   Q     So bottom left, that's where the text messages between

14   Anas on the left, Matt on the right; is that correct?

15   A     Yes.  The defendant's on the right, and Anas is on the

16   left.

17   Q     Okay.  So just to be clear, green is defendant, blue is

18   Anas?

19   A     Yes, ma'am.

20   Q     Okay.  So the first text message that you can see on

21   October 9th would be that one, the blue text message, right?

22   A     Correct.

23   Q     Okay.  Now, if you flip the page to 174 -- if we may?

24         All blue?

25   A     Correct.

1   Q    Correct?  All Anas?

2   A    Correct.

3   Q    Okay.  And these are also on October 9th, correct?

4   A    Yes.

5   Q    Okay.  And from those various text messages, like the top

6   one, it says:  I'm on Nohonani?

7   A    Yes.

8   Q    From Anas, correct?

9   A    Yes.

10  Q    No response?

11  A    Correct.

12  Q    Next one -- you don't have to highlight it.  "In front of

13  the Island Colony" from Anas, no response?

14  A    Correct.

15  Q    Also on October 9th?

16  A    Correct.

17  Q    Okay.  And the next one, same thing:  Also on October 9th,

18  from Anas, no response at that time, correct?

19  A    Correct.

20  Q    Okay.  So --

21           THE COURT:  Agent, pull your microphone down a

22  little.

23           THE WITNESS:  Sorry, Your Honor.

24           THE COURT:  Thank you.

25  BY MS. GLENDON:

1   Q    On page 175, if we can go there.

2         So the next page, again, October 9th, it looks like it's

3   around 11:49 a.m. or there -- or 11:26 a.m., thereabouts, on

4   the bottom right of the top text?

5   A    Correct.

6   Q    Okay.  That's from Anas.  There is a response in green, on

7   October 9th, from Mr. McBraun, from Matt, correct?

8   A    Correct.

9   Q    Okay.  And then back and forth.  From these text messages

10  and -- messages, what they're saying, can you tell whether or

11  not they met up that day?

12  A    Based on the text messages, I can't tell.

13  Q    Okay.  But it doesn't look like they met up that day,

14  based on the text messages, correct?

15  A    I do not know based on the text messages.

16  Q    Okay.  Now, if we can flip to page 176.  This is again --

17  top left.  It says "ready" in blue.  It's a text message from

18  Anas, correct?

19  A    That is correct.

20  Q    And that's dated October 9th?

21  A    October 9th.

22  Q    Okay.  The one right below that, there's a question mark.

23  It's also in blue, dated October 9, from Anas, correct?

24  A    Correct.

25  Q    Okay.  The next text message that comes in is in green,

1    from Matt:  WYA -- "where you at" -- correct?

2    A    Correct.

3    Q    And that's October 9th?

4    A    Yes.

5    Q    From those text messages you cannot tell whether or not

6    they met up, correct?

7    A    Correct.

8    Q    Okay.  The next page, 177.  We're already on October 10th,

9    in the top left, correct?

10   A    Yes.

11   Q    Okay.  Now, if you look at the green message, we're at

12   October 11th, correct?

13   A    That's correct.

14   Q    And the green message is from Matt, correct?

15   A    That is correct.

16   Q    And that message says:  I be out that way tomorrow, being

17   a homebody tonight with the girl.  Correct?

18   A    That's correct.  Yes.

19   Q    So be out there -- "be out that way tomorrow, being a

20   homebody with the girl," that would indicate to you tomorrow

21   being October 12th, correct?

22   A    So the message is at 12:00 a.m. on the 11th.

23   Q    Okay.

24   A    So it could reference the next day.  So -- or the same

25   day.  So it's the 11th, later on in the evening.

1  Q    I'm sorry?

2  A    So if -- the -- the message is at -- at 12:00 a.m. --

3  Q    Okay.

4  A    -- on the 11th.  So it could be that night.  'Cause

5  he's --

6  Q    Okay.

7  A    It's that night.  It's over.  The next day, if that makes

8  sense.

9  Q    Ultimately, the blue says:  Yes, dad?

10 A    Yes.

11 Q    And then the next page, the response is:  Go with God, my

12 son.  Right?

13 A    Next page.  Sorry.

14 Q    178?

15 A    Yes.  It does.

16 Q    Okay.  From those text messages you cannot tell whether or

17 not they met up on October 10th, correct?

18 A    From the messages it looks like that they did not meet up

19 on October 10th.

20 Q    And then on October 11th, you cannot tell whether or not

21 they met up on October 11th as well?

22 A    Well, based on it being at 1:13 in the morning, no.

23 Q    Okay.  Okay, so October 11th, that's -- that gets us to

24 Tuesday, correct?  October 11th?

25 A    Yes.

1    Q    And Tuesday evening is when Matt got arrested, right?

2    A    Yes.

3    Q    Okay.  And when he was arrested, with the baggies that he

4    was arrested with, are you aware of the weight of what -- of

5    the fentanyl that he was arrested with?

6    A    I would have to refer to the -- my report or the -- the

7    lab report.

8    Q    If I can draw your attention to what's in evidence at

9    Government's 11.

10            MS. GLENDON:  If we could have that brought up,

11    please.

12            THE COURT:  Wait.  Hold on one second.  Renee, did

13    we --

14            COURTROOM MANAGER:  Yeah, it's not --

15            THE COURT:  Yeah, it's not -- it's never been

16    admitted.  Neither 11 nor 12 were.

17            MR. NAMMAR:  No objection, Your Honor, to admission.

18            MS. GLENDON:  It's --

19            THE COURT:  You can stipulate all you want.  You have

20    to ask me to admit it.

21            MS. GLENDON:  Sure, Your Honor.  Yes, Your Honor.

22            THE COURT:  All right.  Do you want to admit 11 and

23    12?

24            MS. GLENDON:  Yes, Your Honor.  At this time, we

25    would like to admit 11 and 12.

```
 1              MR. NAMMAR:  No objection, Your Honor.

 2              THE COURT:  11 and 12 are admitted.

 3              (Government Exhibits 11 and 12 received in evidence.)

 4              THE COURT:  Now you may publish.

 5              MS. GLENDON:  Thank you.

 6              If we could have the net weight and the fentanyl --

 7    thank you.

 8    BY MS. GLENDON:

 9    Q    Okay.  So this is the lab report that tested the baggie

10    that was found on Matthew McBraun on Tuesday, October 11th,

11    2022.  Do you see the net weight?

12    A    Yes, ma'am, I do.

13    Q    Okay.  And that net weight is .694 grams, correct?

14    A    Yes, ma'am.

15    Q    Okay.  Okay.  And it tested only for fentanyl, correct?

16    A    That's correct.

17    Q    Okay.  Thank you.

18              MS. GLENDON:  I'm done.  Thank you.

19    BY MS. GLENDON:

20    Q    He's also arrested that night with the crystal

21    methamphetamine, correct?

22    A    Correct.

23    Q    No heroin?

24    A    No.

25    Q    No fentanyl laced with heroin?
```

1    A    No.

2    Q    No crystal methamphetamine laced with heroin?

3    A    No.

4            MS. GLENDON:  No further questions.

5            THE COURT:  All right.  Redirect?

6            MR. NAMMAR:  Yes, Your Honor.

7                        REDIRECT EXAMINATION

8    BY MR. NAMMAR:

9    Q    You were asked a lot of questions about your

10   interpretation of Government's 38, which is a string of text

11   messages between Anas and McBraun; is that right?

12   A    That's correct.

13   Q    Okay.  So when the defendant Mr. McBraun made a statement,

14   what did he tell you about October 8th, Saturday?

15   A    He said he met up with Sajib Anas.

16   Q    Okay.  And 38, the text messages that defense counsel went

17   over with you, those only showed text messages, correct?

18   A    That is correct.

19   Q    Okay.  And one way people can meet up is if they talk on

20   the phone; is that right?

21   A    That is correct.

22   Q    Okay.  And so if there were phone calls, that could

23   explain how two people got together to meet up on that day, or

24   on the 9th of October?

25   A    Yes.

1          MR. NAMMAR:  No further questions.

2          THE COURT:  All right.

3          You can stay there if you have a question.

4          MS. GLENDON:  Thank you.

5                          RECROSS-EXAMINATION

6    BY MS. GLENDON:

7    Q    So what you're getting this Saturday from is when on

8    Tuesday he told you the last time I got anything from Anas was

9    three days ago, correct?

10   A    And he confirmed -- yes, and he confirmed Saturday.

11   Q    So who said Saturday, him or you?

12   A    I cannot recall, the top of my head.

13   Q    He told you three days, correct?

14   A    He did, yes.

15   Q    And you went one, two, three, oh, that must be Saturday?

16   Because Saturday came from you?

17   A    That, I cannot recall.

18          MS. GLENDON:  No further questions.

19          THE COURT:  All right.

20          MR. NAMMAR:  United States calls --

21          THE COURT:  No, hold on.  Hold on.

22          You may step down.

23          THE WITNESS:  Thank you, Your Honor.

24                                      (Witness excused.)

25          MR. NAMMAR:  United States called Josh Kent.

1          THE COURT:  All right.

2          This monitor's working again --

3          MR. NAMMAR:  Okay.

4          THE COURT:  -- so you folks know.

5          MR. NAMMAR:  Thank you, Your Honor.

6          COURTROOM MANAGER:  Please take the stand and remain

7    standing for me.

8          Please raise your right hand.

9          JOSH KENT, GOVERNMENT'S WITNESS, SWORN.

10          THE WITNESS:  I do.

11          COURTROOM MANAGER:  Please be seated.

12          State your name and spell your first and last name

13    for the record.

14          THE WITNESS:  Yes.

15          Good morning.  Joshua Wayne Kent.  J-O-S-H-U-A,

16    W-A-Y-N-E, K-E-N-T.

17                         DIRECT EXAMINATION

18    BY MR. NAMMAR:

19    Q    Good morning, Agent Kent.

20    A    Good morning.

21    Q    Can you tell the jury how you're employed?

22    A    I'm a special agent with the Drug Enforcement

23    Administration.

24    Q    And how long have you been with the DEA?

25    A    A little over four years.

1   Q    Are you assigned to a particular office?

2   A    Yes, the Honolulu district office.

3   Q    And have you been at that office for your entire career

4   with DEA?

5   A    Yes.

6   Q    What are your duties as a DEA agent?

7   A    I investigate federal drug crimes.

8   Q    And do you work on investigations related to the substance

9   fentanyl?

10  A    Yes.

11  Q    Do you have any professional experience before joining the

12  DEA?

13  A    I was a child protective investigator for a sheriff's

14  office in Tampa, Florida.

15  Q    How far did you go in school?

16  A    I have a master's degree in international security.

17  Q    Where did you get that?

18  A    Charles University in Prague.

19  Q    I want to direct your attention now to October 11th, 2022.

20  Were you working on that day?

21  A    Yes.

22  Q    Do you recall what took place that evening?

23  A    I was a part of the arrest team that evening.

24  Q    What does it mean to be a part of the arrest team?

25  A    I'm one of the -- we usually have more than one agents

1   that are assigned to conduct the arrest of an individual.

2   Q    And which person were you going to arrest on the evening

3   of October 11, 2022?

4   A    Matthew McBraun.

5   Q    To effectuate that arrest, what did you do?

6   A    Personally, I was assigned to a specific vehicle.  We were

7   outside of a residence at the time, and we were to wait for him

8   to leave the residence to then place him in custody.

9   Q    What residence were you outside of?

10  A    It's 1392 Honokahua Street.

11  Q    And where is that?

12  A    It's in Kalama Valley.

13  Q    And what island is that on?

14  A    On Oahu.

15  Q    Okay.  Have you heard of the term buy-bust?

16  A    Yes.

17  Q    What does that term mean?

18  A    It's essentially When a cooperating defendant or source

19  orders drugs from somebody for the purpose of them to show up

20  to do the deal.  Either you conduct the drug transaction and

21  then place that person under arrest, or by them showing up you

22  place them under arrest.

23  Q    Did a buy-bust take place on the evening of

24  October 11th --

25  A    Yes.

1    Q    -- in Kalama Valley?

2         Can you tell the jury what happened?

3    A    I was in the arrest vehicle.  We parked outside the

4    residence.  We got word over the radio that a call had been

5    placed, that the order was made for fentanyl and meth, and

6    sometime later we observed Matthew McBraun exit his residence.

7    He approached the arrest vehicle, and we placed him into

8    custody at that time.

9    Q    What, if anything, happened after he was placed into

10   custody?

11   A    For officer safety, I conducted a pat down, and for

12   officer safety I asked him if he had anything on him.  He

13   stated "I have drugs."

14   Q    And what happened after Mr. McBraun said that?

15   A    I searched his pockets.  In his left pocket I found two

16   small baggies.

17   Q    Did you seize these substances?

18   A    Yes.

19   Q    Why?

20   A    'Cause we believed for them to be drugs at the time.

21   Q    Okay.

22         MR. NAMMAR:  Your Honor, may I approach with Exhibits

23   3 and 4?

24         THE COURT:  All right.

25   BY MR. NAMMAR:

1    Q    Let's start with Exhibit 3.  Do you recognize what's

2    marked as Exhibit 3?

3    A    Yes.

4    Q    How are you able to recognize it?

5    A    I know it as the exhibit that we designate in our DEA

6    case.  I recognize it because my signature is on the front and

7    also at the top.

8    Q    Is it a unique case number that appears on this particular

9    package?

10   A    Yes.

11   Q    And is that the case number associated with the

12   defendant's case?

13   A    Yes.

14   Q    Where did you seize Exhibit 3 from?

15   A    His left pocket.

16   Q    Whose left pocket?

17   A    Matthew McBraun's.

18   Q    And what did you do with Exhibit 3 after it was seized?

19   A    It was later processed.  We seal it into bags.  For

20   fentanyl, we seal it, like, into a double bag.  And then we

21   were -- that night we placed it into the drug evidence vault,

22   because FedEx was closed.  And then on October 13th, we were --

23   we shipped it off to the Southwest Labs.

24   Q    And what's the purpose of shipping it to the lab?

25   A    For testing and processing and safekeeping.

1   Q     And who does that testing?

2   A     The chemists at the lab.

3   Q     Can you tell from looking at Exhibit 3 whether it made it

4   to the lab?

5   A     Yes.

6   Q     How you can you tell?

7   A     Has a sticker at the top with the LIMS case number, which

8   is designated by the lab, and then at the bottom it has a

9   signature where they opened the bag.

10  Q     Is Exhibit 3 in substantially the same condition now as

11  when you first saw it?

12  A     Yes.

13  Q     Do you know what the laboratory found Exhibit 3 to

14  contain?

15  A     Fentanyl.

16  Q     Okay.

17              MR. NAMMAR:  Your Honor, I move to admit Exhibit 3.

18              MS. GLENDON:  No objection.

19              THE COURT:  3 is admitted.

20              (Government Exhibit 3 received in evidence.)

21              MR. NAMMAR:  And 11 is already in evidence.  Can we

22  publish 11?

23              THE COURT:  Yes.

24              MR. NAMMAR:  You can zoom in.  Thank you.

25  BY MR. NAMMAR:

1   Q    Agent Kent, Exhibit 11 is on the screen.  What is shown
2   here?
3   A    It shows the exhibit number, the substance that was
4   identified by the chemist, which shows fentanyl, and then the
5   net weight of what was seized.
6   Q    And is this the lab report that corresponds to Exhibit 3
7   that you took out of the defendant's pocket?
8   A    Yes.
9   Q    And what's the weight associated with that substance?
10  A    The net weight is 0.694 grams plus-minus 00 -- .002 grams.
11  Q    Approximately, in terms of tenths of a gram, approximately
12  how much is that?
13  A    I mean, it's more than half a gram.
14  Q    Okay.  Would it be close to 7/10ths of a gram?
15  A    Yes.
16  Q    Okay.
17          MR. NAMMAR:  You can go ahead and take that down.
18  BY MR. NAMMAR:
19  Q    Can you look now at Exhibit 4, which should be in front of
20  you?
21  A    Yes.
22  Q    Do you recognize it?
23  A    Yes.
24  Q    How are you able to recognize it?
25  A    It has the designated number for the exhibit.  It has my

1    name and signature on it, both on the front and the top.

2    Q    What is Exhibit 4?

3    A    It's crystal methamphetamine.

4    Q    Where did you get Exhibit 4?

5    A    From the pocket of Matthew McBraun.

6    Q    And what did you do after you seized Exhibit 4 from the

7    pocket of Matthew McBraun?

8    A    The same thing with the fentanyl, we processed it, placed

9    it into the drug vault overnight until October 13th, and then

10   we were able to send it via FedEx to Southwest Labs.

11   Q    Is Exhibit 4 substantially in the same condition now as

12   when you first saw it?

13   A    Yes.

14   Q    Can you tell from looking at Exhibit 4 that it made it to

15   the lab?

16   A    Yes.

17   Q    How can you tell that?

18   A    Has the LIMS case number that the lab provides, and then

19   at the bottom, where the lab opened the bag, it has a

20   signature.

21            MR. NAMMAR:  Your Honor, we move for the admission of

22   Exhibit 4.

23            MS. GLENDON:  No objection.

24            THE COURT:  4 is admitted.

25            (Government Exhibit 4 received in evidence.)

1          MR. NAMMAR:  May we publish 12, which is already in

2     evidence?

3          THE COURT:  Yes.

4     BY MR. NAMMAR:

5     Q    Agent Kent, 12 is on the screen.  The jury can see it.

6          What are we looking at here?

7     A    This is Exhibit 4, which the lab identified as

8     methamphetamine hydrochloride, with a net weight of .59 grams,

9     plus-minus .01 grams.

10    Q    Okay.  What does the purity mean?

11    A    It's 97 percent, which is with a plus-minus 6 percent.

12    Q    And what does that mean?

13    A    It means that the substances they test turned out to be

14    97 percent pure methamphetamine.

15    Q    Is that something they typically do with methamphetamine

16    but not with other controlled substances?

17    A    Yes.

18    Q    Okay.  And what lab report does this correspond to?

19    A    Exhibit 4.

20    Q    And that's the methamphetamine that you found in the

21    defendant's pocket?

22    A    Yes.

23    Q    Okay.

24         MR. NAMMAR:  Your Honor, at this time I'd ask to read

25    a stipulation between the parties about the results from the

1    DEA lab.

2              THE COURT:  Any objection?

3              MS. GLENDON:  None.

4              THE COURT:  All right.  You may.

5              To be clear, ladies and gentlemen, this is a

6    stipulation.  It's not part of this agent's testimony.  It's

7    just a stipulation the parties have entered into.  All right?

8              MR. NAMMAR:  Stipulation -- it's entitled:

9    Stipulation Testimony of DEA Chemists.  There are four forensic

10   chemists, each employed by the United States Drug Enforcement

11   Administration, at the DEA Southwest Laboratory in Vista,

12   California, who could provide testimony that is relevant and

13   admissible in this case.

14             In lieu of having those four forensic chemists travel

15   from California to Hawaii in person, the parties have agreed to

16   stipulate to their testimony as if it has been given before

17   this jury in this courtroom.

18             The parties further agree that the jury should

19   consider their testimony in the same manner as the testimony of

20   the other witnesses who have testified in person in this

21   courtroom.

22             The parties stipulate and agree that the following

23   are true and correct:

24             DEA Forensic Chemist Melisa Glatte.  Melisa Glatte is

25   a forensic chemist at the DEA Southwest Laboratory in Vista,

1    California.  Ms. Glatte analyzed Trial Exhibit 1, which

2    consists of a metal tube and three pieces of foil, by

3    performing gas chromatography mass spec analysis to identify

4    the presence and the absence of controlled substances.

5             Trial Exhibit 1 was received by the DEA Southwest

6    Laboratory and arrived intact, without any evidence of

7    tampering or alteration.  Upon receipt, Ms. Glatte maintained

8    continuous chain of custody of the exhibit until it was mailed

9    back to the DEA in Oahu, Hawaii.  A proper chain of custody was

10   maintained for Trial Exhibit 1 from the time of its seizure on

11   October 11, 2022, and through the trial in this case.

12            Testing conducted on Trial Exhibit 1 conclusively

13   revealed that the residue on the metal tube and the three

14   pieces of foil was a mixture of fentanyl and heroin.  A true

15   and accurate copy of Ms. Glatte's laboratory report regarding

16   Trial Exhibit 1 is admitted into evidence in this trial as

17   Trial Exhibit 9.

18            DEA Senior Forensic Chemist Alexandra Ambriz.

19   Alexandra Ambriz is a senior forensic chemist at the DEA

20   Southwest Laboratory in Vista, California.

21            Ms. Ambriz analyzed Trial Exhibit 2, which consists

22   of a plastic bottle containing orange pills and a plastic bag

23   containing other powder, by performing gas chromatography and

24   gas chromatography mass spec analysis to identify the presence

25   or absence of controlled substances.

1          Trial Exhibit 2 was received by the DEA Southwest

2     Laboratory and arrived intact and without any evidence of

3     tampering or alteration.  Upon receipt, Ms. Ambriz maintained

4     continuous chain of custody of the exhibit until it was mailed

5     back to the DEA in Oahu, Hawaii.  A proper chain of custody was

6     maintained for Trial Exhibit 2 from the time of its seizure on

7     October 11, 2022, to and through the trial in this case.

8          Testing conducted on Trial Exhibit 2 conclusively

9     revealed that the orange pills consisted of a mixture of

10    buprenorphine and naloxone, with a net weight of 2.023 grams.

11    Testing conducted on Trial Exhibit 2 conclusively revealed that

12    the orange powder was also a mixture of buprenorphine and

13    naloxone, with a net weight of 3 -- .322 grams.  A true and

14    accurate copy of Ms. Ambriz's laboratory report regarding Trial

15    Exhibit 2 is admitted into evidence in this trial as Trial

16    Exhibit 10.

17         DEA Forensic Chemist Kevin Eckert.  Kevin Eckert is a

18    forensic chemist at the DEA Southwest Laboratory in Vista,

19    California.  Ms. Eckert -- Mr. Eckert analyzed Trial Exhibit 3,

20    which consists of a powder substance, by performing gas

21    chromatography, gas chromatography mass spec, and the Marquis

22    color testing analysis to identify the presence or absence of

23    controlled substances.

24         Trial Exhibit 3 was received by the DEA Southwest Lab

25    and arrived intact, without any evidence of tampering or

1    alteration.  Upon receipt, Mr. Eckert maintained a continuous

2    chain of custody of the exhibit until it was mailed back to the

3    DEA in Oahu, Hawaii.  A proper chain of custody was maintained

4    for Trial Exhibit 3 from the time of its seizure on October 11,

5    2022, to and through the trial in this case.

6           Testing conducted on Trial Exhibit 3 conclusively

7    revealed that the powder substance was fentanyl, with a net

8    weight of .694 grams.  A true and accurate copy of Mr. Eckert's

9    laboratory report regarding Trial Exhibit 3 is admitted into

10   evidence in this trial as Trial Exhibit 11.

11          DEA Senior Forensic Chemist James Joseph.  James

12   Joseph is the senior forensic chemist at the DEA Southwest Lab

13   in Vista, California.  Mr. Joseph analyzed Trial Exhibit 4,

14   which consists of a crystalline substance, by performing gas

15   chromatography, mass spec and infrared spectroscopy analysis to

16   identify the presence or absence of controlled substance --

17   substances.

18          Trial Exhibit 4 was received by the DEA Southwest

19   Laboratory and arrived intact, without any evidence of

20   tampering or alteration.  Upon receipt, Mr. Joseph maintained

21   continuous chain of custody of the exhibit until it was mailed

22   back to the DEA in Oahu, Hawaii.  A proper chain of custody was

23   maintained for Trial Exhibit 4 from the time of its seizure on

24   October 11th, 2022, to and through the trial in this case.

25          Testing conducted on Trial Exhibit 4 conclusively

1  revealed that the crystalline substance was methamphetamine

2  hydrochloride, with a net weight of .59 grams and a substance

3  purity of 97 percent and consisting of .57 grams of pure

4  methamphetamine.

5          A true and accurate copy of Mr. Joseph's laboratory

6  report regarding Trial Exhibit 4 is admitted into evidence in

7  this trial as Trial Exhibit 7, and it's signed by the parties

8  in this case, including the prosecutors, the defendant, and

9  approved by the Judge.

10          THE COURT:  And just to be clear, approved as a

11  stipulation.  I'm not approving the testimony.  I just approved

12  the stipulation.

13          MR. NAMMAR:  Thank you for that clarification --

14          THE COURT:  Okay.

15          MR. NAMMAR:  -- Your Honor.

16          THE COURT:  All right.

17                DIRECT EXAMINATION (Continued)

18  BY MR. NAMMAR:

19  Q    So you've talked about an arrest that took place on

20  October 11th, 2022, and a seizure of drugs from Mr. McBraun's

21  pocket.

22      Do you see Mr. McBraun in the courtroom?

23  A    Yes.

24  Q    Can you pick him out and describe an article of clothing

25  he's wearing?

1    A    He's sitting over there.  He's got the long-sleeve

2    blue-collared shirt on.

3            MR. NAMMAR:  May the record reflect that the witness

4    identified the defendant?

5            THE COURT:  Yes.

6    BY MR. NAMMAR:

7    Q    After you seized the -- after you seized the drugs from

8    Mr. McBraun, placed him under arrest, what did you do next?

9    A    I placed him in a vehicle that was occupied by Special

10   Agent Tyler Ganzel and Task Force Officer Jared Lee.

11   Q    And what happened in that vehicle, if you know?

12   A    It was told to me that he provided consent to search his

13   residence.

14   Q    Okay.  Were you present in the vehicle when that happened?

15   A    No.

16   Q    Okay.  What did you do next after hearing about the

17   consent?

18   A    We went and searched inside of his bedroom.

19   Q    Whose bedroom?

20           THE COURT:  I'm sorry.  Inside of his what?

21           THE WITNESS:  His bedroom.

22           THE COURT:  Thank you.

23   BY MR. NAMMAR:

24   Q    Whose bedroom did you search?

25   A    Matthew McBraun's.

1  Q    And what, if anything, did you recover in McBraun's

2  bedroom?

3  A    A cell phone.

4  Q    Okay.

5         MR. NAMMAR:  May I approach, Your Honor?

6         THE COURT:  You may.

7  BY MR. NAMMAR:

8  Q    I've handed you what's marked as Government's Exhibit 6.

9  Are you able to recognize it?

10  A    Yes.

11  Q    What is it?

12  A    It's Matthew McBraun's cell phone.

13  Q    And how are you able to recognize it as Mr. McBraun's cell

14  phone?

15  A    It has the designated non-drug number that we provide in

16  our case, the N4.  It has my name on it with a signature, and

17  it has my name on the top of the signatures where -- well,

18  where it was sealed.

19  Q    What did you do with this exhibit after sealing it and

20  seizing it?

21  A    We placed it into our non-drug evidence vault.

22  Q    And what's the purpose of doing that?

23  A    To keep it safe and secure.

24  Q    Is Exhibit 6, the cell phone, substantially in the same

25  condition now as when you first saw it?

1    A    Yes.

2         MR. NAMMAR:  Your Honor, we move for the admission of

3    Exhibit 6.

4         MS. GLENDON:  No objection.

5         THE COURT:  6 is admitted.

6         (Government Exhibit 6 received in evidence.)

7    BY MR. NAMMAR:

8    Q    So you've told us that you seized the drugs from

9    Mr. McBraun's pocket.  You sent those off to the lab.  You also

10   seized his cell phone.

11        Did you have any other involvement in this investigation

12   on the night of October 11, 2022?

13   A    Later that night we went on to do --

14   Q    Well -- so before -- I guess, did you have any other

15   involvement with Mr. McBraun on the night of October 11, 2022?

16   A    Other than him providing consent for the phone?

17        Yeah, we were able to look into his phone based on him

18   providing consent for it.

19   Q    Okay.

20   A    Yeah.

21        MR. NAMMAR:  Pass the witness, Your Honor.

22        THE COURT:  All right.  Cross.

23                    CROSS-EXAMINATION

24   BY MS. GLENDON:

25   Q    Good morning, Agent Kent.

1    A    Good morning.

2    Q    Sorry.  I'm trying to get all the titles.

3    A    Either way, it's fine.

4    Q    Okay.  So when you arrested Matthew McBraun on

5    October 11th, at around 9:00 p.m., he was placed into custody

6    without incident, correct?

7    A    Yes.

8    Q    That means that there were no incidents; he wasn't trying

9    to run away; he wasn't uncooperative?

10   A    Oh, no, he was cooperative.

11   Q    Okay.  And when you asked him right off the bat if he had

12   anything on him, he said:  I have drugs?

13   A    Yes.

14   Q    And he consented to your search of his pockets?

15   A    We typically do a search for officer safety.

16   Q    So you did the pat down?

17   A    Yes.

18   Q    And you got the two baggies, correct?

19   A    Yes.

20   Q    And those two baggies, as -- from what you testified, came

21   back positive, one for fentanyl and the other one for crystal

22   methamphetamine, correct?

23   A    Yeah.  The lab said it was methamphetamine hydrochloride.

24   Q    Okay.  I wanted to just talk to you a little bit about

25   that measurement.  So you said that whatever is in the baggie

1    for the fentanyl, that's about 7/10ths of a gram, correct?

2    A    If I can have the --

3    Q    Oh, it's not up there?

4    A    Yeah, it's not up here on my screen.

5    Q    Okay.  But do you recall your testimony with Mr. Nammar?

6    A    Yeah.  Yeah, yeah.  But just for --

7            THE COURT:  Exhibit 11.

8            THE WITNESS:  Okay.  How do I pull that up?

9            THE COURT:  You have a binder right there.  Over

10   there.

11   BY MS. GLENDON:

12   Q    Actually, let's simplify this.  I'm just confirming.

13   7/10ths of a gram, correct?

14           THE COURT:  He says he doesn't know.  He wants to

15   look at the exhibit so he can confirm it.

16           MS. GLENDON:  Sorry about that.

17           THE WITNESS:  Yeah, I don't want to say anything

18   wrong.

19   A    Yes, so approximately, it's .694 grams.

20   BY MS. GLENDON:

21   Q    Okay.  So approximately 7/10ths?

22   A    Sorry.  I said .694 grams, so approximately 7/10ths.

23   Q    Okay.  So, I mean, just do the math just to be a little

24   bit more of a stickler.  If you divide that into seven parts,

25   each one of those things would be about 1/10th of a gram,

1    correct?

2    A    If you -- if you had a full gram and you divide it into --

3    Q    Ten parts?

4    A    -- ten parts --

5    Q    But --

6    A    -- seven of those would be that, yes.

7    Q    Correct.  But if you take that seven, you divide it by

8    seven, each one of those pieces would be like one-tenth of a

9    gram, correct?

10   A    I'm assuming.  I'm not a mathematician.

11   Q    Neither am I, clearly.  Okay.

12        Okay.  Now, at some point in time, you understand that

13   Mr. -- I'm just going to call him Matt.  Sorry.

14   A    Sure.

15   Q    Matt waived his rights and he gave statements, correct?

16   A    Yes, I -- I heard that happened.  I wasn't present for

17   that.

18   Q    Okay.  And you're aware that he said that his only source

19   for fentanyl was Anas?

20   A    Yes.

21   Q    And that would be Sajib Anas, also known as Omar?

22   A    Yes.

23   Q    I want to talk about the Uber trips that Matt took to

24   Anas's place in October 7th.  Are you familiar with that?

25   A    Yes.

1  Q    Okay.  So he took one Uber trip at around 12:52 p.m.,

2  correct?

3  A    If I could look at the --

4  Q    Sure.  Let me get my binder so we're on the same page.

5  A    Okay.

6             THE COURT:  Look at Exhibits 32 and 33.

7             MS. GLENDON:  Thank you, Your Honor.

8             THE WITNESS:  Thank you.

9  BY MS. GLENDON:

10 Q    So referencing Exhibit 32:  First trip, 12:52 p.m.?

11 A    Yes.

12 Q    Okay.  October 7th?

13 A    Yes.

14 Q    And that is from 1209 10th Ave. to 203 Paoakalani Ave.?

15 A    Yes.

16 Q    Okay.  The Paoakalani Ave. is Anas's place?

17 A    It's approximately Anas's place, yeah.

18 Q    Okay.

19 A    Same street.

20            MR. NAMMAR:  I'm going to object to beyond the scope

21 to this line of questioning.

22            THE COURT:  He wasn't asked about this.

23            MS. GLENDON:  Oh, I'm sorry.  Yeah.

24            THE COURT:  Do you have a response?

25            MS. GLENDON:  Well, at this point, Your Honor, it's

1    cross-examination.

2            THE COURT:  Sustained.

3    BY MS. GLENDON:

4    Q    Okay.  So, now, he admitted to you -- he admitted that he

5    had taken the Uber trip, correct?

6    A    I --

7            MR. NAMMAR:  Objection, beyond the scope.

8            THE COURT:  Sustained.

9            MS. GLENDON:  Let's see.  It's okay.  We don't need

10   those.

11           THE COURT:  So you weren't present when the statement

12   was made, right?

13           THE WITNESS:  No.

14           THE COURT:  Yeah.

15           MS. GLENDON:  Understood.  No problem.

16   BY MS. GLENDON:

17   Q    You did prepare a report, though, right?

18   A    Yes.

19   Q    Okay.  And that report -- actually, you prepared several

20   reports, correct?

21   A    Yes.

22   Q    Where you were present when --

23           THE COURT:  I'm having a little trouble hearing you

24   again.

25   BY MS. GLENDON:

1   Q    You did prepare several reports, correct?

2   A    Yes.

3   Q    And during those reports you were present for whatever you

4   were summarizing in your reports, correct?

5   A    Yes.  So typically, when we were -- usually, it's, like,

6   one agent that prepares a report for investigative purposes.

7   And then the other agents that were involved provide

8   information from them, statements, written statements, and then

9   we write it out in the one report.

10  Q    Understood.  So basically, you're getting information that

11  you have firsthand; you're getting information that other

12  agents have, that you weren't present for?

13  A    Yes.

14  Q    And you're taking all of that, and you are compiling it

15  into a report?

16  A    Yes.

17  Q    And you're signing off that -- you actually signed that

18  report as if you were present for that information, correct?

19  A    Yes.

20  Q    And it's not only signed by you -- so I -- I'm -- these

21  reports are not only signed by you, they're also signed by your

22  supervisor, correct?

23  A    Yes.

24          MR. NAMMAR:  I'm going to object to beyond the scope,

25  Your Honor.

1          THE COURT:  Sustained.

2          MS. GLENDON:  All right.

3          THE COURT:  If you have something you want to get

4    into with the report that's within the scope, you can do that.

5    But --

6          MS. GLENDON:  Sure.

7          THE COURT:  -- I'm not hearing that right now.

8    BY MS. GLENDON:

9    Q    Okay.  So you're aware that Matt gets fentanyl from Sajib

10   Anas on October 7th, correct?

11         MR. NAMMAR:  Objection, beyond the scope.

12         THE COURT:  Sustained.

13   BY MS. GLENDON:

14   Q    When Matt is arrested with the .694 grams of fentanyl on

15   October 11th, as well as the .59 grams of crystal

16   methamphetamine on October 11th, those were the items that you

17   recovered, correct?

18   A    Yes.

19   Q    Okay.  No heroin was found on Matt that night, correct?

20   A    No.

21   Q    And regarding the fentanyl that he was found with, it was

22   not laced with heroin, correct?

23   A    According to the lab report, it was not.

24   Q    Okay.  And the crystal methamphetamine was not laced with

25   heroin either --

1   A    No.

2   Q    -- correct?

3   A    According to the lab report.

4   Q    In fact, the fentanyl and the crystal methamphetamine

5   weren't even commingled.  They weren't laced with each other,

6   correct?

7   A    Yes.  One was in one bag and one was in another.

8            MS. GLENDON:  Okay.  No further questions.  Thank

9   you.

10           THE COURT:  I'm sorry?

11           MR. NAMMAR:  No additional questions.

12           THE COURT:  No questions?  All right.

13           You may step down, sir.

14           THE WITNESS:  Thank you.

15                                    (Witness excused.)

16           THE COURT:  Next witness.

17           MR. NAMMAR:  United States calls Joseph Soeka.

18           COURTROOM MANAGER:  Please raise your right hand.

19           JOSEPH SOEKA, GOVERNMENT'S WITNESS, SWORN.

20           THE WITNESS:  I do.

21           COURTROOM MANAGER:  Please be seated.

22           State your full name, spelling your first and last

23   name for the record.

24           THE WITNESS:  My name is Joseph Soeka; J-O-S-E-P-H,

25   last name S-O-E-K-A.

1                          DIRECT EXAMINATION

2      BY MR. NAMMAR:

3      Q     Good morning, Mr. Soeka.

4      A     Good morning.

5      Q     Can you tell the jury what you do for work?

6      A     I'm a senior digital investigative analyst for the

7      Department of Justice's cyber crime lab, the computer crimes

8      and intellectual property section.

9      Q     And what does a senior digital investigative analyst do?

10     A     We analyze a wide range of digital devices, third-party

11     application production such as Facebook, WhatsApp, and server

12     forensics.  So anything from computers to laptops to mobile

13     devices.  We'll look at datasets or do acquisitions of data and

14     then further analysis of those data files to answer questions

15     at the request of the U.S. Attorney's Office.

16     Q     You said you work at the cyber crime lab?

17     A     Yes.

18     Q     What does the cyber crime lab do?

19     A     Again, it's that entity of the computer crime,

20     intellectual property section that, at the request of the U.S.

21     Attorney's Office, we'll do an in-depth analysis of the digital

22     forensics, digital media that we were provided.

23     Q     How long have you been a digital investigative analyst

24     with the Department of Justice?

25     A     I started in January of 2021.

1    Q    And what did you do before that?

2    A    I was in law enforcement.

3    Q    Can you tell the jury about your educational background?

4    A    My educational background, I have a bachelor's of arts in

5    law and society with minors in forensic science and psychology.

6    And I'm currently getting my master's from the University of

7    Central Florida in science, digital forensics.

8    Q    Let's talk about your role as a forensic examiner for the

9    Department of Justice.  What do you do in that role?

10   A    My role is I provide expert analysis, an in-depth analysis

11   of mobile devices, computers, laptops, servers and, again, data

12   files provided by separate companies.

13        We will do everything from report creation to database

14   analysis to full-scale analysis of devices.

15   Q    Is this your full-time job?

16   A    It is.

17   Q    So would you say that you analyze digital devices on a

18   daily basis?

19   A    I would.

20   Q    Can you please describe your training as it relates to

21   digital forensics and any certifications you hold?

22   A    I'm certified as a forensic examiner through the SANS

23   Institute, which is a large certifying entity in the field of

24   digital forensics.  It requires four months of study and then

25   certification testing through a proctored examination.  I'm

1    also an advanced smart phone forensic examiner through the same

2    certifying entity, the SANS Institute.  That goes through the

3    same certification process.

4        I am a certified forensic analyst, also through the SANS

5    Institute.  And I am an iOS and MAC forensic examiner, also

6    through the SANS Institute.

7        I'm a certified forensic examiner through the

8    International Association of Computer Investigative Specialists

9    and a mobile device examiner through the same certifying

10   entity.

11   Q    What is Cellebrite?

12   A    Cellebrite is a forensic tool that is used to parse and

13   analyze an extraction from a mobile device, a drone, external

14   media, a number of sources.  And it basically builds it out so

15   we can view it in a more easily to digest format.

16   Q    Is it a product that's owned by a company?

17   A    It's owned by Cellebrite.  Yes, it's a private company.

18   Q    Do you have any certifications for that particular

19   forensic tool?

20   A    Yes.  I'm a Cellebrite-certified operator and a

21   Cellebrite-certified physical analyst.

22   Q    And how did you become certified by Cellebrite?

23   A    They offer training programs in both certifications and

24   then a testing certification following the training.

25   Q    Do you have to keep up that certification?

1   A    Yes.

2   Q    How?

3   A    It needs to be renewed every three years.

4   Q    Okay.  And have you done that?

5   A    I have.

6   Q    What is the Cellebrite Physical Analyzer?

7   A    The Physical Analyzer is an analysis tool that takes an

8   extraction file and parses it out into subcategories for the

9   ease of an examiner and analyst to get to specific categories

10  of information.  So the tool will go through different database

11  files or areas that store data from a device and identify

12  messages, emails, photographs, phone calls, and build them out

13  into the separated categories so they can be traversed quicker.

14  Q    You used the term "extraction."  Can you tell the jury

15  what that is?

16  A    So an extraction of a device is -- there's different types

17  of extractions that can be done, but it allows us to take the

18  data from the physical device itself, using our forensic tools,

19  and then taking that extraction file and analyzing it in those

20  analysis tools.

21  Q    And we were talking about Cellebrite Physical Analyzer.

22  About how many times have you used Cellebrite Physical Analyzer

23  to analyze and examine information from cell phones?

24  A    I don't have an exact number, but I would say upwards of

25  200 times.

1    Q    And aside from Cellebrite, what other tools have you used

2    in your role as a digital investigative analyst?

3    A    I've used Magnet AXIOM, which is another forensic company

4    that makes forensic tools.  Oxygen Forensics, FTK Lab, and FTK.

5    They're suites.  They have an imager product as well.

6    Q    Do you also teach in the area of digital forensics?

7    A    I do.

8    Q    Where?

9    A    So one of the roles that we have within the lab is we

10   provide training in digital forensics, nationally and

11   internationally, to investigators, judges, and prosecutors.  In

12   addition to that, I am also an adjunct professor at Georgetown

13   University, teaching a hands-on lab course in digital

14   forensics.

15   Q    Do you have any professional memberships relating to

16   forensic examination of electronic evidence?

17   A    Yes.  I'm a member of the SANS advisory board and a member

18   of IACIS, which is that international association where I am a

19   coach and mentor.  So I also grade the work of individuals who

20   are coming up within the process of certification.

21   Q    In your position as a senior digital investigative

22   analyst, have you testified in court as a witness in the field

23   of digital forensics?

24   A    I have.

25   Q    And were you qualified as an expert?

1    A    I was.

2    Q    How many times?

3    A    Twice.

4    Q    Where?

5    A    Here in Hawaii and also in Puerto Rico.

6    Q    And was that in federal court?

7    A    It was.

8    Q    In your former role as a law enforcement officer, did you

9    testify in both federal and states courts as a case agent in

10   cases that required the use of digital forensics?

11   A    Yes.

12          MR. NAMMAR:  Your Honor, at this time we would tender

13   Mr. Soeka as an expert in the area of digital forensics.

14          MS. GLENDON:  No objection.

15          THE COURT:  All right.  I'll permit him to testify as

16   an expert in the field of digital forensics.

17   BY MR. NAMMAR:

18   Q    Mr. Soeka, you testified that one of the tools that you

19   used in the execution of your job is Cellebrite?

20   A    Yes.

21   Q    Please tell the jury about Cellebrite Premium.

22   A    So Cellebrite Premium is an advanced services tool that

23   Cellebrite offers that's available to law enforcement agencies.

24   It allows us to get a more in-depth acquisition of data for

25   mobile devices than their standard acquisition tool, which is

1  UFED 4PC.

2  Q    Is Cellebrite Premium regularly used by law enforcement

3  agencies?

4  A    It is.

5  Q    Do you know whether evidence from Cellebrite Premium has

6  been admitted in courts of law?

7  A    It has.

8  Q    Did you use Cellebrite Premium to acquire information from

9  cell phones in this case, United States versus Matthew McBraun?

10 A    I did.

11 Q    When did you do that?

12 A    I did it on July 20th.

13 Q    Specifically, what were you asked to do?

14         THE COURT:  July 20th of?

15         THE WITNESS:  Of 2023.  I'm sorry.

16         MR. NAMMAR:  Thank you, Your Honor.

17 BY MR. NAMMAR:

18 Q    Specifically, what were you asked to do?

19 A    I was asked to do acquisitions of these devices for

20 purposes -- for the purpose of analysis.

21         MR. NAMMAR:  Your Honor, may I approach?

22 BY MR. NAMMAR:

23 Q    I've handed you what's marked as Government's 5 and 6.

24 A    Yes.

25 Q    Do you recognize Government's 5 and 6?

1   A    I do.

2   Q    How are you able to recognize it?

3   A    I recognize them as an iPhone 11 and an iPhone 12 Pro Max.

4   These are the devices that I was requested to conduct an

5   acquisition on and also analysis of.

6   Q    Is there any writing on the packaging that leads you to

7   that conclusion?

8   A    Yes.  I see my signature, dates, and then my initials on

9   the sealing tape at the bottom of the bags.

10  Q    Were you able to successfully acquire information from

11  Exhibits 5 and 6?

12  A    I was.

13  Q    What did you do with the original cellular devices when

14  you finished extracting information from Exhibit 5 and 6?

15  A    They were stored within our evidence room at the cyber

16  crime lab.

17  Q    And then what did you ultimately do with them?

18  A    Ultimately, I was requested to send them back to the

19  AUSA's office.  I did so via FedEx.  They were sealed and sent,

20  and I did get confirmation upon their delivery.

21  Q    Are there different options for acquiring information from

22  a cellular device?

23  A    There are.

24  Q    And what are those options?

25  A    So there's different levels of acquisition that we can get

1    from mobile devices, and it is dependent on make and model,

2    operating system, and a number of other factors.

3         You can get what is basically like a backup device, so if

4    you have an iPhone and you've ever plugged into iTunes and done

5    a backup of your device, this is kind of what we call a logical

6    acquisition.  So it's very base level information made of

7    applications and then some -- some third-party applications,

8    but not many.

9         Then there's a full file system acquisition, which is

10   getting all of that information, but also, information related

11   to third-party applications, and then the system files of the

12   phone itself, areas that are not accessible to the user.

13   Q    Which is more comprehensive?

14   A    The full file system.

15   Q    Okay.  What type of extraction did you do of Exhibits 5

16   and 6, the two cell phones in this case?

17   A    I did a full file system acquisition of these devices.

18             MR. NAMMAR:  Your Honor, may I approach?

19             THE COURT:  Yes.

20   BY MR. NAMMAR:

21   Q    I've handed you what's marked as 5, Government's

22   Exhibit 5A.  Do you recognize Government's Exhibit 5A?

23   A    I do.

24   Q    How are you able to recognize it?

25   A    I recognize it as the drive that I sent the initial

1  reports and acquisitions on.  These are my initials on the

2  drive as well.  And I have validated the data on it since

3  arriving here.

4  Q    Okay.  What is on Exhibits 5 and 6?

5  A    So it's the extraction files that were created using

6  Cellebrite Premium and then UFDR reports, which are reports

7  traversable to the user, through Physical Analyzer or UFED

8  Reader, which is kind of a tool that just allows you to see

9  what I am seeing from my usage of Physical Analyzer.

10      There were also some --

11           THE COURT:  Sorry.

12           THE WITNESS:  Yes, sir.

13           MR. NAMMAR:  Yes, sorry.  I think I asked a -- I

14  asked a poorly worded question.  So let me rephrase that.

15           THE WITNESS:  Yes.

16  BY MR. NAMMAR:

17  Q    What is on Exhibit 5A?

18  A    On Exhibit 5A are the extraction files and the files I

19  created related to the devices.

20  Q    Okay.  And is Exhibit 5A a true and accurate copy of the

21  extractions from the two cell phones in this case, Exhibit 5

22  and 6?

23  A    They are.

24  Q    And has Exhibit 5A been altered in any way?

25  A    No.

1  Q    You mentioned the term "validate."  Can you tell the jury

2  what that means?

3  A    So we use hass -- hash validation to validate everything

4  from individual files, to directories, to entire forensic

5  images of hard drives.

6       Hash values are mathematical values that are created using

7  an algorithm that looks at every one and zero of a file, of a

8  directory, of an entire hard drive.  And through this

9  mathematical algorithm, it creates an alphanumeric value; that

10 if one 1 or one zero of that piece of media was changed, the

11 number would not be the same.  It would be completely

12 different, not just a little different.

13      So we are able to take the hash value upon acquisition,

14 and I can hash working copies of that data.  As long as the

15 hash values are the same, we can speak to the validity and

16 the -- the trueness of the data.

17 Q    And did you do that --

18 A    I did.

19 Q    -- for 5?

20      And what were the results of that --

21 A    They matched.

22 Q    Sorry?  What was that?

23 A    They matched the same hash values that were created at

24 time of acquisition.

25           MR. NAMMAR:  Okay.  Your Honor, the government moves

1    for the admission of Exhibit 5A.

2            MS. GLENDON:  No objection.

3            THE COURT:  All right.  But 5A itself isn't something

4    the jury's going to be looking at the contents of, correct?

5            MR. NAMMAR:  Exactly.

6            THE COURT:  I just want to make sure we're clear on

7    that.  Same with 6A?

8            MR. NAMMAR:  Yes.  And 6A won't -- 5A is -- actually

9    contains everything from 5 and 6.  I won't be offering 6A.

10           THE COURT:  Okay.  I see.  All right.

11           So to be clear then, you want this because from that

12   other things came, right?

13           MR. NAMMAR:  That's correct.

14           THE COURT:  Okay. but the jury's not going to be

15   accessing what's on 5A?

16           MR. NAMMAR:  That's correct.

17           THE COURT:  Okay.  That's your understanding as well?

18           MS. GLENDON:  Yes, Your Honor.

19           THE COURT:  All right.  With that understanding, 5A

20   is admitted.

21           (Government Exhibit 5A received in evidence.)

22   BY MR. NAMMAR:

23   Q    So you did the extractions in this case, you said.

24        What did you do once you performed those extractions with

25   the data you had?

1    A    I ingested the extractions both through Cellebrite

2    Physical Analyzer, which is that analysis tool, so I can see

3    the data from the extraction, and then also through the use of

4    Magnet AXIOM, which is another forensic tool.

5    Q    Okay.  And what did you do with those forensic tools?

6    A    I'm sorry?

7    Q    What did you do with those forensic tools with the data

8    you had?

9    A    So using those forensic tools I created reports from the

10   data.

11   Q    And what kind of reports were those?

12   A    So I created UFDRs, which are portable reports that allow

13   a user to kind of see what I would see within the tool, and

14   then I created portable cases through AXIOM, which are of a

15   similar nature.  They allow you to see the data as I would

16   within the tool.  I also created smaller reports, via PDFs and

17   HTMLs, of specific time periods of interest and persons of

18   interest.

19   Q    Okay.  Can you take a -- there's a binder in front of you.

20   Can you flip to Exhibit -- Exhibits 45 and '6?

21   A    I'm there.

22   Q    Do you recognize Exhibits 45 and '6?

23   A    I do.

24   Q    How are you able to recognize them?

25   A    These are preliminary device reports that I created from

1    those larger reports, those UFDRs, that have high-level view

2    information related to the device and user accounts.

3    Q    And how did you prepare the report?

4    A    I prepared these using Physical Analyzer.

5    Q    Are these reports true and accurate copies?

6    A    They are.

7    Q    Have they been altered in any way?

8    A    Aside from the addition of page numbers, no.

9           MR. NAMMAR:  Okay.  Your Honor, I move for the

10   admission of Government's 45 and '6.

11          MS. GLENDON:  No objection.

12          THE COURT:  45 and 46 are admitted.

13          (Government Exhibits 45 and 46 received in evidence.)

14          MR. NAMMAR:  Can we publish 45?

15          THE COURT:  Yeah, I'm not sure the jury's going to be

16   able to see anything.

17          MR. NAMMAR:  Okay.  Well, I'm going to zoom in here.

18          THE COURT:  Okay.  All right.  You can try that.

19          Yes, you may publish.

20          MR. NAMMAR:  Okay.

21          Okay.  Can you zoom in on the Apple ID?

22          THE COURT:  You're on 45 first, right?

23          MR. NAMMAR:  Yes.

24          THE COURT:  Okay.

25   BY MR. NAMMAR:

1  Q    Okay.  Just generally again, tell us what 45 is.

2  A    So this is a preliminary device report from the

3  extractions that outlines a number of identifiable features of

4  the device and user accounts.

5        So, for example, this report lists the make and model, the

6  IMEI, which is a mobile equipment identifier of the device

7  which is specific to the device, things like the phone number,

8  the serial number, and the associated Apple ID to the device.

9  Q    Okay.  And which -- Exhibit 45, which phone does this

10 relate to?

11 A    This is the iPhone 12 Pro Max.

12 Q    Is that Exhibit 5?

13 A    It is.

14 Q    Okay.  We have an Apple ID up here on the screen.  Do you

15 see that?

16 A    I do.

17 Q    And what Apple ID is listed here?

18 A    Pono.delima@iCloud.com.

19 Q    And what is an Apple ID?

20 A    An Apple ID is used to create a synchronization of devices

21 within the Apple ecosystem.  So if I have two iPhones and an

22 iPad, I can use my Apple ID to sync data between that -- those

23 devices if I choose to; and it also is associated with storage

24 within my iCloud account, which users get access to a limited

25 amount of data just by its creation.

1          So upon setup of the device, it will ask you to provide it

2     with an associative email for an Apple ID; and therefore, the

3     other devices with that ID can all be associated with the same

4     user.

5     Q    Is it your expert opinion that the Apple ID is indicative

6     of who is actually using a device?

7     A    Yes.  It's engrained into the functionality of the

8     devices.

9     Q    Can you go to page 2?

10         Sorry.  The Apple ID here, who did it come back to?

11         On Exhibit 45, page 1, who did the Apple ID come back to?

12    A    The Apple ID is pono.delima@iCloud.com.

13    Q    Okay.  Thank you.

14         MR. NAMMAR:  Can you now go to page 2?  And zoom in

15    maybe on like the top four accounts.

16    BY MR. NAMMAR:

17    Q    What's shown on page 2?

18    A    The remaining pages of this preliminary device report is

19    user accounts that were parsed out from the extraction.  So

20    these are various user accounts from the device itself.  What

21    you have zoomed in on are the user names associated with

22    several features of the iOS device.

23    Q    And in this case what we have highlighted to come back to

24    Pono DeLima at iCloud.com?

25    A    Correct.

1          MR. NAMMAR:  Can you go down to page 4?  And can you

2    zoom in on 42, the Uber?

3    BY MR. NAMMAR:

4    Q    Okay.  What's shown here?

5    A    This is the user name associated with the Uber

6    application.

7    Q    And what is that user name?

8    A    Tyler Orso-DeLima.

9    Q    And what email does that come back to on the far right?

10   A    Pono.delima@iCloud.com.

11   Q    And how about the phone number?

12   A    (808) 428-6755.

13   Q    And is that the same phone number that you found to be

14   associated with this device?

15   A    Yes.

16   Q    Okay.

17          MR. NAMMAR:  Your Honor, may we publish 46 now?

18          THE COURT:  All right.

19          MR. NAMMAR:  And can you zoom in on the -- on the

20   Apple ID.

21   BY MR. NAMMAR:

22   Q    What's shown here?

23   A    This shows an associative Apple ID of McBraun Matthew at

24   gmail dot-com, and this is the iPhone 11.

25   Q    And that is Exhibit 6?

1  A    It is.

2  Q    So Exhibit 6 comes back to the Apple ID of Matthew --

3  McBraun Matthew at gmail dot-com?

4  A    Yes.  McBraun Matthew at gmail dot-com.

5  Q    Again, that is indicative of which particular person is

6  using the device?

7  A    It's -- it was what was provided at setup, which is what

8  we -- we see most often for the functionality of the features

9  of the phone.

10 Q    Okay.

11        MR. NAMMAR:  Can you highlight the column -- the row

12 that says MSISDN?  Yep.  Right there.

13 BY MR. NAMMAR:

14 Q    What's shown here?

15 A    The MSISDN is the phone number of the device, and it shows

16 a value of 1(808)321-6787.

17 Q    Okay.  Can you go -- now go to page 2?

18        And can you zoom in -- well, first of all, what's shown in

19 the top three?

20 A    The top of page 2?

21 Q    Yes.

22 A    These are the user accounts associated with the device.

23 And at the top of page 2 it starts with, again, many of those

24 iOS features.

25 Q    And the first 12 come back to what user name?

1    A    McBraun Matthew at gmail dot-com.

2    Q    Okay.

3            MR. NAMMAR:  Can you zoom in on 22?

4    BY MR. NAMMAR:

5    Q    And what's shown here?

6    A    This is information that was taken from the Cash App

7    application.

8    Q    Can you tell the jury what the Cash App application is?

9    A    It's a third-party application that can be downloaded for

10   the exchange of funds, much like a Venmo or a PayPal.

11   Q    Okay.  And what particular phone number is associated with

12   this Cash App?

13   A    (808)321-6787.

14   Q    And is that the same phone number of the device?

15   A    It is.

16   Q    And what about the email address?

17   A    The email is McBraun Matthew at gmail.com.

18   Q    Okay.  Can you take a look at page 3 and 4 of this

19   exhibit?  What is shown there?

20   A    Additional user accounts.

21   Q    And who do those additional users -- user accounts come

22   back to?

23   A    Starting at the top of page 3, it says Matt From Town ISM,

24   but the ones following it are Matthew McBraun.

25   Q    Okay.

1  A    And then the very last one on page 4 is the email, McBraun

2  Matthew mat gmail.com.

3          MR. NAMMAR:  You can take down that exhibit now.

4  BY MR. NAMMAR:

5  Q    Can you flip in the binder in front of you to Exhibit 43?

6  A    I'm in.

7  Q    What's this document entitled?

8  A    It appears to be a consent to search form from the Drug

9  Enforcement Administration.

10  Q    And is there a name anywhere printed above "signature"?

11  A    I believe it says Matthew McBraun.

12  Q    And do you see any phone numbers on this?

13  A    I do.

14  Q    What phone number?

15  A    On the top section of this form it says (808)321-6787.

16  Q    And is this the same phone number that you found to be

17  associated with the device?

18  A    It is.

19          MR. NAMMAR:  Your Honor, I move for the admission of

20  43.

21          MS. GLENDON:  No objection.

22          THE COURT:  43 is admitted.

23          (Government Exhibit 43 received in evidence.)

24          MR. NAMMAR:  Can you put it up on the screen?

25          Oh, can I put it up on the screen, Your Honor?

```
 1                THE COURT:  Yes.  Yes.

 2                MR. NAMMAR:  Thank you.

 3                Can you zoom in on the top handwriting?

 4   BY MR. NAMMAR:

 5   Q    Is this the area where you saw the phone number?

 6   A    Yes.

 7   Q    Okay.  Can you --

 8                MR. NAMMAR:  Is the monitor working?  Is the

 9   monitor --

10   BY MR. NAMMAR:

11   Q    Can you circle the phone number that you had just read out

12   to us?

13   A    (Complies.)

14   Q    Okay.

15                MR. NAMMAR:  Can you zoom out now, and can you zoom

16   in on "signature"?

17   BY MR. NAMMAR:

18   Q    Whose name is printed above the signature?

19   A    (Indicates.)  And I believe that says Matthew McBraun.

20   Q    And does it list somebody as a witness right below that?

21   A    It does.

22   Q    And --

23   A    It appears to be Task Force Officer Jared Lee and then

24   Special Agent Michael -- and I can't make out the last name.

25   Q    Okay.  Can you take now a look at --
```

1          MR. NAMMAR:  Actually, since 7's in, can we publish 7

2     now, Your Honor?

3          THE COURT:  Seven?

4          MR. NAMMAR:  Yes.

5          THE COURT:  Yes.

6     BY MR. NAMMAR:

7     Q    Okay.  The jury can see 7.  What is 7?

8     A    Seven is a color-coded timeline with specific dates and

9     forensic artifacts that I created from the two device

10    extractions and the analysis of.

11    Q    How did you prepare it?

12    A    I prepared this using Excel.  And again, I prepared it

13    using specific artifacts which are just points of interest from

14    these extractions from both of these devices.

15    Q    So both Mr. McBraun's device and Mr. DeLima's device?

16    A    Correct.

17    Q    Okay.  Exhibit 7, is all the information on there true and

18    accurate?

19    A    Yes.

20    Q    Can you flip in the binder now to Exhibits 39 and 40?

21    A    I'm there.

22    Q    Do you recognize 39 and 40?

23    A    I do.

24    Q    What are these exhibits?

25    A    These are extraction reports that I created that contain

1    the points within this timeline that I've created.  So these

2    are created from the forensic tool for purposes of validation.

3    These are what dates and times and content were available from

4    the extraction report.  I just built them into this timeline.

5    Q    Is it much easier to view that information from

6    Exhibits 39 and 40 in Exhibit 7, in the timeline?

7    A    Yeah.  It's -- our -- we're just building it into more of

8    a chronological format instead of having to jump around from

9    different categories of -- of what it is deemed as, for

10   example, calls or artifacts from another source, like photos.

11   Q    Okay.

12             MR. NAMMAR:  Can you now zoom in on the first

13   message, including the --

14             THE COURT:  Wait, wait.  What are we on?

15             MR. NAMMAR:  Seven, Your Honor.  It's up on the

16   screen.

17             THE COURT:  Oh, you're back to 7?

18             MR. NAMMAR:  I'm back to 7 now.

19             THE COURT:  Okay.  Go ahead.

20             MR. NAMMAR:  Can you zoom in on the top there,

21   including the headers?  Yeah.  Thank you.

22   BY MR. NAMMAR:

23   Q    Okay.  We're back on 7.  It's up on the screen.

24        What appears at the top here of the columns?

25   A    So there are titles at the top of each of these columns.

1    The first column will be the date associated with the row.  The

2    time, which is UTC minus 10.  So it's local time here in

3    Hawaii.  And then the third is date and time, so it's those two

4    values combined.  An artifact type, a source, the status and

5    sender, the recipient, and then comments.

6    Q    What does artifact type mean?

7    A    Artifact type is me cataloging it in a way to speak to

8    what it is referencing.  So purple in this line, specifically,

9    this is a SMS message.  This is the native messaging

10   application from the device.  But the purple will indicate

11   communication.  So these are communications that were brought

12   out from these other reports into the timeline.

13   Q    Okay.  And what does the source represent?

14   A    The source is, in this example, a database that stores

15   that material.  So it's -- it's where the data actually resides

16   from the extractions.

17   Q    How about status sender?  What did you put there?

18   A    So in this example, it's Auntie, which who -- Auntie would

19   be the sender of this message.  Or it's the status in relation

20   to other artifacts within this timeline.

21   Q    And what shows up in the comment section?

22   A    The comment is the message itself.

23   Q    Okay.  And so in this first line, it's Auntie sending a

24   message to McBraun, and the message appears in the comment

25   section?

1    A    Correct.

2    Q    Okay.  So I want to walk through some of the messages on

3    here.  If we could look at, on this same page, a message that

4    appears at time of 14:32 and 13 seconds.  It's from -- yeah.

5        Mr. Soeka, what's shown here?

6    A    This is a message from DeLima to a content -- contact with

7    the saved name of New Dog, sent on October 7th, 2022, at

8    2:32 p.m., approximately.

9    Q    Okay.  And where does the information New Dog come from?

10   A    This is saved within the device's contacts list, so the

11   database sees a phone number and it associates it with the

12   contact.

13   Q    Okay.  And so can you read that message to the jury?

14   A    Hey, what's up, man?  Would you be down to front me a Q

15   again just till tonight?  I can throw you 50 again.  I'm in

16   Kapahulu RN -- so "right now" -- doing deliveries.

17   Q    Okay.

18           THE WITNESS:  Bless you.

19   BY MR. NAMMAR:

20   Q    Was there any response that came close in time to this

21   from New Dog?

22   A    Not close in time, no.

23   Q    Okay.

24           MR. NAMMAR:  Can you bring up page 2 now of the

25   timeline?

1    BY MR. NAMMAR:

2    Q    On page 2, it looks like there's some different colors

3    here.  What do those different colors represent?

4    A    So just reiterating, purple is going to be our

5    communications, it's via iMessages or -- or text messages.  If

6    you see the text as orange, that mean -- that means that it

7    came from McBraun's device.  Otherwise, it came from DeLima's

8    device.

9         The yellow represents the locked state of the device.  And

10   the locked state tells you whether the phone is either locked

11   or unlocked.  And red indicates FaceTime calls or phone calls.

12   Q    Okay.  If you could zoom in on a call that appears at

13   22:07 -- or a text.  Sorry.  That text.  Yep.

14        What's shown here, Mr. Soeka, in purple?

15   A    This is a message from DeLima to a contact named Cory G-Z

16   that was sent on October 7th, 2022, at approximately 10:07 p.m.

17   Q    And the message is:  Ay, bro, you up?

18   A    Correct.

19   Q    Where does the name Cory Gz come from?

20   A    The same as previously referenced, it's a phone number

21   associated with a saved contact name.

22   Q    Okay.  Right above that it's -- there's a line in yellow,

23   locked state, Knowledge C, unlocked.

24        What's the source of this information?

25   A    So this comes from the Knowledge C database of the device,

1   which we have access to because of that full file system

2   acquisition.

3   Q    Okay.  What sort of stuff is held in the Knowledge C?

4   A    The Knowledge C is a database that is basically storing

5   pattern of life artifacts.  So this database within iOS devices

6   stores everything from whether your screen lights up or it

7   turns off, whether you've plugged your phone in or it's

8   unplugged, whether it's locked or unlocked, and a wide variety

9   of other artifacts.

10  Q    Okay.

11        MR. NAMMAR:  Can you zoom in on the three Face -- two

12  FaceTime calls there in red, in the middle?  Perfect.

13  BY MR. NAMMAR:

14  Q    What's shown here, Mr. Soeka, in red?

15  A    So in red, this shows that FaceTime calls were attempted

16  from DeLima to Cory G-Z.

17  Q    And where is the source of this information?

18  A    This is stored within the Knowledge C.  It's also stored

19  within a call database.  But specifically, I got it from the

20  Knowledge C.

21  Q    And is this from Mr. DeLima's phone?

22  A    It is.

23  Q    In the comments it says:  Not answered.  What does that

24  mean?

25  A    That means that the duration time was listed as zero

1    seconds, indicative of a call not being answered.

2    Q    Can you go to the text at 22:17 and 14 seconds.

3         Mr. Soeka, what is shown here?

4    A    This is a text message sent on October 7th, 2022, at

5    approximately 10:17 p.m., from DeLima to New Dog, that says:

6    Please, my G.  I got you FR -- or "for real" -- prayer hands.

7    Just this one time.  I never really grab this late.  I just

8    didn't have a ride.  That's why I was trying to grab earlier.

9    My bad.

10   Q    Who were the parties here?

11   A    This was sent from DeLima to New Dog.

12   Q    Did you review the extraction of DeLima's phone to see if

13   there were any messages to or from New Dog on October 8th or

14   the morning of the 9th after this particular message?

15   A    I did.

16   Q    And what did you find out?

17   A    I did not find any.

18   Q    Okay.

19        MR. NAMMAR:  Can we now go to page 4.

20        Can you zoom in on the first message that includes

21   the image.

22   BY MR. NAMMAR:

23   Q    What is shown here?

24   A    This is a message from Cory to DeLima that was sent

25   October 7th, 2022, at approximately 10:25 p.m.

1  Q    Okay.  And does it -- what shows up in the comments

2  section of the timeline?

3  A    It was a photo attachment.

4  Q    Okay.  Can you go to the last page of the timeline?

5       And that's good, right there.

6       What is this right -- shown on the screen right here?

7  A    This is a larger version of that attachment.

8  Q    Okay.  And this is a -- you said this is a photo?

9  A    Yes.

10  Q    And how would one take a photo like this?

11  A    It appears that it was, since I can see the edges of the

12  phone, taken with a secondary device.

13  Q    Okay.

14  A    But you can also screen capture what is on a phone screen.

15  But since I can see the boundaries of this device, it appears

16  to be taken externally.

17  Q    And what shows up in the screen?

18  A    It is a notification screen on a cellular phone that has a

19  shown time of 10:25 on October 7th, Friday.  And the

20  notifications panel shows a text from a contact named Debo,

21  that says:  Okay, I get fetty and xans, yoo.

22       And then there is a phone and then it says missed, and a

23  missed from Unz -- or "Unks."

24  Q    Do you know how notifications show up on your phone?

25  A    Notifications show up on the phone if I have an

1    application or if I have it set up as a user to give me a

2    summary or just information to let me know that information is

3    coming into my device when it's in a locked state.

4    Q    Okay.

5    A    Or even in an unlocked state, if you have scroll bars and

6    things at the top.

7    Q    Can you go back to page 4?

8    A    I'm on page 4.

9    Q    Okay.  Can you zoom in on the red there?

10        What is shown here, Mr. Soeka?

11   A    These are phone calls on October 7th, 2022, the first one

12   at approximately 10:26 p.m. and the second one at 10:27 p.m.

13   Q    And there's a duration listed.  What's that mean?

14   A    That's the duration of the calls.  And since the text of

15   these is orange, this is from the McBraun phone extraction.

16   Q    Okay.  So these are -- this is a call from Cory to

17   Mr. McBraun with a -- with a duration?

18   A    Correct.

19   Q    Do the durations seem to indicate based on their length a

20   connection?

21   A    Yes.

22   Q    Why is that?

23   A    Because it has a duration of one minute and 13 seconds for

24   the first and a duration of 31 seconds as opposed to the

25   previous one in the unanswered state of zero seconds.

1    Q    Okay.  Can you now zoom in on the FaceTime call at the

2    bottom in red?

3         What is shown here?

4    A    This is a FaceTime call on October 7th, 2022, at

5    approximately 10:29 p.m.  But from Cory to DeLima.

6    Q    And what does the duration indicate, if anything?

7    A    Three minutes and 35 seconds in length.

8    Q    Okay.  Can you now go to page 5?

9              MR. NAMMAR:  And can we go to the purple text message

10   at 23:09 and 7 seconds?

11   BY MR. NAMMAR:

12   Q    Mr. Soeka, what is shown here?

13   A    This is a message on October 7th, 2022, at approximately

14   11:09 p.m., from DeLima to Cory G-Z, that says:  Hey, the only

15   thing is that my grams is driving us, bro -- with an emoji.

16   She wouldn't trust me to bring the whip out this late, SMH --

17   or "shaking my head" -- my bad.

18   Q    From your time in law enforcement are you familiar with

19   the term "whip"?

20   A    Yes, as a vehicle.

21   Q    Can you now go to the message at 23:20 and 35 seconds?

22        What is shown here, Mr. Soeka?

23   A    This is a message from Cory to McBraun that says:  My bad.

24   I'm headed your way now.  I'll LYK -- or "let you know" -- when

25   I'm in Kalama.

1    And this message was October 7th, 2022, at approximately

2    11:20 p.m.

3            MR. NAMMAR:  Can you pull up the next page?

4            There's some blue that appears on page 6.  Can you

5    highlight that?  Thank you.

6    BY MR. NAMMAR:

7    Q    What is shown here in blue?

8    A    Knowledge C also tracks Bluetooth connections, detections,

9    and disconnections from devices.

10           So this is a row indicating a Bluetooth connection to a

11   device called My Rogue on October 7th, 2022, at approximately

12   11:39 p.m.

13   Q    And what particular phone is this from?

14   A    This is from DeLima's phone.

15   Q    And do you know what the reference "My Rogue" is to?

16   A    It's a device name, but my opinion is I know a Rogue to be

17   a type of vehicle.

18   Q    And who makes -- who makes the Rogue vehicle?

19   A    Nissan.

20   Q    Okay.  It shows a connected.  What does that mean?

21   A    It shows that the device connected to a Bluetooth device

22   with the device name of My Rogue.

23   Q    And what's the time associated with this connection?

24   A    11:39 p.m., approximately.

25   Q    Okay.

1          MR. NAMMAR:  Can you now bring up page 7.  And can

2     you zoom in on the purple messages at the top.

3     BY MR. NAMMAR:

4     Q    What's shown here, Mr. Soeka?

5     A    This is a message on October 8, 2022, at approximately

6     12:00 a.m., from Cory to McBraun, that says "pulling up."

7     Q    Okay.  The first message is sent 36 seconds after

8     midnight?

9     A    Yes.

10    Q    Okay.  And then, what appears directly after that?

11    A    At approximately 12:02 a.m., on the 8th, there is a phone

12    call from Cory to McBraun that has a duration of 22 seconds.

13    Q    And then there's another message after that?

14    A    Yes.  At 12:04 a.m., approximately, on the same day, from

15    Cory to McBraun, that says:  I'm up towards my mom's a little.

16    Q    Okay.  Can you now go to the next page?

17         MR. NAMMAR:  And can you highlight the blue box here?

18    BY MR. NAMMAR:

19    Q    What is shown in blue here?

20    A    It shows that on October 8th, 2022, at approximately

21    1:02 a.m., the cell phone disconnects from the Bluetooth device

22    with the device name of My Rogue.

23    Q    Okay.  What, if anything, is the significance of that?

24    A    It just shows that the phone has severed its connection to

25    this Bluetooth device.

1  Q    Okay.  So for the rest of the day on October 8th and the

2  morning of October 9th, did you ever see Mr. DeLima's device

3  connect to the My Rogue again?

4  A    I did not find any indications that it did.

5  Q    And that would tend to indicate that his cell phone was

6  not in the Nissan Rogue; is that right?

7  A    It indicates that the phone did not pair with the Nissan

8  Rogue.

9  Q    Can you go to page 9.

10      Just generally, can you tell the jury what is shown on

11  page 9 in green and yellow?

12  A    So green is also from the Knowledge C, and this is an

13  artifact -- it's applications in Focus.  So it is the

14  application that is at the forefront of the screen.

15      So multiple applications can be running on a device.  But

16  app in Focus tracks what application is in front of the user.

17      So this page of this timeline indicates when the

18  application in Focus starts.  So, for example, at the top of

19  this page, it says:  YouTube started.  And then the next entry

20  is:  YouTube ended.

21      So the timeline page is showing that on October 8th, 2022,

22  at approximately 1:15 a.m. in the morning, YouTube starts and

23  is at the forefront of the screen.  And at approximately

24  2:05 a.m. on the same date, that Focus ends.

25      And then yellow indicates the device lock or unlock

1    states.  So at 2:05 a.m., approximately, on the 8th, the lock

2    state switches to locked, indicating the phone is now locked.

3    Q    What are some of the apps that -- and whose phone does

4    this relate to?

5    A    This is from DeLima's phone.

6    Q    And what are the some of the apps that Mr. DeLima's phone

7    is utilizing during the early morning hours of October 8, 2022?

8    A    We start with YouTube, and then YouTube again, then

9    Facebook, then YouTube, then the clock application, then

10   Facebook, then Instagram, then Snapchat.

11   Q    And what, if anything, does that indicate about whether

12   the user of the device is sleeping or awake?

13   A    This indicates from a locked and unlocked state.  'Cause

14   this is not a screen lighting up for notifications.  This is

15   when the user of the device unlocks it to gain access to it.

16   And since these applications are at the forefront following an

17   unlock, it would be indicative of someone at least making the

18   furtive effort to unlock the phone and run these applications.

19   Q    You mentioned Snapchat.

20         MR. NAMMAR:  Can you zoom in on the purple at the

21   bottom?

22   BY MR. NAMMAR:

23   Q    What's shown here, Mr. Soeka?

24   A    So in the lines above it, it shows the device unlocks.

25   And then at approximately 8:06 a.m., on October 8th, 2022,

1  Snapchat starts; and then at approximately 8:06 a.m., it has a

2  message from DeLima to someone with the handle of Jakealikz

3  Gustavo, and the message says:  I came across some pure last

4  night.  Holy fuck.

5  Q    Can you tell the jury what Snapchat is?

6  A    Snapchat is a third-party application.  We call them

7  ephemeral applications because they do have the ability to have

8  destructive messages with perishable timestamps and things like

9  that.  But it's a third-party communication application.

10 Q    Does Snapchat not automatically delete a user's message?

11 A    So there are areas within databases that changes can be

12 made to, but we can look at the database itself.  And if those

13 changes haven't been fully written to that database, we can

14 view it without something called a write ahead log.  And a

15 write ahead log is basically maintaining the changes to the

16 database until it reaches either a point established by the

17 application or a certain number of pages, and then those

18 changes are made.

19      But forensically, we can look at them separately and see

20 messages before those changes are fully written.

21 Q    Okay.

22          MR. NAMMAR:  Can we go to the next page?  And zoom in

23 on the top purple message.

24 BY MR. NAMMAR:

25 Q    What's shown here?

1   A    This is a message through Snapchat on October 8th, 2022,

2   at approximately 8:06 a.m., from DeLima to Jakealikz Gustavo,

3   that says:  I took two small rips and I woke up folded in half,

4   literally.

5   Q    Okay.  So this is from Mr. DeLima?

6   A    Yes.

7   Q    And the -- the arroyo.db, What does that mean?

8   A    Arroyo.db is the database associated with Snapchat.

9   Q    Okay.

10          MR. NAMMAR:  Zooming out, can you zoom in on the --

11   BY MR. NAMMAR:

12   Q    What's shown in green here?

13   A    This is again an application usage.  So green directly

14   below the message I just read indicates that on October 8th,

15   2022, at approximately 8:13 a.m., Snapchat ends, and then

16   following that Facebook starts.

17   Q    Okay.

18   A    And then a number of other application transferences.

19   Q    Again, are these application usages indicative of meaning

20   that the user of this particular cell phone is awake?

21   A    So the phone is in an unlocked state and these

22   applications are being ro -- rotated between, so they are

23   moving to these other locations.  So it would be indicative of

24   someone awake running through the phone.

25          MR. NAMMAR:  Can you zoom in on the message at

1    10:10 a.m. and two seconds in purple?

2    BY MR. NAMMAR:

3    Q    What's shown here, Mr. Soeka?

4    A    This is a message on October 8th, 2022, at approximately

5    10:10 a.m., from a contact with the name Grandma DeLima to

6    DeLima, that says:  Take out your dirty clothes -- with an

7    emoji thumbs up.

8    Q    Okay.  And the contact Grandma DeLima, where would that

9    come from?

10   A    It comes with what's saved in the contacts list of the

11   phone, associated with the phone number from the database.

12   Q    Can you go now to page 11?  What is shown on page 11 at

13   the top?

14   A    The top of page 11, it shows that on October 8th, 2022,

15   at approximately 10:26 a.m., YouTube starts.

16   Q    Okay.  So there are more app usages that are shown on the

17   first quarter of page 11?

18   A    Yes.  And lock states.

19   Q    Okay.

20         MR. NAMMAR:  Can you zoom in on that message sent at

21   10:45 and 39 seconds?

22   BY MR. NAMMAR:

23   Q    What is this, Mr. Soeka?

24   A    This shows that a message on October 8th, 2022, at

25   approximately 10:45 a.m., was sent from DeLima to Grandma

1    DeLima, that says:  I put it outside.

2    Q    Okay.  Is this the last message that Mr. DeLima sent on

3    the day of October 8th and the morning of October 9th, 2022?

4    A    Yes.

5    Q    Okay.

6              MR. NAMMAR:  Can you zoom out?

7    BY MR. NAMMAR:

8    Q    And were there -- was there any indication on Mr. DeLima's

9    device that messages were deleted on the morning -- or on --

10   after this message on October 8th and the morning of

11   October 9th?

12   A    So these messages are stored within the SMS database and

13   we're able to go to the database itself and look at these

14   chronological numeric messages to basically look for gaps,

15   because it kind of up -- ends, like you would expect an Excel

16   spreadsheet to, except the row numbers don't really reset.

17             So if I was to send ten text messages and then delete

18   Messages 4, 5, and 6, the database would show 1, 2, 3, 7, 8, 9,

19   10.  So those messages would be removed.  I didn't see any

20   indication for that from these dates.

21   Q    And was there any -- when's the last lock that you see on

22   10-8-2022?

23   A    The last lock state that I see to the state of a lock is

24   on October 8th, 2022, at approximately 11:14 a.m.

25   Q    Okay.

1            MR. NAMMAR:  Can you zoom in on that one?

2    BY MR. NAMMAR:

3    Q    Is there any indication that after this point in time

4    there was any data deleted on Mr. DeLima's phone up until the

5    afternoon or so of October 9th?

6    A    I didn't see any indication of anything being deleted.

7    Q    And so this lock is at 11:14 a.m. on October 8th.

8         When is the next unlock?

9    A    The next unlock is on October 9th, at approximately

10   12:33 p.m.

11   Q    Okay.  And did you review a Honolulu police report about a

12   DeLima potential drug overdose in this case?

13   A    I did.

14   Q    And what does it say about the timing of when the police

15   responded to Mr. DeLima's residence?

16   A    I believe the police responded and arrived at

17   approximately 11:23 a.m. on October 9th.

18   Q    So this next unlock would happen after the police had

19   already arrived to Mr. DeLima's residence?

20   A    According to the report.

21   Q    Okay.

22            MR. NAMMAR:  If you could go to the next page, can

23   you zoom in on those three messages?

24   BY MR. NAMMAR:

25   Q    What's shown here, Mr. Soeka?

1  A    These are messages sent on October 8th, 2022, first one at

2  approximately 11:28 p.m., that's from Grandma DeLima to DeLima,

3  that says:  Just got home.  Going to crash -- with an emoji

4  that looks like a frowning face.

5  Q    And then?

6  A    And then the next one is a message sent at approximately

7  5:12 p.m. on the same day, from mom to DeLima, that says:  What

8  doing?

9  Q    Okay.

10  A    And then the final one is on October 9th, 2022, at

11  approximately 9:50 a.m. from Grandma DeLima to DeLima that

12  says:  Are you up?  With a kissing face emoji.

13  Q    Okay.  And you already talked about this, but was there

14  any response to any of these messages by Mr. DeLima?

15  A    No.

16  Q    And you mentioned before that the phone was in locked

17  state, correct?

18  A    Yes.

19  Q    Can a person use a phone in locked state?

20  A    You can, for example, send a message via Siri, but that

21  indicates entries into this database.  There's nothing like

22  that.  But the -- the vast majority of the functionality of the

23  device, phone, must be unlocked in order to access.

24          THE COURT:  Mr. Nammar, how close are you to being

25  done?  Because it's about time to break for lunch.

1              MR. NAMMAR:  I think I'm not close to being done,

2    Your Honor.

3              THE COURT:  You're not?

4              MR. NAMMAR:  No.

5              THE COURT:  Okay.  All right.  Let's go ahead and

6    break for our abbreviated lunch break now, ladies and

7    gentlemen.  So leave your notepads and iPads on the chair.  I

8    remind you not to discuss the case with each other or others or

9    do any research regarding it.

10             And I hope you have a pleasant lunch in the short

11   time frame.  All right?

12             I'm sorry?  Yeah, 20 to 30 minutes, just as

13   expeditiously as possible.  Thank you.

14             COURTROOM MANAGER:  All rise for the jury.

15             (The jury was excused at 12:08 p.m.)

16             (The court recessed at 12:09 p.m. until 12:43 p.m.)

17             (Open court in the presence of the jury.)

18             THE COURT:  All right.  Please be seated.

19             All right.  We are back with ladies and gentlemen of

20   the jury and counsel, Mr. McBraun.

21             Sir, I remind you, you're still under oath.

22             THE WITNESS:  Yes, Your Honor.

23             THE COURT:  And you may continue with your direct

24   examination, Mr. Nammar.

25             MR. NAMMAR:  Thank you.

1          If we could put the timeline, Exhibit 7, back up,

2   Your Honor?

3          THE COURT:  Yes.

4          MR. NAMMAR:  Page 12.

5          DIRECT EXAMINATION (Continued)

6   BY MR. NAMMAR:

7   Q    So before we broke for lunch, Mr. Soeka, we were talking

8   about the last messages there at the top, that were on

9   10/9/2022; is that right?

10  A    The one directly above the unlock, yes.

11  Q    Okay.  What is shown in the orange color after that?

12  A    So these -- orange, again, is indicative of information

13  that came from the McBraun phone extraction.  So these are

14  messages from that phone as well as one phone call.

15  Q    Okay.

16          MR. NAMMAR:  Can you zoom in now on 16:44 and 24

17  seconds.

18  BY MR. NAMMAR:

19  Q    What is shown here, Mr. Soeka?

20  A    This is a message sent on October 11th, 2022, at

21  approximately 4:44 p.m., from Cory to McBraun, that says:  My

22  homey wants whatever $200 is worth.

23  Q    And where did this text message come from?  What's the

24  source of it?

25  A    McBraun's phone.

1   Q    Okay.  And is there a response to this message that

2   appears right below it?

3   A    There is.

4   Q    And what is that response?

5   A    Is it going to be brought -- I can wait.

6   Q    Yes.  We'll bring it up.

7        Is this the response to that message right here?

8   A    It is.

9   Q    Okay.

10  A    So the response is on October 11th, 2022, at approximately

11  4:49 p.m.  It's from McBraun to Cory, that says:  Kalama

12  Valley.

13  Q    Okay.

14       MR. NAMMAR:  Can you zoom out now?  And can you zoom

15  in on the red that's shown there.

16  BY MR. NAMMAR:

17  Q    What's shown in red here?

18  A    This is a phone call on October 11th, 2022, at

19  approximately 8:57 p.m., from McBraun to Cory.

20  Q    And --

21  A    For a duration of 40 seconds.

22  Q    It says:  Knowledge C.  What does that mean?

23  A    Again, the -- it came from the Knowledge C database.

24  Q    And what is that database?

25  A    That database, again, is tracking pattern of life

1    artifacts, ranging from system information, like the power

2    on/power off, locks/unlocks, and also information related to

3    things such as phone conversations -- or phone calls or -- or

4    messages.

5    Q    Can you flip now in the binder in front of you --

6         MR. NAMMAR:  You can take that down.

7    Q    -- to Exhibit 41?

8         What is Exhibit 41?

9    A    It's an extraction report created using Cellebrite

10   Physical Analyzer that outlines message conversations between

11   Cory and McBraun.

12   BY MR. NAMMAR:

13   Q    And is it limited by date range?

14   A    It is.

15   Q    What date range?

16   A    So this is from October 7th, 2022, till October 11th,

17   2022.

18   Q    Did you prepare this report?

19   A    I did.

20   Q    And has it been altered in any way?

21   A    No.

22   Q    Are the messages that are shown here accurate?

23   A    They're accurate.

24        MR. NAMMAR:  Your Honor, I move to admit Government's

25   Exhibit 41.

1          MS. GLENDON:  No objection.

2          THE COURT:  All right.  41 is admitted.

3          (Government Exhibit 41 received in evidence.)

4          MR. NAMMAR:  Can we publish page 4 of that exhibit?

5          If you could zoom in on those messages.

6    BY MR. NAMMAR:

7    Q    What is shown here in blue and in green?

8    A    So these are both sides --

9          THE COURT:  I don't think the jury can read these, by

10   the way.

11         MR. NAMMAR:  Okay.

12         THE COURT:  If you zoom all of them, it doesn't zoom.

13         MR. NAMMAR:  Okay.  Let's just focus on the blue one.

14   First one.  Yep.  Perfect.

15         Thank you, Your Honor.

16         THE COURT:  All right.

17   BY MR. NAMMAR:

18   Q    What's shown here in blue?

19   A    So these bubbles are indicative of both sides of a

20   conversation.  So what's shown here in blue is a message from

21   Cory to McBraun, and it will show the content of the message

22   and then some information related to it.

23   Q    Okay.  So which number is associated with McBraun here?

24   A    It shows the 1(808)321-6787.

25   Q    Okay.  And there looks like there's a couple of different

1    times here.  The time in the bottom right, what is that?

2    A    That is the time that the message was delivered.

3    Q    Okay.  And --

4    A    And then the read time is the time that it was marked as

5    read within the device.

6    Q    Okay.  When does a message get marked as read in the

7    device?

8    A    So when it is opened or brought up, for example, you see

9    the little red 1, letting you know you have an unread message

10   within your text messages.  As soon as the system flags it as

11   read, that number disappears.  That's basically what's

12   happening.

13   Q    And what time are we looking at here?

14   A    This is October 7th, 2022, at 11:00 p.m. would be the

15   delivered.  And then the read time lists October 7th, 2022, at

16   approximately 11:28 p.m.

17   Q    Okay.  What is the response to this message --

18          MR. NAMMAR:  If you can bring that up, the next one,

19   green.

20   BY MR. NAMMAR:

21   Q    What is the response to that message?

22   A    This is from McBraun to Cory that says:  KK.

23   Q    And, again, what's the source of this particular message?

24   A    This message is from the SMS database, so the messaging

25   application of the device.

1    Q    Okay.  Can you go now to Exhibit 38 in the binder?

2              MR. NAMMAR:  You can take that down.

3    A    I'm there.

4    BY MR. NAMMAR:

5    Q    Do you recognize 38?

6    A    I do.

7    Q    And how are you able to recognize it?

8    A    It is a conversation report created using Physical

9    Analyzer, same as the previous, with chats between McBraun and

10   a contact with the name Anas.

11   Q    And did you create this conversation report?

12   A    I did.

13   Q    Okay.

14             MR. NAMMAR:  Your Honor, can we put up -- it's

15   already in evidence, 38.  Can we publish page 77 of this

16   report?

17             THE COURT:  Yes.

18             MR. NAMMAR:  And can you zoom in on the first

19   message.

20   BY MR. NAMMAR:

21   Q    What is shown here, Mr. Soeka?

22   A    This is a message from McBraun to Anas on September 18th,

23   2022, at approximately 9:58 p.m., that says:  What is your Cash

24   App?

25   Q    Okay.

1          MR. NAMMAR:  And can you zoom out?  And now zoom in

2     on the blue bubble.

3     BY MR. NAMMAR:

4     Q    And what is the response?

5     A    A response is from Anas to McBraun on September 18th,

6     2022, at approximately 9:59 p.m., that says:  Dollar sign,

7     Sajib Anas.

8     Q    Okay.  You talked a little bit about Cash App, but what is

9     Cash App?

10    A    It's a third-party application that can be downloaded for

11    the exchange of -- of funds, much like Venmo or PayPal.

12    Q    And how does one send money to another?  What do they need

13    to know?

14    A    User name information, just like with the other

15    applications.

16    Q    Okay.

17         MR. NAMMAR:  Can you now bring up page 146?

18         Can you start with the blue bubble.

19    BY MR. NAMMAR:

20    Q    What's shown here?

21    A    This is a message from Anas to McBraun, and it was sent on

22    October 5th, 2022, at approximately 9:20 p.m., the content of

23    which is:  What's your last name?

24         MR. NAMMAR:  Can you zoom out now?

25         And can you go to the bottom green bubble.

1    BY MR. NAMMAR:

2    Q    Is this a response from McBraun's phone?

3    A    Yes.

4    Q    And what is the response shown here?

5    A    From McBraun to Anas on October 5th, 2022, at

6    approximately 9:21 p.m., is the last name McBraun.

7    Q    Okay.  Exhibit 38 --

8         MR. NAMMAR:  You can take that down.

9    BY MR. NAMMAR:

10   Q    Exhibit 38 is just text messages, right?

11   A    Yes.

12   Q    Okay.  And it's text messages again between who and who?

13   A    These are between McBraun and Anas.

14   Q    Okay.  Did you look into whether there were particular

15   phone call -- phone calls between Anas and McBraun on the dates

16   of October 8th and October 9th, 2022?

17   A    I did.

18   Q    What did you find out?

19   A    I found that there were 12 calls between those two dates.

20   Q    Okay.  And do you recall how many on each particular --

21   was there some on October 8th and some on October 9th?

22   A    I believe there were two on October 8th, and the rest were

23   on the 9th.

24        MR. NAMMAR:  Your Honor, can we publish 32 at this

25   time, which is already in evidence?

```
 1              THE COURT:  Yes.

 2              MR. NAMMAR:  If we could just zoom in on the top

 3    portion.  Thank you.

 4    BY MR. NAMMAR:

 5    Q    What is Exhibit 32?

 6    A    Exhibit 32 appears to be a photograph of a phone

 7    displaying the Uber application, specifically a trip detail and

 8    receipt.

 9    Q    Did you find any evidence on Mr. McBraun's phone of this

10    same Uber trip?

11    A    I did.  The app in Focus associated with the date and time

12    does show the Uber client.

13    Q    Okay.  And can you now --

14              MR. NAMMAR:  Can we publish, Your Honor, 33, which is

15    also in evidence?

16              THE COURT:  Yes.

17    BY MR. NAMMAR:

18    Q    Same question here:  Did you find any evidence in

19    Mr. McBraun's phone of this particular Uber trip?

20    A    Yes.  Also focusing on October 7th, 2022, with a time of

21    6:41 p.m., I found app was in Focus, also the Uber client.

22    Q    Okay.

23              MR. NAMMAR:  Pass the witness, Your Honor.

24              THE COURT:  All right.  Cross.

25    ///
```

1                          CROSS-EXAMINATION

2    BY MS. GLENDON:

3    Q    Good afternoon.

4    A    Afternoon.

5    Q    I just have one question.  If a phone battery is dead, can

6    your program --

7               THE COURT:  Wait.  I'm sorry.  If a what is dead?

8               MS. GLENDON:  If your phone battery is dead.

9               THE COURT:  Oh, battery.  I didn't hear it.

10   BY MS. GLENDON:

11   Q    Can your program tell us that?

12   A    So I would have to look.  It does track battery percentage

13   life, yes.  There are databases that do track the percentages

14   of the phone's battery and also whether it is plugged in and

15   plugged -- unplugged.

16   Q    Un -- okay.  Did you give us that?

17   A    No.

18   Q    My question was if the phone battery is dead can your

19   program track that.

20   A    Yeah, it would show that it's -- it gets down to a zero

21   percent battery.  So, again, it's over battery life.

22   Q    Okay.  But we don't have it, right?

23   A    No.

24               MS. GLENDON:  Thank you.

25               THE COURT:  All right.  Mr. Nammar, anything else?

```
 1                MR. NAMMAR:  Nothing additional.
 2                THE COURT:  All right.  You may step down, sir.
 3    Thank you.
 4                THE WITNESS:  Thank you, Your Honor.
 5                                      (Witness excused.)
 6                THE COURT:  All right.  Next witness.
 7                MS. AFFINITO:  United States calls Yoshiyuki Kikuchi.
 8                COURTROOM MANAGER:  Please raise your right hand.
 9                YOSHIYUKI KIKUCHI, GOVERNMENT'S WITNESS, SWORN.
10                THE WITNESS:  Yes, I do.
11                COURTROOM MANAGER:  Please be seated.
12                State your name, spelling your first and last name
13    for the record.
14                THE COURT:  Sir, are you okay taking your facemask
15    off for your testimony?
16                THE WITNESS:  Thank you.
17                THE COURT:  Thank you.
18                THE WITNESS:  My name is Yoshiyuki Kikuchi;
19    Y-O-S-H-I-Y-U-K-I and K-I-K-U-C-H-I.
20                          DIRECT EXAMINATION
21    BY MS. AFFINITO:
22    Q    Mr. Kikuchi, where do you work?
23    A    I work at Honolulu Medical Examiner's office.
24    Q    And what is your title?
25    A    I'm a forensic pathologist.
```

1  Q    And would you please describe for the jury your

2  educational background?

3  A    Yes.  I earned my bachelor's degree from Colorado State

4  University and my medical degree from Des Moines University.

5  And after graduation, I completed four years of anatomic and

6  clinical pathology residency as well as one year of

7  cytopathology fellowship at Temple, Texas.

8        And then I completed one year of forensic pathology

9  fellowship at Tarrant County Medical Examiner's office in Fort

10 Worth, Texas.

11 Q    Would you please describe your employment history?

12 A    Yes.  And then I worked for New Orleans Forensic Center

13 for about six months; St. Tammany Parish Coroner's Office, in

14 Louisiana, for about one and a half years; then Galveston

15 County Medical Examiner's Office for about three years.

16       And currently, I'm working for Honolulu Medical Examiner's

17 Office, and it's been about four years.

18 Q    How long have you been a doctor?

19 A    It's been about 15 years.

20 Q    And how long have you worked as a forensic pathologist?

21 A    It's been about nine years.

22 Q    And have you received specialized training as a forensic

23 pathologist?

24 A    Yes.

25 Q    And what did that entail?

1          What type of specialized training did you receive?

2     A    I did the training at medical examiner's office.

3     Q    And I believe you mentioned a fellowship earlier; is that

4     correct?

5               THE COURT:  Wait.

6     A    Yes.

7               THE COURT:  You asked him what training he received,

8     and I thought he answered what training he gave.  So maybe you

9     can go back and clarify.

10              MS. AFFINITO:  Okay, yes.

11              THE COURT:  Maybe I misunderstood, but why don't you

12    clarify?

13    BY MS. AFFINITO:

14    Q    I'm asking what -- what training you've received as a

15    forensic pathologist.

16    A    I received forensic pathology fellowship at Tarrant County

17    Medical Examiner's Office.

18    Q    Okay.  And do you belong to any professional organizations

19    related to forensic pathology?

20    A    Yes.

21    Q    And what are those?

22    A    I belong to National Association of Medical Examiners and

23    American Association of Forensic Science.

24    Q    And are you board-certified?

25    A    Yes.

1  Q    And what are those certifications in?

2  A    I'm board-certified in anatomic and clinical pathology,

3  cytopathology, and forensic pathology.

4  Q    And how do you become board-certified?

5  A    You need to study and pass the board exam.

6  Q    And so did you take an exam for each of those three

7  certifications?

8  A    Yes.

9  Q    And explain for the jury, what is a forensic pathologist?

10 A    Basically, we perform postmortem examination.  It's an

11 autopsy and determining cause of death and manner of death.

12 Q    And what's the difference between cause and manner of

13 death?

14 A    Cause is to find out how -- what caused person to die.

15 And manner is how the person died.  We have five manners:

16 Natural, accident, suicide, homicide, and undetermined.

17 Q    And approximately how many autopsies have you performed in

18 your career?

19 A    Probably over a thousand autopsies.

20 Q    And have you previously testified in court and been

21 qualified as an expert witness in the field of forensic

22 pathology?

23 A    Yes.

24 Q    And about how many times is that?

25 A    About 20 times.

1          MS. AFFINITO:  Your Honor, the United States tenders

2   Dr. Yoshiyuki Kikuchi as an expert in the field of forensic

3   pathology.

4          MS. GLENDON:  No objection.

5          THE COURT:  All right.  I will permit testimony in

6   the field of forensic pathology.

7   BY MS. AFFINITO:

8   Q    Dr. Kikuchi, as part of your duties as a forensic

9   pathologist, did you perform a postmortem examination on Tyler

10  Orso-DeLima?

11  A    Yes.

12  Q    And how did you identify the decedent, Mr. DeLima, as the

13  person you were examining?

14  A    We identified by fingerprints.

15  Q    And did you generate a report as part of this examination?

16  A    Yes.

17  Q    Would you please take a look at Exhibit 13?

18         And you could you please flip through each of the pages?

19  A    (Complies.)

20  Q    Do you recognize this exhibit?

21  A    Yes.

22  Q    And what is it?

23  A    This is my autopsy report and autopsy report with

24  toxicology report.

25  Q    And does this document set forth your department's

1    activities?

2    A    Yes.

3    Q    And does your department have a legal duty to report the

4    information contained within this document?

5    A    Yes.

6    Q    Is this document a public document that any member of the

7    public may request from your office?

8    A    Yes.

9    Q    And how would a member of the public request this

10   document?

11   A    You can contact the medical examiner's office and there's

12   a five-dollar process fee.  And you can receive it.

13             MS. AFFINITO:  Your Honor, the government moves to

14   admit Exhibit 13 into evidence as a public record.

15             MS. GLENDON:  Your Honor, objection.

16             THE COURT:  All right.  Well, let's go to sidebar.

17             (Sidebar on the record.)

18             THE COURT:  All right.  What's the nature of the

19   objection?

20             MS. GLENDON:  My objection is that this is not the

21   full document.  As you can see from the document, it

22   does skip --

23             THE COURT:  I'm sorry.  You're going to have to speak

24   into the --

25             MS. GLENDON:  My objection is that it is not the full

1    document.  It does skip pages.  As you can see, it's got page 3

2    of five, page 5 of five.

3              MS. AFFINITO:  We swapped these out.  This is -- we

4    sent you the new one.

5              MS. GLENDON:  Does the new one have everything?

6              MS. AFFINITO:  Yeah, it has the -- yeah, it has the

7    pages.  That's why we sent you the updated one, because there

8    was a problem with the scanning.

9              MS. GLENDON:  Okay, understood.

10             So this is the document that I have received in my

11   binder?

12             MS. AFFINITO:  We -- that is the one we sent you,

13   though.  The new one that I sent you, I sent you --

14             THE COURT:  Do you have a copy of the exhibit you

15   want admitted in?

16             MS. AFFINITO:  Yes.

17             THE COURT:  Go get it and bring it here.  Show it to

18   her.

19             MS. AFFINITO:  Okay.

20             THE COURT:  And -- oh, do you have it right there?

21             MS. GLENDON:  Okay, thank you.

22             Sorry.  I was referencing what I had in my binder.

23             THE COURT:  Well, that's all I have too, which I

24   think is also not the whole thing.

25             MS. AFFINITO:  Are they not swapped off?

 1            THE COURT:  Well, I don't know what the whole thing
 2  is.  It starts on page 7.
 3            MS. AFFINITO:  That's the footnote, but that's also
 4  not the version she has.
 5            MS. GLENDON:  Okay.
 6            MR. NAMMAR:  I'm going to give you mine.
 7            MS. GLENDON:  Are you not planning to --
 8            THE COURT:  Okay, wait.  Wait, wait.  Hold on.
 9            You're going to have to get closer here.
10            MS. GLENDON:  Okay.
11            THE COURT:  No, no, that's okay.  He's going to get
12  me a copy but --
13            MS. GLENDON:  I'll wait until he comes back.
14            THE COURT:  Okay.
15            MR. NAMMAR:  (Hands document to the Court.)
16            MS. GLENDON:  I guess my question is, if you were
17  planning to admit any portion of the full case information,
18  which has the background information in the investigation.
19            MS. AFFINITO:  No, because this document is not a
20  public record, and it includes hearsay from a witness who will
21  not be testifying in this trial.
22            MS. GLENDON:  Understood.
23            Based upon what the government has represented and
24  the updated version of Exhibit 13, I don't have an objection.
25            THE COURT:  Okay.  So just to be clear -- because I

1    don't know what you were just referencing just now -- you don't

2    have an objection to what's been marked as Exhibit 13?

3              MS. GLENDON:  Yes.

4              THE COURT:  That you just looked at?

5              MS. GLENDON:  Correct.

6              THE COURT:  In that form?

7              MS. GLENDON:  Correct.

8              THE COURT:  Okay.

9              And that's what you just handed me?

10             MR. NAMMAR:  Yes, Your Honor.

11             THE COURT:  Okay.  All right.

12             (End of sidebar.)

13             THE COURT:  All right.  So after getting a little

14   clarity at sidebar, Ms. Glendon, you have no objection to the

15   Exhibit 13 as shown to you?

16             MS. GLENDON:  Yes.

17             THE COURT:  Okay.  Exhibit 13 then is admitted.

18             (Government Exhibit 13 received in evidence.)

19             MS. GLENDON:  If we could pull up Exhibit 13 and

20   publish for the jury?

21             THE COURT:  All right.

22   BY MS. AFFINITO:

23   Q    And could you please turn to page 2?

24        Dr. Kikuchi, is that your signature at the bottom right of

25   the page?

1   A    Yes.

2   Q    And did you author this report, the autopsy report?

3   A    Yes.

4   Q    And who is the decedent to which this report relates?

5   A    Decedent name?

6   Q    Yes.

7   A    It's -- it's Tyler Orso-DeLima.

8   Q    Before we get into the autopsy itself, would you please

9   walk the jury through the steps you take generally in

10  performing an autopsy?

11  A    Yes.  First, we do external examination.  We remove the

12  clothing and --

13          THE COURT:  Can you get a little closer to the

14  microphone?  Okay.

15  A    First, we remove the clothing and document whatever I see.

16  Could be injuries, natural disease, scars, tattoos, and

17  sometimes decomposition changes, I document that.

18          And then we do internal examination.  Basically, we cut

19  into the body, take out organs and examine each organ.

20          And we also collect body fluid, blood -- usually blood,

21  vitreous fluid, and urine.

22          And at the end of autopsy, we collect portions of major

23  organs, just in case that I need to -- I need to go back and

24  see the tissue later on.

25  BY MS. GLENDON:

1  Q    And do you consider any outside sources of information in

2  your analysis?

3  A    Yes.

4  Q    And what is that?

5  A    It's a toxicology, we send out body fluid.

6  Q    Okay.  Any other outside sources of information?

7  A    We -- I also receive a death investigation report.

8  Q    Okay.  Do you personally perform a toxicology analysis?

9  A    No.

10 Q    And where is that toxicology analysis performed?

11 A    We sent to NM -- NMS Forensic Lab.

12 Q    Do you have any expertise in toxicology?

13 A    No.

14 Q    So for a toxicological analysis, would you defer to a

15 toxicologist?

16 A    Yes.

17 Q    Did you take the steps you just described in performing

18 the autopsy of Mr. DeLima?

19 A    Yes.

20 Q    Okay.  Let's turn to page 3 of this document.

21      So there's a header here that says:  External Examination.

22 Do you see that?

23 A    Yes.

24 Q    What is this section under that header document?

25 A    It's preliminary examination.

1    Q    A pre --

2    A    Base --

3    Q    Sorry.  Go ahead.

4    A    Basically, we -- we -- the body comes with ID tag, and I

5    identify the body.

6    Q    Okay.  And if we turn to the next page, at the top here it

7    says "Evidence of Injury."  What does this section document?

8    A    It's if there are injuries, I document, summarize injuries

9    here.

10   Q    Okay.  And below that it says "Internal Examination."

11   What does that section document?

12   A    It documents each organ or system and my -- document my

13   findings.

14   Q    Okay.  And there are various subheadings here.  What do

15   those subheadings mean?

16   A    It means major systems.

17   Q    What type of systems?

18   A    Basically, like, I list like circulatory system,

19   cardiovascular system, respiratory system, each -- by each

20   system I describe what -- my findings.

21   Q    Okay.  And if we turn to page 6, it says "Microscopic

22   Examination."  What does that section document?

23   A    Some cases, I looked at tissue under the microscope.

24   Q    Was that done here?

25   A    No.

1    Q    And why not?

2    A    It was not indicated, so I didn't do microscopic

3    examination.

4    Q    Okay.  And you mentioned a toxicology report; is that

5    correct?

6    A    Yes.

7    Q    And if we turn to page 11 of this document, what is this

8    page?

9    A    This is the summary of a toxicology report.

10   Q    And --

11   A    Results.

12   Q    -- where is the -- who prepares this summary of the

13   toxicology report?

14   A    We have a lab staff, and they prepare this page.

15   Q    When you say "we," are you referring to your department?

16   A    Yes.

17   Q    Okay.  And -- okay.  Let's turn back to page 2 of

18   Exhibit 13.

19        Did you make any findings based on your examination of

20   Mr. DeLima?

21   A    Yes.

22   Q    There's a heading here that says the word "Findings."

23   A    Yes.

24   Q    Does that document those findings that you just

25   referenced?

1  A    Yes.

2  Q    And what were your findings?

3  A    It's -- this toxicology is per toxicology report.  I found

4  fentanyl toxicity.  And there was a reported medical history of

5  asthma, obesity, and polysubstance abuse.  But mainly this is

6  from this investigation report.

7       And from my autopsy, I found hypertensive cardiovascular

8  disease and morbid obesity, and I didn't find any trauma.

9  Q    Did you see any indication that asthma was the cause of

10 death for Mr. DeLima?

11 A    No.

12 Q    Did you see any indication that obesity was the cause of

13 death for Mr. DeLima?

14 A    No.

15 Q    What is hypertensive cardiovascular disease?

16 A    Basically, heart has to work so hard and heart get

17 enlarged.

18 Q    Did you see any indication that hypertensive

19 cardiovascular disease was a cause of death as to Mr. DeLima?

20 A    No.

21 Q    And you mentioned there was no evidence of trauma; is that

22 correct?

23 A    Correct.

24 Q    Did you see any indication that trauma was a cause of

25 death of Mr. DeLima?

1  A    No.

2  Q    Based on your examination, did you identify any natural

3  causes of death?

4  A    No.

5  Q    What is pulmonary edema?

6  A    Edema is basically fluid buildup in the lungs.

7  Q    Was there any evidence of pulmonary edema with Mr. DeLima?

8  A    Yes.

9  Q    And what condition or conditions is pulmonary edema

10 consistent with?

11 A    You can commonly see from drug overdose.

12 Q    And did you form an expert opinion as to Mr. DeLima's

13 cause of death?

14 A    Yes.

15 Q    And what was it?

16 A    It was fentanyl toxicity.

17 Q    And what was the basis of that opinion?

18 A    It's based on the toxicology report I received from

19 toxicology lab.

20 Q    Was it based on anything else that you did?

21 A    Also my autopsy findings in this investigation report.

22 Q    And did you form an expert opinion as to Mr. DeLima --

23 Mr. DeLima's manner of death?

24 A    Yes.

25 Q    And what was it?

1   A     It was an accident.

2   Q     And what was the basis of that opinion?

3   A     I -- I believe decedent was -- accidentally consumed drug.

4   Q     Okay.  Did you reach an opinion as to time of death?

5   A     No.

6   Q     Is time of death within your area of expertise?

7   A     No.

8   Q     Did you reach a conclusion as to Mr. DeLima's but-for

9   cause of death?

10  A     No.

11  Q     Is that a determination you typically make as part of the

12  autopsies you perform?

13  A     No.

14             MS. AFFINITO:  Pass the witness, Your Honor.

15             THE COURT:  Okay.

16             Cross?

17             MS. GLENDON:  Thank you.

18                         CROSS-EXAMINATION

19  BY MS. GLENDON:

20  Q     Good afternoon, Doctor.

21  A     Good afternoon.

22  Q     Okay.  The way I understand your testimony to be is that,

23  I mean, you did determine that fentanyl toxicity was a cause of

24  death, correct?

25  A     Yes.

1   Q    Okay.  And I do understand that you're not a toxicologist.

2   Is it -- are you able to answer that -- let's say Mr. Orso-

3   DeLima had last used fentanyl at 8:00 a.m. on Saturday,

4   October 7th, 2023.  Are you aware of whether or not fentanyl

5   would have been detectable in his blood that was drawn on

6   October 10th?

7   A    I don't know.

8   Q    Do you know what the half-life of fentanyl is?

9            MS. AFFINITO:  Objection, Your Honor.  Beyond the

10  scope of Mr. Kikuchi's expertise.

11           THE COURT:  Sustained.

12           MS. GLENDON:  We can move on.

13  BY MS. GLENDON:

14  Q    Okay.  If you know the answer to this, when one overdoses

15  on heroin, isn't it true that the overdose happens very close

16  in time to the use of heroin?

17           MS. AFFINITO:  Objection, Your Honor.  Again, beyond

18  the scope of his expertise.

19           THE COURT:  Sustained.

20  BY MS. GLENDON:

21  Q    How many autopsies have you performed on someone who has

22  overdosed from fentanyl?

23  A    Maybe 20 or 30.

24  Q    Now, in your experience and in performing these autopsies,

25  are you familiar with, I guess, the timeline for when an OD

1    could happen after someone uses fentanyl?

2    A    No.  I defer to a medical toxicologist for that question.

3    Q    Understood.

4         Now, when you got the toxicology report, you did notice

5    that there was morphine in Mr. Orso-DeLima's system, correct?

6    A    Yes.

7    Q    And this had been detected in -- by the lab based upon the

8    blood draw that had occurred on October 10th, 2022, correct?

9    A    Yes.

10   Q    When you saw that, what, if anything, did you think about

11   that?

12   A    It's not -- not a large amount.

13   Q    It would be -- and this is referring to the report -- 16

14   nanograms?

15   A    Yes.

16   Q    Okay.  And the fentanyl amount was 8.2 nanograms, correct?

17   A    Yes.

18   Q    So based upon just looking at the amount that you saw, the

19   16 nanograms, that is why you only attributed the death to

20   fentanyl?

21   A    You mean 8.2 nanogram?

22   Q    Let me ask the question one more time.

23        When you looked at the morphine -- and let's just be very

24   clear.  The morphine would be the breakdown of heroin, correct?

25   A    Yes.

1    Q    Okay.  When you looked at the morphine levels in the lab,

2    and the amount there, based upon the amount that you saw in the

3    labs, that's why you -- you said the death was caused by

4    fentanyl, and you didn't say that the death was caused by

5    heroin, correct?

6    A    Correct.

7    Q    But you didn't do any other investigation or anything else

8    beyond that, just looking at the labs?

9    A    Right.

10   Q    Based on looking at -- I'm sorry.  Just to be clear, based

11   upon your autopsy and what -- the tests that you performed, you

12   said you cannot pinpoint time of death, correct?

13   A    Correct.

14         MS. GLENDON:  No further questions for the doctor,

15   Your Honor.

16         THE COURT:  All right.  Anything?

17         MS. AFFINITO:  No redirect, Your Honor.

18         THE COURT:  All right.  You may step down, sir.

19         Thank you.

20         THE WITNESS:  Thank you.

21                                   (Witness excused.)

22         MR. NAMMAR:  United States calls Dolores DeLima.

23         COURTROOM MANAGER:  Please raise your right hand.

24         DOLORES DeLIMA, GOVERNMENT'S WITNESS, SWORN.

25         THE WITNESS:  Yes.

```
 1                COURTROOM MANAGER:  Please be seated.

 2                State your full name, spelling your first and last

 3   name for the record.

 4                THE WITNESS:  Dolores DeLima; D-O-L-O-R-E-S,

 5   D-E-L-I-M-A.

 6                THE COURT:  Ms. DeLima, maybe be about six inches

 7   from that microphone.

 8                THE WITNESS:  Oh, okay.

 9                THE COURT:  Not too close, but not too far away also.

10   Okay.  There's a sweet spot.  Thank you.

11                         DIRECT EXAMINATION

12   BY MR. NAMMAR:

13   Q    Good afternoon.

14        Can you tell the jury how old you are?

15   A    79.

16   Q    And can you tell the jury where you live?

17   A    My address?

18   Q    The area of town?

19   A    Okay.  Hawaii Kai.

20   Q    Okay.  Where in Hawaii Kai do you live near?

21   A    By Kaiser High School.

22   Q    Okay.

23                THE COURT:  That's -- yeah.

24   BY MR. NAMMAR:

25   Q    How far did you go in school?
```

```
 1   A   To business school.

 2   Q   Okay.  Where did you graduate from?

 3   A   Kailua High School.

 4   Q   And are you currently working?

 5   A   No.  I'm retired.

 6   Q   Okay.  When did you retire?

 7   A   Twenty years ago.

 8   Q   Okay.  What did you do before you retired?

 9       What did you do for work?

10   A   Oh, I was a computer operator.

11   Q   Okay.  Who was your employer?

12   A   Honolulu Advertiser.

13   Q   Are you married?

14   A   No.

15   Q   Any children?

16   A   Yes.

17   Q   How many?

18   A   Two.

19   Q   And where do your children live?

20   A   My son lives on Maui and my daughter lives here.

21   Q   How about grandchildren?

22   A   I have ten grandchildren and two great-grandchildren.

23   Q   Do you know a Tyler Orso-DeLima?

24   A   Yes.

25   Q   Okay.  How did you know Mr. DeLima?
```

1    A    He's my grandson.

2    Q    And did he pass away?

3    A    Yes.

4    Q    Okay.  Was that in October of 2022?

5    A    Yes.

6    Q    Okay.  How close were you with Tyler?

7    A    We were very close.  He was my oldest grandson.  He lived

8    with me.

9    Q    And what did you call Tyler?

10    A    Pono.

11    Q    How long did he live with you?

12    A    I think six years.  Well, I raised him.  Then he went away

13    to school.  Then he came back.  So the last six years he was

14    with me.

15    Q    Okay.  Where did he go to school?

16    A    Lahainaluna, on Maui.

17    Q    And where did he live when he went there?

18    A    With his father in Kahului.

19    Q    Okay.  Was he what's called a boarder?

20    A    Yes, he was a boarder at Lahainaluna.

21    Q    Tell the jury what that is.

22    A    Anybody outside of Lahainaluna can board at the school.

23    And it's a privilege to do it.  You have to go through

24    interviews and all.

25    Q    So he grew up on Oahu?

```
 1   A    Yes.

 2   Q    Went to Maui for high school?

 3   A    Yes.

 4   Q    And then he came back to Oahu?

 5   A    Yes.

 6   Q    And he lived with you?

 7   A    Yes.

 8   Q    What did he do for work?

 9   A    He was a security guard.

10   Q    For -- who did he work for?

11   A    Securitas.

12   Q    Okay.  Did he stop working there at some point?

13   A    Yes, he did.

14   Q    Okay.  And then where did he -- where was he working in

15   October of 2022?

16   A    He was doing that Door Dash.

17   Q    And can you tell the jury what that is?

18   A    They -- they -- they deliver food to people.  You go to

19   McDonald's, you pick up the food, and you deliver to the

20   people.

21   Q    Would you help him with that?

22   A    Yes, I helped him.  And he enjoyed that job.  Yes.

23   Q    Okay.

24   A    I was the driver.

25   Q    What do you mean by you were the driver?
```

 1   A    He doesn't drive.

 2   Q    Okay.

 3   A    He didn't have a license.

 4   Q    Okay.  So you would drive him to deliver the food?

 5   A    Yes.

 6   Q    And who would get out of the car and deliver the food?

 7   A    And it -- beg your pardon?

 8   Q    Who would get out of the car and deliver the food?

 9   A    He would.

10   Q    Okay.  What kind of car did you drive?

11   A    I have a Nissan Road [verbatim].

12   Q    Okay.  Was that the only car at your house?

13   A    Yes.

14   Q    Okay.  Did you know that Tyler's phone would occasionally

15   or sometimes connect to your car, the Nissan Rogue?

16   A    Yes.

17   Q    How did you know that?

18   A    'Cause he connected all the phones to my car.

19   Q    Okay.  Was Tyler allowed to drive the Nissan Rogue without

20   you?

21   A    No.

22   Q    Why not?

23   A    'Cause he didn't have his license.

24   Q    Okay.  Would he ever drive the Nissan Rogue without your

25   permission?

1   A    No.  No.

2   Q    Did Tyler ever take the bus?

3   A    No.

4   Q    Why not?

5   A    He didn't like the bus.  He didn't want to stand over

6   there.

7   Q    What did Tyler do when he wasn't working?

8   A    Well, he had the game, the Game Boy, he would play in his

9   room.

10  Q    Okay.  Did he have a guitar?

11  A    And -- yes, and he had a guitar.

12  Q    Okay.  Have you heard of the term homebody?  Homebody?

13  A    Yes.

14  Q    Would you use that term to describe Tyler?

15          MS. GLENDON:  Objection, leading.

16          THE COURT:  Sustained.

17  BY MR. NAMMAR:

18  Q    Did Tyler spend a lot of time at home?

19  A    Yes.

20  Q    Okay.  What would he do when he was at home?

21  A    Play his music or the Game Boy.

22  Q    Okay.  Did you know that Tyler used drugs?

23  A    Yes.

24  Q    What did you know about that?

25  A    What do you mean?

1  Q    What drugs did you think he used?

2  A    Oh, marijuana.

3  Q    And why did you think he used marijuana?

4  A    'Cause he told me.

5  Q    Okay.  Were you ever with him when he purchased marijuana?

6  A    Yes.

7  Q    Why were you with him?

8  A    'Cause I was the driver to take him to where he had to get

9  it.

10  Q    Okay.  So you would drive him to where --

11  A    Yes.

12  Q    -- you thought he was getting marijuana?

13  A    Yes.

14  Q    How often would you do that?

15  A    Maybe three times a week.

16  Q    Okay.  And where would he get the money to buy the

17  marijuana?

18  A    Well, he was working.  Then I would help him.

19  Q    Okay.  Would you drive him -- well, would you do anything

20  to make sure it was marijuana?

21  A    Yeah, he -- well, I would ask him.  He would show me.

22  Q    He would show you the substance?

23  A    Every time he picked up, he would show me.

24  Q    And did it look like marijuana --

25  A    Yeah.

1   Q    -- to you?

2   A    It -- yeah.  Yes.

3   Q    Did you ever see him use the marijuana?

4   A    Yeah, he showed me how it's used.

5   Q    What did he show you?

6   A    Well, the one you smoke around.  I don't know, he had a

7   tube or whatever.

8   Q    A tube.  Okay.

9   A    Mm-hmm.

10  Q    Did you know whether he used any other drugs besides --

11  A    No.

12  Q    -- marijuana?

13  A    No.  No.

14  Q    You didn't know that?

15  A    No.

16  Q    Okay.

17         MR. NAMMAR:  Your Honor, can we publish Exhibit 24?

18         THE COURT:  24, yes.

19  BY MR. NAMMAR:

20  Q    You mentioned a tube.  Does this look familiar to you,

21  this item that I circled in the middle there?

22  A    Yeah.  I -- something like that, yes.

23  Q    Okay.  You can't say for certain that's the one?

24  A    No.

25  Q    Okay.  How would you see him smoke it?

1    A    Oh, he would bring it -- he -- he would show me.

2    Q    Okay.  What would he show you?

3    A    He could come out and say, "Grandma, this is what it is,"

4    you know, "what I'm doing."

5    Q    Okay.

6    A    You know.

7    Q    And what would you see?

8    A    I would just -- it's hard.  I don't know.  He had it

9    around.  All I saw was using that thing.  Yeah.  Smoking it

10   around.  Or doing something.  I don't know.

11   Q    Did you know about Tyler's health?

12   A    About his health?

13   Q    Yes.

14   A    Yes.

15   Q    Was he generally healthy?

16   A    He had asthma.

17   Q    Okay.  Did he see a doctor about his asthma?

18   A    Yes.

19   Q    Okay.  Was his asthma under control?

20   A    Yes.

21   Q    There is a binder in front of you.  Can you flip to

22   Exhibit 8?  Ms. Honda will help you.

23        Do you recognize what's in 8?

24   A    Yes.

25   Q    What is it?

 1   A    Pono's picture.

 2   Q    And did that, how he looked -- is that how he looked

 3   before he died?

 4   A    Yes.

 5          MR. NAMMAR:  Your Honor, can we -- we would move to

 6   admit Exhibit 8.

 7          MS. GLENDON:  I do object.  Relevance.

 8          THE COURT:  What is the relevance of this photo?

 9          MR. NAMMAR:  As to what the -- as to what the person

10   looks like?

11          THE COURT:  Yeah.

12          MR. NAMMAR:  Okay.  I mean --

13          THE COURT:  Sustained objection.

14          MR. NAMMAR:  All right.

15   BY MR. NAMMAR:

16   Q    So you mentioned that your grandson died.  Do you remember

17   what day that was?

18   A    It was on a Sunday.

19   Q    And what month?

20   A    October 9th.

21   Q    Okay.  I want to back up a couple days earlier, to

22   October 7th.  Do you remember what you were doing on that day?

23   A    I had my class reunion that night, that day.

24   Q    Okay.

25   A    Or that weekend.

1  Q    Was that an all-weekend event?

2  A    Yes.

3  Q    What did it entail?  What did the -- what -- was it

4  multiple events?

5  A    Well, I only went for two, two nights.

6  Q    Okay.

7  A    I mean two days.  Yeah.

8  Q    And what reunion was it?

9  A    Oh, Kailua High School 60th class reunion.

10  Q    Okay.  And what nights did you attend?

11  A    Friday and Saturday.

12  Q    Did you do anything in the morning on Saturday related to

13  that event?

14  A    Yes.  I went to help decorate, yeah.

15  Q    Okay.  On Friday night, do you remember what event you

16  went to for your reunion?

17  A    It -- it's called a stag night.

18  Q    Okay.  And what did you all do on the stag night?

19  A    Just get reacquainted with everybody there.

20  Q    Okay.  After that event, did you see Tyler?

21  A    Yes.

22  Q    And what did you all do, if anything?

23  A    Came home and he told me:  Grandma, I have to go get

24  something.  And his friend Cody, Cory, knows the person, and we

25  had to go to pick him up.

1   Q    Okay.

2   A    At his house.

3   Q    What did you think he wanted to get?

4   A    Well, I assume marijuana.

5   Q    Okay.  And you said his friend.  You said Cody, Cory.  Was

6   that his name?

7   A    Well, Cory.  Cory.  Cody.

8   Q    You thought his name was Cory?

9   A    That's -- Cory.

10  Q    Okay.  Did you agree to help him?

11  A    I -- I really didn't want to, but he asked me, so I said

12  okay.

13          THE COURT:  Ma'am, your voice is dropping off a

14  little bit.  So just get --

15          THE WITNESS:  I'm -- I'm sorry.

16          THE COURT:  That's okay.  That's all right.  Just get

17  a little closer to that microphone.  Okay.

18  A    We picked up Cory because he said Cory knows the person.

19  BY MR. NAMMAR:

20  Q    Okay.

21  A    He knew where to go.

22  Q    Okay.  Did you drive?

23  A    I drove.

24  Q    Why did you drive?

25  A    'Cause I'm the -- he don't have any other way to go.

1  Q    Okay.  And where did you drive?

2  A    I drove to Liliha to go pick up Cory.  Then we had to come

3  all the way back to Hawaii Kai.  Then he told me where to go.

4  All I know, it's Kalama Valley.

5  Q    Okay.

6  A    I don't know where we went.  It was pitch dark.  It was

7  like 12:00 o'clock.  It was midnight.

8  Q    Okay.

9  A    And Cory told me where to turn, turn, and whatever and

10 stop.

11 Q    And this is on October 7th?

12 A    Yes.

13 Q    Okay.  So let's take it one step at a time.  What car did

14 you drive?

15 A    My Nissan.

16 Q    Okay.  And who was with you at the beginning --

17 A    Pono.

18 Q    -- before you pick up Cory?

19 A    Pono.

20 Q    Okay.  And where did you all go?

21 A    You mean where did Pono and I go?

22 Q    First.

23 A    To -- to Cory's house.

24 Q    And where was that?

25 A    He lives in Liliha.

1   Q    Okay.  Where in Liliha?

2   A    The end of the road of Liliha Street.

3   Q    Okay.

4           MR. NAMMAR:  Your Honor, may we publish 16?

5           THE COURT:  Yes.

6   BY MR. NAMMAR:

7   Q    Ms. DeLima, 16's on the screen.

8   A    Mm-hmm.

9   Q    Do you recognize this map?

10  A    Okay.  Yeah, well, I see the areas, yeah.  I'm looking for

11  the place.

12  Q    Do you see the area where you picked up Cory?

13  A    Yes.

14  Q    Okay.  Can you circle it on the map?

15  A    Oh, with this (indicates)?

16          THE COURT:  Yes.

17  BY MR. NAMMAR:

18  Q    Yes.

19  A    Oh, okay.  It's over here (indicates).

20          MR. NAMMAR:  Okay.  For the record, she's circling an

21  area near Hawaii Street and Liliha Street.

22  BY MR. NAMMAR:

23  Q    Had you seen Cory before?

24  A    No.

25  Q    Okay.  Did you know his last name?

1   A    No.

2   Q    How would you describe what Cory looks like?

3   A    He was a tall, skinny haole boy with long hair.

4   Q    Okay.  What happened after you picked up Cory?

5   A    Then Cory told me where to go.

6   Q    Okay.  And where did you all go?

7   A    Back to Hawaii Kai and into Kalama Valley.

8   Q    And where in Kalama Valley did you go?

9   A    Oh, shucks.  I -- I really don't -- all I did was drive.

10  Q    Okay.

11  A    We drove all the way in, and Cory told me when to turn

12  right.  I -- I know I turned right.  That's all I know.

13  Q    Okay.

14  A    Because it was pitch dark and I didn't know where I was

15  going.

16  Q    So would you say it's in the front or the back of Kalama

17  Valley?

18  A    It's way inside.

19  Q    Way in the back?

20  A    Yeah.  I drove quite far before I even turned right.

21  Q    And at some point Cory told you to turn right?

22  A    He told me turn right, turn right, then stop.

23  Q    And did you give anything to Cory at that point?

24  A    I gave to Pono money.

25  Q    Okay.

1   A     And he gave it to Cory.

2   Q     How much money?

3   A     $60.

4   Q     Okay.  And what happened after the $60 was given to Cory?

5   A     Then Cory got out and went to -- I don't know what house

6   he went to.  But he went to a house in the back of us, in the

7   back of the car.

8   Q     How long was he gone for?

9   A     Oh, maybe five, ten minutes.

10  Q     Did Cory eventually come back?

11  A     He came back.

12  Q     And what, if anything, did you observe when he came back?

13  A     Then he said, okay, start driving, and he gave the thing

14  to Pono.

15  Q     What did you see him give --

16  A     He -- I -- I didn't see.  All I saw was his hand going to

17  Pono like -- I -- I didn't see anything.

18  Q     You saw an exchange?

19  A     Ye -- well, yes, yes.

20  Q     Okay.

21  A     He gave something to Pono.

22  Q     Okay.  Where did you all go after that?

23  A     Then I had to take him all the way back to Liliha and drop

24  him off at his house.

25  Q     Okay.  When you dropped Cory off at his house, did Tyler

1    stay in the car?

2    A    Yes.

3    Q    Okay.  And then after dropping Cory off at his house,

4    where did you all go?

5    A    We came home.

6    Q    And what happened then?

7    A    Then we went in the house, then he went to sleep and I

8    went -- and then -- and I went to sleep, and we were talking

9    about my class reunion the next day, before he went to sleep.

10   Q    Okay.  So that was Friday, October 7th.  You mentioned it

11   was almost midnight?

12   A    It was midnight.

13   Q    Okay.  When was it midnight?

14   A    When we were going to the house.  Well, I guess by the

15   time I got home.  But it -- well, no, it was going to -- to

16   Kalama Valley.

17   Q    Okay.  So that was Friday.

18   A    Friday.

19   Q    I want to now go a little bit earlier in time.

20        So earlier that same week do you recall a time when you

21   took Pono to get what you thought was marijuana?

22   A    Yeah, maybe Monday or Tuesday.

23   Q    Okay.

24   A    Yeah.

25   Q    Why did you think it was -- you were taking him to get

1    marijuana?

2    A    'Cause it was the same person he was getting for it -- I

3    mean, he was going to this guy quite often.

4    Q    Okay.  And where did you all go?

5    A    Well, wherever the guy would meet us.

6    Q    Okay.  And how would -- on this particular occasion on

7    Monday or Tuesday, where did -- was there money exchanged?

8    A    Yes.

9    Q    Okay.  Did you provide any money for that transaction?

10   A    I don't think -- no.  No.

11   Q    Okay.  What time of the day was that one?

12   A    Oh, like about 10:00 o'clock or so, 10:00, 11:00.

13   Q    In the morning or the evening?

14   A    In the morning.

15   Q    Okay.  So Friday, you told us you picked up Cory, went to

16   Kalama Valley and went back to Liliha Street to take Cory home?

17   A    Mm-hmm.

18   Q    And then went back home, right?

19   A    Yes.

20   Q    And it was around midnight when you got home?

21   A    Yes.

22   Q    The next morning, Saturday, what did you do?

23   A    I got up, then Pono got up.  We had breakfast.  Then he

24   said -- then I told him I was going to help decorate.  So I

25   went to go to --

1    Q    Where did you go?

2    A    Waimanalo.

3    Q    Okay.  And did Pono go with you or did he stay home?

4    A    No, he stayed home.

5    Q    Okay.  How long were you gone?

6    A    Oh, maybe two, three hours.

7    Q    Okay.  And around when did you get home?

8    A    Oh, let me see, about 12:00.  Or before 12:00, I think.

9    Q    Okay.

10   A    Yeah.

11          MR. NAMMAR:  Your Honor, can I publish Exhibit 7 at

12   this time?

13          THE COURT:  All right.

14          MR. NAMMAR:  Can we go to page 10.

15          And can you zoom in on that message.

16   BY MR. NAMMAR:

17   Q    Can you see that message, Ms. DeLima?

18   A    Oh, yes, yes.  Yes.

19   Q    It's from Grandma DeLima to DeLima.  It says:  Take out

20   your dirty clothes.  Do you recognize that message?

21   A    Yes, yes.

22   Q    Did you send that message?

23   A    Yes.

24   Q    Okay.  Where were you, if you recall, when you sent that

25   message?

1   A    I may be in my bedroom.

2   Q    Okay.  This is before you helped decorate?

3   A    Yes.

4   Q    Okay.

5        MR. NAMMAR:  Can you go to the next page of 7.  Can

6   you zoom in on that message.

7   BY MR. NAMMAR:

8   Q    This message has a timestamp of 10:45 a.m.

9   A    Okay, yeah.

10  Q    It's from DeLima to Grandma DeLima.  It says:  I put it

11  outside.

12       Do you remember receiving this message?

13  A    Yes.

14  Q    Okay.  What was he talking about here?

15  A    His clothes.

16  Q    Okay.  Do you remember him putting them outside?

17  A    Yes.

18  Q    Okay.  Can you go to the next page?

19  A    Oh, shucks.

20       MR. NAMMAR:  And can you zoom in on the top message.

21  BY MR. NAMMAR:

22  Q    This message has a timestamp of 12:28 --

23  A    Oh, okay.

24  Q    -- on October 8.

25  A    Mm-hmm.

```
 1   Q    And it's from Grandma DeLima to DeLima.  It says:  Just
 2   got home.  Going to crash.
 3   A    Yeah.
 4   Q    Do you recognize this message?
 5   A    Yes.  Yes.
 6   Q    Did you send this message?
 7   A    Yes.
 8   Q    When did you send it?
 9   A    When I got home I was going to crash.
10   Q    As in sleep?
11   A    Yeah.
12   Q    And got home from what?
13   A    From my reunion.
14   Q    And did you go to bed when you got home?
15   A    Okay.  7, 8.  Yes, I did.
16   Q    Okay.  And this is when you got home from decorating?
17   A    Yes.
18             THE COURT:  Can you clarify if you're talking
19   12:28 a.m. or p.m.?
20             THE WITNESS:  Yeah, it's --
21             MR. NAMMAR:  Yeah.
22   BY MR. NAMMAR:
23   Q    12:28 p.m.?
24   A    That's not decorating.  That's -- that's the reunion.
25   Q    Okay.
```

1  A    Saturday.  Right?  This is Saturday.

2  Q    This is Saturday?

3  A    Yes.  That's the reunion.

4  Q    Okay.  So this is just after noon, 28 minutes after

5  lunchtime?

6  A    Mm-hmm.

7  Q    On October 8th?

8  A    Oh, okay.  Yeah.

9  Q    Where do you think you had just gotten home from?

10  A    28?  Oh, this is from decorating.

11  Q    Okay.

12  A    Yeah.

13  Q    Because, I think, did you go decorating in the morning?

14  A    Yes, in the morning.

15  Q    Got it.

16  A    I'm sorry.

17  Q    And then later in the day, did you go back out for your

18  reunion?

19  A    In the evening, I went.

20  Q    Okay.  What time did you leave to go to your reunion?

21  A    Oh, maybe 5:00, 4:00 or 5:00.

22  Q    And before you went, did you talk to Tyler at all?

23  A    Yes, I did.  Yeah.

24  Q    Okay.  Tell us what happened.

25  A    He came out and just told me:  Grandma, have a nice time.

1    Be careful in driving.  And I'll see you tomorrow -- meaning

2    that he was going to go sleep.

3    Q    Okay.

4    A    Yeah.  When I got home.

5    Q    Did you drive -- then drive yourself around?

6    A    Yes.  Yes, I did.

7    Q    Okay.  What time did you return home from your reunion?

8    A    Maybe about 11:30.

9    Q    At night?

10   A    Yes.

11   Q    And this is on October 8th?

12   A    Yes.

13   Q    Okay.  What, if anything, did you do when you came home at

14   11:30 at night on October 8th?

15   A    I just came home.  I went by his room.  I could hear him

16   snoring.  So I said, okay, he's fine.  He's sleeping.

17   Q    Did you notice whether his light was on or off?

18   A    Just his -- his light was on.  But he -- he sleeps with

19   his light on anyway.

20   Q    Okay.  So take us now to Sunday, the next day.

21        Do you remember when you woke up?

22   A    Yes, I -- well, yeah, I got up.  We were supposed to go

23   out that day, around ten o'clock.  So I just waited for him.

24   And when he didn't come to the room at ten o'clock, I said

25   something is wrong.  I tried to call him.  He didn't answer the

1    phone.  So I went to his room and I knocked on the door.  He

2    didn't answer.  Then I opened the door.

3    Q    Okay.  Before we get to that --

4    A    Yeah.

5              MR. NAMMAR:  -- if you could zoom -- zoom out and

6    then zoom in on this message, 10/9 -- yeah, that one.

7    BY MR. NAMMAR:

8    Q    This is a message on 10/9?

9    A    Well, yes.

10   Q    At 9:50 a.m.?

11   A    Yeah.

12   Q    It's -- it states it's from Grandma --

13   A    Yes.

14   Q    -- DeLima to DeLima:  Are you up?

15        Do you recognize this message?

16   A    Yes, yes.  I --

17   Q    Did you send this message?

18   A    Yeah.

19   Q    Okay.  Did you get any response?

20   A    No, I didn't.

21   Q    Okay.  So then, when you didn't get any response -- well,

22   what did you two have planned to do that day?

23   A    Well, it really -- well, he worked for Door Dash, where he

24   delivers.  So that's the time we go out every day so that he

25   can do his work.

1    Q    Okay.  So this message was sent at 9:50 a.m.?

2    A    Mm-hmm.

3    Q    Do you recall waking up several hours before this, around

4    6:00 or 5:00 a.m., at all?

5    A    Yeah.  I could have.  Yes.

6    Q    Okay.  Did you -- did you -- do you recall going by

7    Tyler's room?

8    A    I think I did get up and went by his room, just to see how

9    he was.

10            THE COURT:  Okay.  I can't hear you again.  I'm

11    sorry.

12            THE WITNESS:  Oh, I'm sorry.

13            THE COURT:  You can pull that mic closer to you.

14            THE WITNESS:  Okay.

15    A    I think I went to his room to find out, I mean to just see

16    how he was.

17    BY MR. NAMMAR:

18    Q    Around what time was that?

19    A    Oh, like about 6:00 or -- 6:00 or so.

20    Q    Okay.  Do you recall seeing whether his light was on or

21    off?

22    A    The -- the light was on.

23    Q    The light was on?

24    A    Yeah.

25    Q    Okay.  Do you remember --

```
 1              MS. GLENDON:  I'm sorry.  I'm having a hard time
 2   hearing.
 3              THE COURT:  Yeah.  Just speak up a little bit or turn
 4   that mic up, Renee.
 5              THE WITNESS:  Yes.
 6   BY MR. NAMMAR:
 7   Q    You said the light was on?
 8   A    Yes.
 9   Q    Okay.  Do you remember giving a statement to the police on
10   the day that you found Tyler's body?
11   A    Yes.
12   Q    Okay.  Tell us about your mental state on that day.
13   A    It wasn't a good day 'cause I was -- I found him.  And
14   everybody was asking me questions.  The detective, this guy,
15   they were all asking me.
16   Q    Okay.
17   A    And I just --
18   Q    And so do you recall that the detective asked you if you
19   went out around the house -- out of the room and checked to see
20   whether Pono's light was on around 6:00 a.m.?
21   A    You know, he was asking me so many that -- I -- I
22   honestly, you know, I -- I know the light was on.
23   Q    Okay.
24              MS. GLENDON:  I'm so sorry.  I cannot make out if
25   it's "on" or "off."
```

1              THE COURT:  On.

2    A    I know the light was on.

3              MS. GLENDON:  Thank you.

4    BY MR. NAMMAR:

5    Q    Okay.  And you've had time to reflect on that and you're

6    sure that the light was on?

7    A    Yes.

8    Q    Okay.  So you sent this text message that's up here at

9    9:50 a.m.  You don't get a response.  You told us you went in

10   the room?

11   A    Then I went to his room to see how come he wasn't

12   answering.

13   Q    Okay.  What did you see?

14   A    He was laying on the ground.  And it seems that he was

15   going to eat 'cause he had his chicken nuggets there and his

16   drink there.

17   Q    Did you try to touch him?

18   A    I -- I did.  I wanted to hug him.

19   Q    Could you feel his body temperature?

20   A    He was cold.

21   Q    And when you felt that he was cold, what did you do?

22   A    I called one of the family members.  They told me to call

23   911.  So that's what I did.

24   Q    Okay.  Was he breathing when you touched him?

25   A    I -- I don't know.  I don't know.

1   Q    So the day that you went to your reunion, Saturday, you

2   told us that you went to decorate in the morning?

3   A    Yes.

4   Q    Okay.  And then you told us that you went to an event in

5   the evening?

6   A    Yes.

7   Q    So you were gone for some of that day?

8   A    Yes.

9   Q    Do you -- do you think Pono left the house when you were

10  gone?

11  A    No.

12         MS. GLENDON:  Objection, speculation.

13         THE COURT:  Sustained.  No, sustain the objection.

14  I'll strike the answer.

15  BY MR. NAMMAR:

16  Q    What was Pono's normal routine if he was going to leave

17  the house?

18         MS. GLENDON:  Objection, vague in terms of timeline.

19         MR. NAMMAR:  Okay.

20  BY MR. NAMMAR:

21  Q    On -- in October of 2022, what was Pono's normal routine

22  when he would leave the house?

23  A    October 2022?

24  Q    So -- so he lived with you, right?

25  A    He -- he wouldn't leave the house.  He always asked.

1    I'm -- I'm the one that did everything for him.  If he had to

2    go to -- go someplace, I would take him there.

3    Q    Okay.  So he never left the house without you?

4    A    He -- he -- no.  And he's not going to walk down to the

5    bus stop.

6    Q    Why not?

7    A    'Cause he don't want the bus stop.  He will not take the

8    bus.

9    Q    Okay.  So when you talked about him being at Securitas

10   when he would work, who would take him to work?

11   A    I would take him to work and the papa would pick him up

12   and bring him home.

13   Q    Okay.  And if he was ever going to go anywhere with a

14   family member, would he communicate that to you?

15   A    Beg your pardon?

16   Q    If he -- if Tyler was ever going to go anywhere with a

17   family member, would he communicate to you --

18   A    Yes.

19   Q    -- about his whereabouts?

20   A    Yes.

21            MR. NAMMAR:  Pass the witness, Your Honor.

22            THE COURT:  All right.  Cross.

23            MS. GLENDON:  Thank you.

24   ///

25   ///

1                        CROSS-EXAMINATION

2    BY MS. GLENDON:

3    Q    Okay.  Good afternoon, Mrs. DeLima.

4         Hi.  My name is Crystal Glendon.  I'm Matthew McBraun's

5    attorney.

6         I understand that being here is very difficult for you.

7    And before we get started, may I say I truly am sorry for your

8    loss.

9         I will be asking you questions about your grandson's

10   death.  Is it all right if I call him Pono?

11   A    Yes.

12   Q    Okay.  You may have already answered some of these

13   questions with Mr. Nammar, but please bear with me.  And if you

14   have any need to take a break anytime, just please let me know.

15        Would Tyler -- I'm sorry -- Pono sometimes take your car

16   without your permission?

17   A    No.

18   Q    Okay.  Not even like the time that you --

19   A    No.

20   Q    I'm so sorry.  If you could let me finish the question.

21        Our court reporter has to take our answers down one at a

22   time.

23   A    Sorry.

24   Q    Not even anytime that, you know, he might have taken it if

25   you were maybe napping or something?

 1  A    No.

 2  Q    Okay.  The keys, though, you have the keys, what, just

 3  hanging by the front door or something?

 4  A    No.

 5  Q    Where's the keys?

 6  A    In my bag.

 7  Q    Okay.  I want to talk about driving him on October 7th.

 8       So when you drove Pono to Liliha that Friday night, you

 9  had to come all the way from Hawaii Kai, right?

10  A    Yes.

11  Q    Okay.  And you went to go pick up Cory Germain?

12  A    Beg your pardon?

13  Q    You went to pick up Cory?  I'll speak into the mic.

14  A    Yes.

15  Q    Okay.  Okay, so when you folks drive back to Kalama

16  Valley, Cory is the one who's telling you where to go, right?

17  A    Yes.

18  Q    And he's the only one when you folks got to Kalama Valley

19  who got out of the car, right?

20  A    Yes.

21  Q    And I think you had said that he was behind your car?

22  A    Yes.

23  Q    And it's dark?

24  A    Yeah.

25  Q    It -- it was dark, right?

1  A    Yes.

2  Q    So you cannot really see what's happening, right?

3  A    I didn't even look back there.

4  Q    So you don't see who he's talking to.  You don't see

5  anybody else?

6  A    No.

7  Q    Okay.  And you and Pono stayed in the car the whole time?

8  A    Yes.

9  Q    Okay.  So you didn't see anything about what happened

10 outside, right?

11 A    No.

12 Q    Okay.  You had mentioned, when you spoke with Mr. Nammar,

13 that when Cory did -- he was outside of the car for maybe five

14 to ten minutes, right?

15 A    Yes.

16 Q    And when he got back into the car, you saw him hand

17 something over to Pono?

18 A    Yes.

19 Q    Was Cory sitting in the back or the front?

20 A    Back.

21 Q    And Pono was sitting in the front?

22 A    Yes.

23 Q    Just to be clear, he's -- Pono is front passenger?

24 A    Yes.

25 Q    And Cory is sitting back passenger?

1    A    Yes.

2    Q    Do you recall testifying at a prior hearing?  Where you

3    had to come down to --

4    A    Oh, to do that other one?

5    Q    Yes.

6    A    Yes.

7    Q    Okay.  And do you recall being asked similar questions

8    about -- oh, actually, let me ask you this.

9         You had told Mr. Nammar that you saw Cory give Pono

10   something, right?

11   A    Yes.

12   Q    Could you see exactly what it was?

13   A    No.

14   Q    You do recall testifying at a prior hearing, correct?

15   A    Yes.

16   Q    Okay.  And at that prior hearing, you were asked

17   questions, correct?

18   A    Yes.

19   Q    You were placed under oath (indicates)?

20   A    Yes.

21   Q    And you promised to tell the truth, the whole truth, and

22   nothing but the truth?

23   A    Yes.

24   Q    Okay.  And when you were asked that same question, the

25   question:  Did you see him, Cory, give Pono anything when he

1    got back in the car, your response was different; it was:  I

2    wasn't really paying attention?

3    A    Mm.  Well, I was under a lot of strain.  You know, all

4    these questions are coming to me.

5    Q    I understand.  But at that prior hearing where you

6    testified under oath --

7    A    I -- I did.

8    Q    -- you said, "I really wasn't paying attention," and "you

9    know."

10   A    No.

11   Q    That was your answer.

12   A    Well, I didn't pay attention to what they were doing, but

13   I saw the hand come over to give it to Pono.  But I wasn't

14   paying attention to what it was.

15   Q    But you didn't say that at the prior hearing, right?

16   A    No, I did.

17            THE COURT:  If you want her to -- you've got to show

18   her the testimony if you want --

19            MS. GLENDON:  Sure.

20            THE COURT:  -- her to answer that question.

21   BY MS. GLENDON:

22   Q    Would looking at your prior testimony refresh your

23   recollection as to what --

24            THE COURT:  No, it's not refreshing.

25   A    I can't --

1          THE COURT:  It's just -- stop, stop.  Wait, wait,

2    wait.

3          If you want to impeach her with it, you've got to

4    show it to her so she has an opportunity to look at it.

5          MS. GLENDON:  Okay.

6          THE COURT:  Okay?

7          MS. GLENDON:  May I approach, Your Honor?

8          THE COURT:  Yes.  Yes.

9          And do you have an exhibit number or something that

10   I --

11         MS. GLENDON:  Defense 2.

12         THE COURT:  I'm sorry?

13         MS. GLENDON:  Defense 2.

14         THE COURT:  Two, okay.

15         And a particular page number just so I might

16   reference?

17         MS. GLENDON:  This will be page 11, lines 17 through

18   20.

19         THE COURT:  All right.  Thank you.

20         THE WITNESS:  (Reviews document.)  This is true.

21         THE COURT:  Okay.

22   BY MS. GLENDON:

23   Q    Isn't it true that at that prior hearing when you were

24   asked did you see him give Pono anything when he got back in

25   the car, your only response was:  I really wasn't paying

1  attention, you know.  I just wanted to get out of there because

2  it was dark?

3  A    Well, that is true.

4  Q    Okay.  Thank you.

5        Okay.  So let's move over to Saturday.  Saturday, you said

6  you left the house early to go decorate for your class reunion,

7  right?

8  A    Yes.

9  Q    Okay.  Okay, so let's get back to after you've come home.

10  You crashed out.  You took a nap?

11  A    Yes.

12  Q    Okay.  And then at some point in time you go for the

13  evening portion of your class reunion, right?

14  A    Yes.

15  Q    Okay.  Isn't it true that you left the house at about 3:30

16  or 4:00 p.m.?

17  A    Yes.

18  Q    And you did interact with Pono, right?  You talked to him?

19  A    Yes.

20  Q    You folks made your plans for the next morning?

21  A    Yes.

22  Q    Okay.  What time had you and Pono eaten breakfast that

23  morning?

24  A    I don't remember.

25  Q    Okay.  So do you remember what time you left the house to

1    go to Waimanalo?

2    A    Well, it was about nine o'clock.

3    Q    Okay.  So you would have eaten breakfast before that?

4    A    I could have, yes.

5    Q    Around eight o'clock?

6    A    Could have been, yes.

7    Q    Would it have been earlier?

8    A    I -- I don't -- I didn't look at the time.

9    Q    I understand.

10        Did you eat breakfast like right before you left the

11   house?

12   A    Oh, about half an hour before.

13   Q    Okay.  So about 8:30?

14   A    Yeah.

15   Q    Okay.  So when you got home that night it was around

16   11:30, close to midnight, right?

17   A    Yes.

18   Q    Okay.  And when you got home, you went by Pono's room?

19   A    Yes.

20   Q    Do you have to pass his room to get to yours?

21   A    No.  He -- his bedroom is down the hallway and mine is on

22   the other side.

23   Q    So you walked past his room?

24   A    I -- I did.  I always do, to just check if he's okay.

25   Q    You heard him snoring?

1  A    Yes.

2  Q    Okay.  And the lights were off?

3  A    The lights were on.

4  Q    Okay.  Now, when you talked to that police officer -- I'm

5  going to just --

6  A    Yeah.

7  Q    -- go to a different day.  On October 9th, the next day,

8  Sunday, you recall talking to a police officer, right?  Or

9  several of them, right?

10 A    Yes.

11 Q    There was one police officer who you talked to and he

12 recorded your conversation --

13 A    Yes.

14 Q    -- right?

15 A    Yes.

16 Q    Do you remember that conversation?

17 A    I don't really, but I -- I remember him, talking to him.

18 Q    And, of course, this is right after everything is

19 happening, correct?

20      It is while things are a little fresh in your mind 'cause

21 it's just happened, right?

22 A    Well, everybody was asking me questions at that time.

23 Q    I understand.

24 A    You know.

25 Q    When you talked to this police officer, isn't it true that

1   you told him that when you went to check on Pono that night,

2   around midnight, you did hear him snoring?

3   A    Snore, yes.

4   Q    Okay.  And you indicated to the officer that the lights

5   were off?

6   A    Yes, see, I don't --

7   Q    Could you have?

8   A    I don't know.  I can't answer you that.

9   Q    So it's possible the lights were off?

10  A    No, I think the lights were on.

11  Q    You think so.  Do you recall telling the officer that

12  the --

13  A    Yes.  'Cause from the hallway I could see the lights were

14  on.

15  Q    Do you recall telling the officer that the lights were

16  off?

17  A    I don't remember, actually.  Everything was going on that

18  day.  I don't -- you know, everybody asking me questions.

19  Q    I know.

20  A    And I'm in shock, you know.

21  Q    I understand that it was a hard day, Mrs. DeLima.

22       Let me just try to get through these questions.

23       When you talked to the officer that day -- well, I'm

24  sorry.  Let me back it up.  Let me withdraw that question.

25       Let's talk about what happened later.

1          So you got up Sunday morning around 5:00 a.m., correct?

2     A    Yes.

3     Q    Okay.  Like to use the bathroom or something?

4     A    I always get up that time.

5     Q    All right.  I do too.

6          So you got up.  Went outside your room?

7     A    Mm-hmm.  Yes.

8     Q    And at that point in time when you went outside your room,

9     did you go past Pono's room?

10    A    No.

11    Q    When you got up, did you leave your room?

12    A    When I what?

13    Q    When you got up at 5:00 a.m. that morning, did you leave

14    your room?

15    A    No.

16    Q    So you stayed in your room the whole time?

17    A    Yes.

18    Q    Okay.  After you got up at 5:00 a.m., did you go back to

19    sleep?

20    A    No.

21    Q    You stayed up?  And this is Sunday.

22    A    I watched TV.

23    Q    This is Sunday, yeah?

24    A    Yes.

25    Q    Okay.

1      Okay, and it's not until around 10:00 or so that you start

2   texting him, right?

3   A    Yes.

4   Q    So from 5:00 to 10:00 a.m. you stay in your room?

5   A    Yes.

6   Q    So where are you folks supposed to go?

7   A    To work.  He was supposed to go to work.

8   Q    The Door Dash?

9   A    Door Dash.

10  Q    Okay.  So when you go back -- when you go to his room,

11  it's now around 11:00 o'clock, right?

12  A    Well, I went about a little after 10:00, 'cause we were

13  supposed to leave at 10:00.

14  Q    Okay.  So you're supposed to leave at 10:00.  So you go to

15  his room at 10:00 is what you're saying?

16  A    Well, after 10:00.

17  Q    Okay.  And that's when you went -- you saw that the lights

18  were on, right?

19  A    Yes.

20  Q    Okay.  Now, you remember talking to that officer the day

21  before?

22  A    I talked to a lot of people.  But yes.

23  Q    The -- the only one I'm talking about is the one --

24  A    You're talking about the detective?  He's a detective or

25  officer.  I don't know, see.

1    Q    The one that recorded you?

2    A    Yes.

3    Q    Okay.  So that's the only one that I'm talking about.

4    A    Okay.

5    Q    Okay.  Now, when you talked to that officer or detective

6    the day before and he recorded your statement, you told him

7    that when you went -- well, isn't it true that you told him

8    when you went to check on Pono, around 11:00, you noticed the

9    light was on and that's not normal?

10   A    Yeah, well, yes, I guess so, yeah.  It's not normal.

11   Q    For the light to be on?

12   A    Yes.

13   Q    Because he usually had his lights off?

14   A    Well, at that time I would think so, yes.

15   Q    To you, it looked like he had been up and ready to leave

16   when you got to his room at about 11:00, correct?

17   A    No.

18   Q    Well, he had the chicken nuggets and he had his drink,

19   right?

20   A    Yes.

21   Q    Okay.  And the light was on, correct?

22   A    I -- I guess so, yes.

23   Q    And this is just at 11:00, correct?

24   A    Yes.

25   Q    And that's what you told the officer the day before --

1   A    Yeah.

2   Q    -- that to you it looked like he had been up and ready to

3   leave?

4   A    No, ready to eat.

5   Q    Oh, ready to eat.  Got it.

6   A    Eat.

7   Q    Okay.  So Pono has lived with you for the past six

8   years --

9   A    Yes.

10  Q    -- right?

11       And how old is he?  Well, how old would he have been last

12  year?  I'm so sorry.

13  A    27.

14  Q    So from the time he was 21 to 27 he lived with you?

15  A    Yes.

16  Q    And just the two of you in that house?

17  A    Yes.

18  Q    Okay.  Over the years, would he have friends that came

19  over to the house?

20  A    Yes.

21  Q    They don't sleep over, though.

22  A    No.

23  Q    But he can have --

24  A    Yes.

25  Q    He can have guests come over, right?

1  A    Yes.

2  Q    Okay.  Did you know most of his friends?

3  A    Yes.

4  Q    Would he sometimes have people come over to the house when

5  you leave the house?

6  A    No, 'cause he's always with me.

7        I mean when I go out, he's with me.  If I go shopping, he

8  goes with me.

9  Q    But he stays home a lot, too, right?

10 A    Well, when I come home, yes, he's home.

11 Q    When you go out sometimes, are you going out without him?

12 A    There are a few times, yes.

13 Q    So in the times that you go out without him, he just stays

14 home, right?

15 A    Yes.

16 Q    Okay.  Are you aware of whether or not, like, friends

17 would come over to the house when --

18 A    Yes.

19 Q    Hold on.  Let me just finish the question.

20 A    Sorry.

21 Q    Are you aware of whether friends would come over to the

22 house when you're out and he's home?

23 A    Yes.

24 Q    So friends would come over sometimes?

25 A    Yes.  Yes.

1   Q    And you weren't home, correct?

2   A    Yes.

3   Q    Okay.  Now, on October 8th, 2022, you left about -- you

4   left the house about 3:30, 4:00 o'clock to go to your reunion

5   out in Waimanalo, right?

6   A    Yes.

7   Q    Okay.

8   A    Yeah.

9   Q    And you don't get home until 11:30, midnight, about eight

10  hours later?

11  A    Well, less than that, yes.

12  Q    Okay.

13  A    Yeah.

14  Q    Your math is better than mine.

15       Now, Pono, he kept some stuff from you, yeah?  Like he

16  told you he only smoked marijuana, right?

17  A    Well, yes.

18  Q    He even showed you his straw and his -- his metal straw

19  and his foil?

20  A    Yes.

21  Q    And how he would go back and forth on the straw -- he

22  showed you how he would smoke it?

23  A    Yes.

24  Q    And he's only referring to the marijuana, right?

25  A    Yes.

1    Q    And sometimes he would smoke that marijuana in front of

2    you?

3    A    No.

4    Q    But he would smoke it in your house?

5    A    Well, yes.

6    Q    In his room?

7    A    Yes.

8    Q    Could you smell it?

9    A    No.

10   Q    Do you know what marijuana smells like?

11   A    No.  Really.

12   Q    Now, you knew that his friends, the boys that he would

13   hang out with, they all smoked marijuana too?

14   A    I don't know.

15   Q    Do you recall telling the officer that you spoke with on

16   Saturday --

17   A    Yes.

18   Q    -- October 8th, that his friends, the boys, they all smoke

19   marijuana?

20   A    Oh, well, I guess so, yes.

21   Q    That's what you told the officer, right?

22   A    Yes.

23   Q    Okay.  But you didn't think that they did the heavy stuff.

24   A    No.

25   Q    And by "heavy stuff" you mean something like fentanyl,

1  correct?

2  A    Yes.

3  Q    But you don't really know, right?

4  A    No.

5  Q    The same way that you didn't know that Pono was doing

6  heavy stuff too.

7  A    No.

8  Q    Now, you have taken Pono on other occasions to buy what

9  you thought was marijuana, right?

10  A    Yes.

11  Q    Okay.  You said that he would show it to you, you would

12  make him show it to you?

13  A    Yes.

14  Q    You know what marijuana looks like?

15  A    Well, vaguely, yes.  Well, I know what the plant looks

16  like.

17  Q    I'm sorry.  You know what the plant?

18  A    The plant looks like, yes.

19  Q    What about the things he would get?

20  A    No.

21  Q    So you don't know what marijuana in, like, the drug form

22  looks like?

23  A    No.

24  Q    You said you would take him about three times a week?

25  A    Yes.

1    Q    How many times would you say you've taken him to go and

2    buy some kind of drug over the course of the last month?

3         Or, I'm sorry, the month before.  Sorry.

4    A    I was -- I don't know.  I don't count.  You know.

5    Q    But it's every week?

6    A    Well --

7         (Simultaneous speaking.)

8    Q    About three times a week?

9         MS. GLENDON:  Sorry.  We just have to talk one at a

10   time.

11        THE WITNESS:  Oh.

12   BY MS. GLENDON:

13   Q    So it's every week three times a week?

14   A    Yes.

15   Q    For how long, like the time that he was living with you?

16   A    Yes.

17   Q    You said you would make him show you what he buys when you

18   would take him on these other -- other --

19   A    Yes.

20   Q    -- buys for drugs?  Yes?

21   A    Yes.

22   Q    Okay.

23        On October 7th, the evening that Cory Germain was in your

24   car, did you make Pono show you anything?

25   A    No.

1          MS. GLENDON:  Nothing further.

2          THE COURT:  All right.  Redirect.

3                    REDIRECT EXAMINATION

4    BY MR. NAMMAR:

5    Q    Mrs. DeLima, when you came home from the reunion, are you

6    confident that Pono's light was on in his room?

7    A    Yes.

8    Q    And when you woke up the next morning and found him in his

9    room unresponsive, are you confident that his light was on?

10   A    Yes.

11   Q    Okay.  And are you also confident about what you saw in

12   Kalama Valley, whether you saw an exchange or not?

13   A    Yes.

14   Q    You're confident about that?

15   A    The exchange?

16   Q    Yes.

17   A    Yeah.

18          MR. NAMMAR:  Nothing further.

19          THE COURT:  All right.  Anything?

20          MS. GLENDON:  May we have a sidebar?  My apologies.

21          (Sidebar on the record.)

22          MS. GLENDON:  I would like to impeach her with the

23   recording.  The problem is I don't have a transcript of the

24   recording.  This is the recording that was turned over by the

25   government to me, I believe it was like about October 3rd, so

1    it was in the cache of items.

2            THE COURT:  But she's admitted --

3            MR. NAMMAR:  She's already -- yeah, she's already --

4            THE COURT:  She's admitted to all of that.

5            MR. NAMMAR:  Yeah.  She's --

6            MS. GLENDON:  This would be the response --

7            THE COURT:  I know, but she still admitted to it.

8            MS. GLENDON:  That's fine.

9            THE COURT:  Okay.

10           (End of sidebar.)

11           THE COURT:  All right.  Anything further then?

12           MS. GLENDON:  Actually, I'm sorry, Your Honor.

13           THE COURT:  No?

14           MS. GLENDON:  I do not have any further questions.

15           THE COURT:  Okay.  All right.

16           MS. GLENDON:  Thank you so much, Mrs. DeLima.

17           THE COURT:  All right.

18           Mrs. DeLima, you may step down, ma'am.  Thank you.

19                                    (Witness excused.)

20           THE COURT:  All right.  Shall we call it a day,

21   Mr. Nammar?

22           MR. NAMMAR:  If that's all right with Your Honor, we

23   don't have any other witnesses.

24           THE COURT:  Okay.  All right.  Yeah, it's 2:15, so

25   even if we had another witness, we'd call it a day.  So we will

1    end for the day.

2            Ladies and gentlemen, I want to thank you for your

3    attention.  I want to remind you, do not do any research

4    regarding the case, talk to anyone about it, or be exposed to

5    anything regarding the case.  And we'll do a repeat tomorrow,

6    okay?  So the same time, the same place.  All right?

7            Thank you all.  Have a very pleasant evening.

8            COURTROOM MANAGER:  All rise for the jury.

9            (The jury was excused at 2:16 p.m.)

10           (Open court out of the presence of the jury.)

11           THE COURT:  All right.  The jury has departed.

12           You may be seated.

13           So on the witness list, which witnesses are off now

14   based on the stipulation?  Just so I can --

15           MS. AFFINITO:  That would be Melisa Glatte.

16           THE COURT:  Right.

17           MS. AFFINITO:  Alexander Ambriz, Kevin Eckert, and

18   James Joseph.

19           THE COURT:  All right.  And then do you intend to

20   call the other witnesses, or are there any witnesses that

21   you're not going to call?

22           MS. AFFINITO:  There are certain witnesses that we --

23   we're not going to call.  We are not calling Alfred Prado.

24           THE COURT:  Okay, use the microphone.  No one's using

25   the microphone in this room.

1          MS. AFFINITO:  Sorry.  We are not calling Alfred

2     Prado.  We are not calling Michael Stineman.  We are not

3     calling Nickolas --

4          THE COURT:  Okay, hold on a second.  Let me find --

5     Michael Stineman, what number was he?

6          MS. AFFINITO:  Number 3.

7          THE COURT:  Oh.  Okay.  Go ahead.

8          MS. AFFINITO:  So Number 2, Number 3.

9          THE COURT:  Right.

10          MS. AFFINITO:  We're not calling Number 5, Nickolas

11     Agricola.

12          THE COURT:  Okay.

13          MS. AFFINITO:  And then the four chemists that I just

14     named, which are 9 through 12.

15          THE COURT:  Right.

16          MS. AFFINITO:  We are not calling Anna Foley.

17          THE COURT:  Okay.

18          MS. AFFINITO:  We are obviously not calling Cory

19     Germain.  And a determination as to Jared Lee has not yet been

20     made.

21          THE COURT:  Okay.  So you have one, two, three

22     witnesses left?

23          MS. AFFINITO:  Yes, Your Honor.  But we have been in

24     discussions with the defense counsel about whether they would

25     stipulate to the testimony of Jennifer Swatek, who is a

1    forensic toxicologist who examined the blood -- blood levels of

2    Mr. Orso-DeLima.  She's not available until Tuesday, though.

3              THE COURT:  Okay.

4              MS. AFFINITO:  So if she testifies, it will have to

5    be next week.

6              THE COURT:  Okay.  So we're going to be done early

7    tomorrow.

8              MS. AFFINITO:  We believe so.  Possibly.  Yes.

9    Depends -- so we have two expert witnesses tomorrow who may

10    take an extended period of time.  One of them is the medical

11    toxicologist.  I have a lot of questions for her.  I imagine

12    defense counsel will as well.  So she'll take a while.

13              THE COURT:  Okay.

14              MS. AFFINITO:  And then we have Ryan Faulkner, who I

15    don't know how long that will take.  It depends.  But we

16    probably will be done early.

17              THE COURT:  Is Ryan Faulkner the drug expert?

18              MS. AFFINITO:  Yes, Your Honor.

19              THE COURT:  Okay.  Okay.

20              All right.  So I think what I want you to be prepared

21    to do is start to discuss jury instructions then, tomorrow

22    after we're done. 'Cause I think we'll be done in even -- if

23    we're not done till afternoon, you know, we'll get started on

24    those.  And then we'll have a discussion to the extent you can

25    answer questions, Ms. Glendon, about what you think your case

```
 1   may look like.  Because it's possible we'll go into closing
 2   pretty shortly after we get back on Tuesday.  On Tuesday,
 3   right?
 4             MS. AFFINITO:  Yes, Your Honor.
 5             THE COURT:  Looks likes that could happen.
 6             MS. GLENDON:  Yes.
 7             THE COURT:  Okay.  All right.  I did want to ask you
 8   about the admission of the defendant's statements in relation
 9   to conversations, whether it be text or on the phone with, for
10   instance, Mr. Germain and whether you want a limiting
11   instruction or you don't think that's necessary.
12             And if you want to think about that, that's fine,
13   but --
14             MS. GLENDON:  If I could just think about it, think
15   about it.  I mean, it --
16             THE COURT:  Or we can do an instruction at the end,
17   if you prefer that, with the instructions.
18             MS. GLENDON:  Okay.  I --
19             THE COURT:  At this stage, that might make more sense
20   if you want it, because the jury's already heard it.
21             MS. GLENDON:  Yes.  If I could just think about that,
22   Your Honor.
23             THE COURT:  All right.  If you want it, though,
24   submit something for me to give as part of the closing
25   instructions.
```

1              MS. GLENDON:  Will do.

2              THE COURT:  Okay?  All right.

3              MS. AFFINITO:  For clarification, would that -- would

4    that instruction be specific to particular messages?

5              THE COURT:  I think we have to -- well, not

6    particular messages.  I mean, particular people, like

7    conversations.  When the defendant is conversing with somebody

8    else --

9              MS. AFFINITO:  Right, but --

10             THE COURT:  -- what that somebody else says, that

11   only comes in for context, not for the truth of the matter

12   asserted.

13             MS. AFFINITO:  Well, so I think it would maybe depend

14   on what the other person is saying.  If it were a statement

15   against penal interest as to an unavailable witness, I think it

16   would come in.

17             THE COURT:  Well -- okay.  So it would be

18   Mr. Germain's?

19             MS. AFFINITO:  Yes, if he's discussing a drug

20   transaction, that's not -- that would not be hearsay -- that

21   would be permissible.  So I -- it would really depend on the

22   specific communications.

23             MS. GLENDON:  That's why I have to look at it all.

24             THE COURT:  Okay.

25             MS. GLENDON:  Because some of it kind of goes into my

1  defense too.  So --

2          THE COURT:  Okay.

3          MS. GLENDON:  -- I'd like the opportunity --

4          THE COURT:  Okay.

5          MS. GLENDON:  -- just to --

6          THE COURT:  Okay.  All right.  So we'll continue that

7  discussion then.  Okay?

8          Anything else then?

9          MS. AFFINITO:  No, Your Honor.

10          MS. GLENDON:  No, Your Honor.  Thank you.

11          THE COURT:  Okay.  Have a nice evening.

12          MS. GLENDON:  You too.

13          (Whereupon, at 2:22 p.m., the jury trial proceedings

14  adjourned.)

15

16

17

18

19

20

21

22

23

24

25

```
 1              COURT REPORTER CERTIFICATE

 2         I, Ann B. Matsumoto, Official Court Reporter, United

 3   States District Court, District of Hawaii, do hereby certify

 4   that pursuant to 28 U.S.C. Sec. 753 the foregoing is a

 5   complete, true, and correct transcript of the stenographically

 6   recorded proceedings held in the above-entitled matter and that

 7   the transcript page format is in conformance with the

 8   regulations of the Judicial Conference of the United States.

 9         DATED at Honolulu, Hawaii, February 15, 2025.

10

11

12
                        /s/ Ann B. Matsumoto
13                      ANN B. MATSUMOTO, RPR

14

15

16

17

18

19

20

21

22

23

24

25
```